```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                      :
TREVOR MURRAY,                                        :
                                                      :
                                    Plaintiff,        :      14 Civ. 927 (KPF)
                                                      :
                        v.                            :      OPINION AND ORDER
                                                      :
UBS SECURITIES, LLC and UBS AG,                       :
                                                      :
                                    Defendants.       :
                                                      :
------------------------------------------------------X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 24, 2015

KATHERINE POLK FAILLA, District Judge:

On February 13, 2014, Plaintiff Trevor Murray filed this action against Defendants UBS Securities, LLC ("UBS Securities"), and UBS AG ("UBS") (collectively, "Defendants") under 18 U.S.C. § 1514A(a), the anti-retaliation provision of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ("Sarbanes-Oxley"), and 12 U.S.C. § 5567(a), the anti-retaliation provision of Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 123 Stat. 1376 ("Dodd-Frank"), commonly known as the Consumer Financial Protection Act (the "CFPA").  Plaintiff alleges that Defendants violated the anti-retaliation provisions of both statutes in terminating his employment after Plaintiff made certain protected statements. Defendants have moved to dismiss both claims for impermissible claim-splitting, based upon a prior action filed in this Court alleging retaliation under Dodd-Frank; in the alternative, to dismiss the CFPA claims for failure to state a claim; and to stay any remaining portion of the action due to pending

arbitration on the Dodd-Frank claim.  For the reasons set forth in this Opinion, Defendants' motion to dismiss is granted, but only with regard to the CFPA claim, and their request to stay the remaining Sarbanes-Oxley claim is denied.

## BACKGROUND[1]

### A.  Factual Background

#### 1.  Plaintiff's Employment with UBS Securities

Plaintiff was first employed by UBS Securities, a broker-dealer registered with the United States Securities and Exchange Commission (the "SEC"), from approximately May 2007 to September 2009, at which time Plaintiff was laid off.  (Am. Compl. ¶ 10).[2]  Thereafter, in early 2011, UBS Securities solicited Plaintiff to return to work for the company.  (*Id.* at ¶ 13).  In or around May 2011, Plaintiff rejoined UBS Securities as a Senior Commercial Mortgage-Backed Security ("CMBS") Strategist and Executive Director.  (*Id.* at ¶ 14).  In that position, Plaintiff performed research and created reports "that were distributed to Defendants' current and potential clients about CMBS products, services and transactions, including, without limitation, CMBS products, services and transactions regulated by the [SEC] and/or the [Consumer Financial Protection Bureau (the 'CFPB')], and CMBS products in which UBS Securities held trading positions."  (*Id.* at ¶ 2).

---

[1]  The facts contained in this Opinion are drawn from Plaintiff's Amended Complaint ("Am. Compl.") (Dkt. #25) and, where noted, the Court's prior opinions in the related case of *Murray* v. *UBS Securities, LLC et al.*, No. 12 Civ. 5914 (KPF).  For convenience, the parties' memoranda of law are cited as "Def. Br.," "Pl. Opp.," and "Def. Reply."

[2]  UBS Securities is a wholly-owned subsidiary of UBS, a Swiss corporation that conducts business and has offices in New York.  (Am. Compl. ¶¶ 8-9).

### 2. Plaintiff's Agreements to Arbitrate with Defendants

As discussed in the Court's Opinion and Order of January 27, 2014, in the related action, when Plaintiff rejoined UBS Securities he signed a formal offer letter and a U-4 form, both of which obligated him to arbitrate any disputes arising out of his employment except where prohibited by applicable law. *See Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 285093, at *1-2 (S.D.N.Y. Jan. 27, 2014) ("*Murray I*"). As the Court determined in that Opinion, the anti-arbitration clause of Sarbanes-Oxley's anti-retaliation provision did not cover the Dodd-Frank claim at issue there. *Id.* at *7-11. The Court did not discuss 12 U.S.C. § 5567(d)(2), which provides: "Except as provided under paragraph (3) [concerning collective bargaining agreements], and notwithstanding any other provision of law, no predispute arbitration agreement shall be valid or enforceable to the extent that it requires arbitration of a dispute arising under [the CFPA's anti-retaliation provision]."

### 3. The Termination of Plaintiff's Employment

According to Plaintiff, during his second stint with UBS Securities, senior personnel involved in CMBS trading and commercial mortgage origination made a "concerted effort" to influence Plaintiff "to skew his research to appear more favorable to UBS Securities' CMBS products and trading positions." (Am. Compl. ¶ 2). Plaintiff details a series of interactions with individuals responsible for CMBS trading, during which those individuals instructed Plaintiff "to help 'improve conditions in the CMBS market'"; "to inform the head CMBS trader about his research ideas prior to publication"; "not to publish

3

anything negative" about certain bonds recently purchased by the trading desk; and "not to publish anything negative about the hotel sector because of UBS Securities' exposure." (*Id.* at ¶¶ 18-20). Plaintiff "believed that he was being pressured to produce ostensibly objective research reports about its securities products that were ... false or misleading, and intended to favor UBS Securities' products and trading positions." (*Id.* at ¶ 23). He further claimed that he felt pressure to produce "reports about consumer financial products or services that were intended to be unfair, deceptive and/or abusive, to participate in offering or providing to consumers financial products or services that did not conform with Federal consumer financial law, and/or to engage ... in acts that violated Federal consumer financial law." (*Id.* at ¶ 24).

According to Plaintiff, despite this pressure "he did not publish any report that was inconsistent with his own research" (Am. Compl. ¶ 20), and he "repeatedly told his superiors at UBS Securities" about these encounters (*id.* at ¶ 22). Specifically, from in or around December 2011 to January 2012, Plaintiff told his manager about the negative responses he had received to his research, including criticisms that Plaintiff's published articles were "'too bearish' and 'off message' with the strategy of the trading desk and overall commercial mortgage group." (*Id.*). Plaintiff also alleged that in or around January 2012, he informed a Managing Director of UBS Securities that the head of CMBS trading and commercial mortgage originations had excluded him from meetings and "only interacted with Plaintiff to criticize his research and attempt to manipulate his reports." (*Id.*).

4

On February 6, 2012, UBS Securities advised Plaintiff that he was being terminated. (Am. Compl. ¶ 27). In the Amended Complaint, Plaintiff notes his "impeccable record," and claims that his termination was motivated, at least in part, by Plaintiff informing his superiors about the attempts by others at UBS Securities to skew Plaintiff's published research. (*Id.* at ¶¶ 29, 33, 40). Plaintiff claims that his termination thus violated the anti-retaliation provisions of Sarbanes-Oxley and the CFPA.

**B.    Procedural Background**

On August 2, 2012, Plaintiff filed suit in the Southern District of New York alleging termination in violation of Dodd-Frank, and on the same day filed complaints with the United States Department of Labor (the "DoL") alleging termination in violation of Sarbanes-Oxley and the CFPA. The latter statutes' anti-retaliation provisions require that complaints first be filed with the Secretary of Labor, but allow complainants to file actions in federal court if no decision has been rendered by the DoL within, respectively, 180 and 210 days. *See* 18 U.S.C. § 1514A(b) (Sarbanes-Oxley); 12 U.S.C. § 5567(4) (CFPA). Plaintiff suggested that he would seek leave to amend his Dodd-Frank complaint by adding to it his Sarbanes-Oxley and CFPA claims once the necessary period had elapsed, but by the time the Court issued its order compelling arbitration and staying the case, 543 days later, he had not done so. *See Murray I*, 2014 WL 285093, at *3 n.3.

On February 13, 2014, shortly after the Court's Opinion compelling arbitration of Plaintiff's Dodd-Frank claim, Plaintiff filed the instant case,

exercising his rights to bring his Sarbanes-Oxley and CFPA claims de novo due to the failure of the DoL to act. (Dkt. #1). On March 28, 2014, Defendants requested a conference to discuss their anticipated motion to dismiss (Dkt. #16), which conference was held on May 15, 2014. Prior to the conference, Plaintiff filed his Amended Complaint on April 18, 2014. (Dkt. #25). In accordance with the schedule set by the Court, Defendants filed a motion to dismiss or, in the alternative, to stay on June 16, 2014. (Dkt. #32). Plaintiff filed his opposition on July 24, 2014 (Dkt. #38), and the motion was fully briefed upon the filing of Defendant's reply brief on August 13, 2014 (Dkt. #40).

## DISCUSSION

### A. Plaintiff's Claims Are Not Impermissibly Duplicative of the Prior Action

"As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis* v. *Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citing, *inter alia, Colo. River Water Conservation Dist.* v. *United States*, 424 U.S. 800, 817 (1976)). "The complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion." *Id.* "The rule against duplicative litigation is distinct from but related to the doctrine of claim preclusion or *res judicata*," *id.*, and thus "does not require that all aspects of the new and prior suits be identical but rather, focuses on whether the two claims arise from the same 'nucleus of operative fact,'" *Davis* v. *Norwalk Econ. Opportunity Now, Inc.*, 534 F. App'x 47, 48 (2d Cir. 2013) (summary order)

6

(quoting *Waldman* v. *Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000)). This rule pertains even when "the complaints allege different retaliatory motives consistent with the distinct legal theories" of two different statutes. *Id.* at 49 (citing, *inter alia*, *Cieszkowska* v. *Gray Line N.Y.*, 295 F.3d 204, 206 (2d Cir. 2002)); *accord Woods* v. *Dunlop Tire Corp.*, 972 F.2d 36, 39 (2d Cir. 1992) ("It is this identity of facts surrounding the occurrence which constitutes the cause of action, not the legal theory upon which [plaintiff] chose to frame her complaint.").

Here there can be little dispute that the Sarbanes-Oxley and FCPA claims share a common nucleus of operative fact with the Dodd-Frank claim at the heart of the prior litigation; Plaintiff's Amended Complaint deviates only slightly from his complaint in the earlier-filed action, altering certain phrasing and adding a handful of clauses related to the CFPA. All three claims stem from the reports Plaintiff wrote about CMBS products, pressure he claims to have received from superiors at UBS Securities to alter those reports, and his termination from UBS Securities, allegedly in retaliation for his complaints about this pressure and his refusal to succumb to it. While there are distinct elements among the retaliation claims, the heart of each claim concerns why Plaintiff's employment was terminated.

Yet courts dismissing duplicative claims have done so where the claims not only arise out of a common nucleus of operative fact, but where the claims also accrue at the same time or at least within the period where amendment as of right is still available. *See Davis*, 534 F. App'x at 49; *Brown* v. *Plansky*, 24

7

F. App'x 26, 28 (2d Cir. 2001) (summary order) ("[A]ll of the claims [plaintiff] raises now were or could have been brought in that action."). Here, the claims brought here could not have been brought in the earlier action because a procedural bar existed to filing immediately in federal court. Plaintiff's Sarbanes-Oxley claim did not accrue until after the 180-day period had run, and Plaintiff's CFPA claim did not accrue until after the 210-day period had run. *Cf. Heimeshoff* v. *Hartford Life & Acc. Ins. Co.*, 134 S. Ct. 604, 610 (2013) (finding that a cause of action "accrues ... when the plaintiff can file suit and obtain relief," and that an ERISA claim accordingly does not accrue until the statutorily required pre-suit procedures have been exhausted (internal quotation marks omitted)).

Although the doctrine of duplicative suits is "distinct" from that of claim preclusion, *Curtis*, 226 F.3d at 138, they share a related insight that a plaintiff cannot be precluded from litigating a claim on the basis of an earlier claim where, for factual or procedural reasons, he could not bring the later claim at the same time as the earlier claim. For example, in *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905 (2d Cir. 2010), the Second Circuit considered the preclusive effect of an earlier suit where noteholders were barred by the terms of an indenture from bringing claims until the notes' final maturity, which occurred well after the first suit was filed. The court concluded that "[c]laim preclusion does not bar claims, even between identical parties, that arise after the commencement of the prior action." *Id.* at 919.

An illustration of this principle is provided by the Sixth Circuit's decision in *Whitfield* v. *City of Knoxville*, 756 F.2d 455 (6th Cir. 1985), where the Court held that a second suit under the Age Discrimination in Employment Act (the "ADEA") was not barred by claim preclusion when the ADEA's requirement that a plaintiff institute an administrative proceeding and then wait 60 days prevented him from filing his ADEA claims in the prior proceeding. *Id.* at 459-60. The Court rejected the suggestion — similar to that offered by Defendants here — that Plaintiff could merely have waited until the 60-day period had run before filing both claims at once, finding that such a requirement "would, in effect, engraft a waiting period" onto the state statutory scheme that the legislature had not intended. *Id.* at 463. Similarly, there is no evidence that Congress intended Dodd-Frank plaintiffs to have to wait out the pendency of DoL proceedings before filing, lest they risk forfeiting their Sarbanes-Oxley and CFPA claims. It is true that Plaintiff could have requested leave to amend his complaint in the earlier action to add the Sarbanes-Oxley and CFPA claims, but "[t]he plaintiff has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events; plaintiff may simply bring a later suit on those later-arising claims." *Curtis*, 226 F.3d at 139.[3] Because

---

[3] Where plaintiffs have chosen the route of additional suit rather than amendment, courts have sometimes looked for an attempt in bad faith to circumvent scheduling orders that might bar amendment. *See, e.g.*, *Fido's Fences, Inc.* v. *Radio Sys. Corp.*, 999 F. Supp. 2d 442, 454 (E.D.N.Y. 2014); *BNP Paribas Mortgage Corp.* v. *Bank of Am., N.A.*, No. 10 Civ. 8299 (RWS), 2011 WL 3847376, at *4 (S.D.N.Y. Aug. 30, 2011) (finding "no indication of bad faith or dilatory motive here"). The Court finds — disregarding the affidavit submitted by Plaintiff's counsel (*see* Declaration of Robert B. Stulberg (Dkt. #37)) — no evidence of bad faith here. The Court also finds that Plaintiff's inability to raise the claims in the prior suit was not due to dilatory conduct, but rather to the

Plaintiff's current claims were unavailable at the time of the initial suit, the Court declines to dismiss Plaintiff's claims as duplicative.

## B. Plaintiff Has Failed to State a Claim Under the CFPA

### 1. Applicable Law

The CFPA provides, in relevant part:

> No covered person or service provider shall terminate … any covered employee … by reason of the fact that such employee … has … objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee … reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the [CFPB].

12 U.S.C. § 5567(a)(4). The CFPA's anti-retaliation provision goes on to define a "covered employee" as "any individual performing tasks related to the offering or provision of a consumer financial product or service." *Id.* § 5567(b). Elsewhere, the CFPA defines a "consumer financial product or service," in relevant part, as "any financial product or service" that "is offered or provided for use by consumers primarily for personal, family, or household purposes" and fits within a list of enumerated products. *Id.* § 5481(5). That list includes the following catchall provision:

> such other financial product or service as may be defined by the [CFPB], by regulation, for purposes of this title, if the [CFPB] finds that such financial product or service is (I) entered into or conducted as a subterfuge or with a purpose to evade any Federal consumer financial law; or (II) permissible for a bank or for a financial holding company to offer or to provide under any provision of a Federal law or regulation applicable to a bank or a financial holding company,

---

existence of a procedural bar. *Contra Am. Stock Exch., LLC* v. *Mopex, Inc.*, 215 F.R.D. 87, 91 (S.D.N.Y. 2002).

10

       and has, or likely will have, a material impact on consumers.

12 U.S.C. § 5481(15)(A)(xi).

### 2. Analysis

The viability of Plaintiff's CFPA claim depends on whether the products evaluated for UBS Securities were consumer financial products or services within the meaning of the CFPA, which in turn depends on the meaning of the phrase "as may be defined by the [CFPB], by regulation, for the purposes of this title." 12 U.S.C. § 5481(15)(A)(xi). Plaintiff interprets this phrase as defining a consumer financial product or service as any product or service that the CFPB has the statutory authority to regulate, while Defendants argue that the phrase defines a consumer financial product or service more narrowly as the products or services that the CFPB has actually chosen to regulate. The distinction is critical, because the parties do not contest that, as of the filing of Plaintiff's suit, the CFPB had not actually promulgated any regulation covering the CMBS products that Plaintiff evaluated for UBS Securities. Because the Court agrees with Defendants' interpretation, it dismisses Plaintiff's CFPA retaliation claim.[4]

This question of statutory interpretation appears to be a matter of first impression within the federal judiciary. The Court thus turns to the "familiar

---

[4]    Defendants present two additional arguments for the dismissal of Plaintiff's CFPA claims: first, that CMBS products do not even fall within the potential regulatory authority of the CFPB, because they are committed to the jurisdiction of the SEC (Def. Br. 13 n.3); and second, that Plaintiff has failed to make more than conclusory allegations that the products were offered or provided to consumers primarily for personal, family, or household uses (*id.* at 13-15). Because the Court agrees that the CFPB must actually have regulated the product at issue for the catch-all provision to apply, and had not done so, it need not consider the alternative arguments for dismissal.

canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). The Court "examine[s] the statute's text in light of context, structure, and related statutory provisions." *Exxon Mobil Corp.* v. *Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). Here, Plaintiff's interpretation is clearly foreclosed by the logic of the statutory text.

The full phrase at issue is "such other financial product or service as may be defined by the [CFPB], by regulation, for purposes of this title, if the [CFPB] finds that …." 12 U.S.C. § 5481(15)(xi). Plaintiff's interpretation of this provision as covering any product that *could* fall under the CFPB's regulatory authority would require this Court to undertake an elaborate series of hypothetical inquiries without having the benefit of any actual regulation or rulemaking process to review. The Court would have to decide whether the CFPB could have found that that the product or service was "entered into or conducted as a subterfuge or with a purpose to evade any Federal consumer financial law," or whether the CFPB could have found that the product or service had, or likely could have had, "a material impact on consumers." *Id.* The use of the word "may" is thus best read as leaving open the possibility of future CFPB regulations not in effect at the time of the CFPA's passage, rather than as an invitation to define the potential breadth of the CFPB's authority.

Courts have rejected similar interpretive arguments in analogous statutory settings. For example, Section 30(b) of the Securities Exchange Act of 1934 provides that

12

> [t]he provisions of this chapter ... shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States, unless he transacts such business in contravention of *such rules and regulations as the Commission may prescribe as necessary or appropriate* to prevent the evasion of this chapter.

15 U.S.C. § 78dd (emphasis added).  In *SEC* v. *Zahareas*, 272 F.3d 1102 (8th Cir. 2001), the Eighth Circuit confronted the argument that Section 30(b)'s extraterritoriality provision did not apply because the SEC *could* have validly enacted regulations barring the transactions at issue.  The Court found that, "[d]espite being granted some authority by the statute, the SEC never enacted a rule or regulation applicable to transactions with foreign brokers" such as those at issue in the case, and accordingly directed entry of judgment against the SEC because "we are bound by the current language of the statute and regulations." *Id.* at 1107.  This Court notes as well that Section 16(b) of the Exchange Act, which prohibits short-swing profits by corporate insiders, states in part that "[t]his subsection shall not be construed to cover ... any transaction or transactions which the Commission by rules and regulations *may exempt* as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b) (emphasis added).  It cannot plausibly be suggested that, in applying this section, a court must consider all of the rules and regulations that the SEC might possibly issue, and dismiss a case if any theoretically permissible regulation might exempt the transaction at issue.

Because the CFPA's catch-all provision requires an actual CFPB regulation to provide coverage, and because no such regulation existed at the

13

time of Plaintiff's conduct, it was not reasonable for Plaintiff to believe that his reports on CMBS were covered products or services within the meaning of 12 U.S.C. § 5481.  Accordingly, his claim of retaliatory termination in violation of the CFPA is dismissed.

## C.     Defendants' Motion to Stay Is Denied

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis* v. *N. Am. Co.*, 299 U.S. 248, 254 (1936).  Such a matter is within the sound discretion of the Court.  *Curtis*, 226 F.3d at 138.[5]  In determining whether to stay the balance of nonarbitrable federal claims while a related claim is being arbitrated, the Second Circuit has looked approvingly to Justice White's concurrence in *Dean Witter Reynolds* v. *Byrd*, 470 U.S. 213 (1985):

> [O]nce it is decided that [litigation of federal securities claims and arbitration of pendent state claims] are to go forward independently, the concern for speedy resolution suggests that neither should be delayed. While the impossibility of the lawyers being in two

---

[5]     Defendants argue that 9 U.S.C. § 3 makes a stay pending arbitration mandatory where the parties have agreed to arbitrate "any issue" underlying the action. (Def. Br. 6). However, this section only applies where the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement."  9 U.S.C. 3.  Though there may be some textual ambiguity in support of Defendants' position, "[t]he courts … generally have not interpreted § 3 in this fashion.…  [T]he cases, perhaps concerned lest the tail wag the dog, treat the question whether to stay the entire case as discretionary in cases involving both arbitrable and nonarbitrable issues."  *Volkswagen of Am., Inc.* v. *Sud's of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007) (internal citation and quotation marks omitted) (collecting cases across circuits). It is clear within the Second Circuit that Section 3 does not apply to nonarbitrable claims, and the decision over whether to grant a stay of nonarbitrable claims lies within the Court's discretion.  *See White* v. *Fitzgerald*, 393 F. App'x 804, 808 (2d Cir. 2010) (summary order) ("[T]he district court is not required to stay the litigation of the nonarbitrable claims before it on remand pending the outcome of any arbitrated claims." (collecting cases)).

> places at once may require some accommodation in scheduling,… the heavy presumption should be that the arbitration and the lawsuit will each proceed in its normal course.

*Chang* v. *Lin*, 824 F.2d 219, 223 (2d Cir. 1987) (alterations in original) (quoting *Dean Witter Reynolds*, 470 U.S. at 225 (White, J., concurring)).  The *Dean Witter Reynolds* majority noted that "it is far from certain that arbitration proceedings will have any preclusive effect on the litigation of nonarbitrable federal claims," and held that courts need not manipulate the ordering of parallel proceedings under such circumstances out of premature concerns over collateral estoppel, since "[t]he collateral-estoppel effect of an arbitration proceeding is at issue only after arbitration is completed."  *Id.* at 222-23 (majority opinion).  Courts in this District have followed this advice when considering whether to stay consideration of nonarbitrable federal claims.  *See, e.g.*, *Chartis Seguros Mex., S.A. de C.V.* v. *HLI Rail & Rigging, LLC*, 967 F. Supp. 2d 756, 767 (S.D.N.Y. 2013); *Pompano-Windy City Partners, Ltd.* v. *Bear, Stearns & Co.*, 698 F. Supp. 504, 520 (S.D.N.Y. 1988).

The Court notes a multitude of cases in which courts have stayed litigation duplicative of another suit, *see Curtis*, 226 F.3d at 138 ("Because of the obvious difficulties of anticipating the claim or issue-preclusion effects of a case that is still pending, a court faced with a duplicative suit will commonly stay the second suit[.]"), as well as where courts have stayed consideration of claims with significant factual overlap with arbitrated claims, *see, e.g.*, *Maritima de Ecologia, S.A. de C.V.* v. *Sealion Shipping Ltd.*, No. 10 Civ. 8134 (DLC), 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011) (finding that, even

15

though arbitration would not prove "controlling of the action before the court," a stay was appropriate because the arbitration "will have a significant bearing on this case" (internal citations omitted)); *Moore* v. *Interacciones Global, Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) ("It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants."). In such cases, a stay is warranted in part because the prior litigation or arbitration is likely to have preclusive effect over some or all of the claims not subject to arbitration. *See Bear, Stearns & Co., Bear, Stearns Sec. Corp.* v. *1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) (finding it well established that, under certain conditions, "[a]n arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show with clarity and certainty that the same issues were resolved" (internal quotation marks omitted)).

But as noted in *Dean Witter Reynolds*, an arbitration award need not be given preclusive effect over a statutory scheme where the federal interests are deemed too significant to force parties to submit them to arbitration. *See* 470 U.S. at 222-23 (discussing *McDonald* v. *West Branch,* 466 U.S. 284 (1984) (declining to accord preclusive effect to an arbitration award in a subsequent action under 42 U.S.C. § 1983)). To be clear, the Supreme Court has not extended that reasoning beyond § 1983 claims, *see W.J. O'Neil Co.* v. *Shepley, Bulfinch, Richardson & Abbott, Inc.*, 765 F.3d 625, 630-31 (6th Cir. 2014), and

16

subsequent cases have found the Court less willing to find arbitration an inadequate remedy in the absence of explicit congressional command, *see Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) ("It is by now clear that statutory claims may be the subject of an arbitration agreement, enforceable pursuant to the FAA.... Although all statutory claims may not be appropriate for arbitration, having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." (internal alterations and quotation marks omitted) (collecting cases)). Yet Congress has explicitly rendered predispute arbitration agreements unenforceable over Sarbanes-Oxley whistleblowing retaliation claims. *See* 18 U.S.C. § 1514A(e)(2). It would be curious to allow an arbitration award to preclude remedies under a statutory scheme for which arbitration has been deemed inappropriate by Congress; it would be equally curious to stay litigation of such a statutory claim so that arbitration might proceed unimpeded on a different claim.

Moreover, this is not a case where "the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco, Inc.* v. *T. Kakiuchi & Co.*, 815 F.2d 840, 856 (2d Cir. 1987). Plaintiff's Sarbanes-Oxley claim appears at this early juncture to stand on equally sound footing as his Dodd-Frank claim, and he is entitled to proceed with the former despite "the inefficiencies associated with litigating similar claims in separate proceedings in different forums." *White* v. *Fitzgerald*, 393 F. App'x 804, 808 (2d Cir. 2010) (summary order). This Court heeds the advice of the Second Circuit

and the Supreme Court that the parties' statutory federal rights — under Sarbanes-Oxley, Dodd-Frank, and even the Federal Arbitration Act — are best served by careful consideration of the proper scope of claim and issue preclusion after there has been a final decision, rather than preemptive anticipation of the possible effects of the instant litigation or the pending arbitration.[6]  It is worth noting as well that concerns over potentially inconsistent findings between the arbitration and the instant litigation would seem to be purely hypothetical, given Plaintiff's apparent lack of enthusiasm for proceeding with arbitration.

## CONCLUSION

The Court declines to dismiss the Amended Complaint in its entirety, finding that because the statutory waiting periods barred suit on Plaintiff's Sarbanes-Oxley and CFPA claims at the time of his earlier Dodd-Frank suit, the claims are not impermissibly duplicative.  The Court grants Defendants' motion to dismiss with regard to Plaintiff's CFPA claims, finding that he was not a covered employee within the meaning of the statute.  And finally, the Court declines to stay the remaining Sarbanes-Oxley claim due to the interest of the Court and the parties in a speedy resolution.

The Clerk of Court is directed to terminate Docket Entry 32.  Defendants' answer to the Amended Complaint shall be due no later than **March 13, 2015**.

---

[6] The case cited by Defendants for the opposite position is inapposite.  In *Neal* v. *Asta Funding, Inc.*, No. 13 Civ. 3438 (KM)(MAH), 2014 WL 131770 (D.N.J. Jan. 6, 2014), the Court considered whether to stay potentially arbitrable claims where the arbitrator had yet to determine the scope of the arbitration agreement.  Here, there is no question of whether the Sarbanes-Oxley claim is within the scope of the arbitration agreement.

The parties are directed to appear before the Court for an initial pretrial conference on **April 7, 2015, at 2:00 p.m.**  The parties are further directed to submit a joint status letter and Proposed Civil Case Management Plan and Scheduling Order, the template of which is available on the Court's website, no later than **April 2, 2015**.

    SO ORDERED.

Dated:    February 24, 2015
           New York, New York

                                              KATHERINE POLK FAILLA
                                              United States District Judge