USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _April 25, 2017_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                :

TREVOR MURRAY,                           :

                        :

                     Plaintiff,     :        14 Civ. 927 (KPF)

                        :

            v.                  :        REDACTED OPINION
                        :           AND ORDER

UBS SECURITIES, LLC and UBS AG,   :

                        :

                   Defendants.  :

                        :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

Plaintiff Trevor Murray alleges that his employer, Defendant UBS Securities, LLC, a subsidiary of Defendant UBS AG (collectively, "Defendants" or "UBS"), terminated his employment in retaliation for his whistleblowing activities. UBS responds that his termination was an unfortunate, but non-retaliatory, reaction to an economic downturn. The Court previously granted Defendants' motion to dismiss Plaintiff's claim under 12 U.S.C. § 5567(a), the anti-retaliation provision of Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), commonly known as the Consumer Financial Protection Act. *See Murray* v. *UBS Sec., LLC*, No. 14 Civ. 927 (KPF), 2015 WL 769586 (S.D.N.Y. Feb. 24, 2015) ("*Murray I*"). Plaintiff's remaining claim is brought under the anti-retaliation provision of the Sarbanes-Oxley Act, Pub. L. No. 107-204, § 806(a), 116 Stat. 745 (2002) (codified at 18 U.S.C. § 1514A) ("§ 806"). Defendants have moved for summary judgment under Federal Rule of Civil Procedure 56 on

Plaintiff's § 806 claim and, alternatively, on his back-pay damages remedy. For the reasons that follow, Defendants' motion is denied in its entirety.

## BACKGROUND[1]

### A.  Factual Background

The Court assumes familiarity with the factual and procedural history of this action, *see Murray I*, 2015 WL 769586, at *1, as well as of a predecessor related action, *see Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 1316472, at *1 (S.D.N.Y. Apr. 1, 2014); *Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 285093, at *1 (S.D.N.Y. Jan. 27, 2014); *Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084, at *1 (S.D.N.Y. May 21, 2013).

---

[1]  The facts in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #103)); the corrected version of Plaintiff's combined opposition to this statement and counter-statement ("Pl. 56.1 Opp." (Dkt. #129)); and Defendants' opposition to Plaintiffs' counter-statement ("Def. 56.1 Opp." (Dkt. #135)). In addition, the Court has drawn on various declarations from attorneys and witnesses, along with the exhibits thereto (cited using the convention "[Name] Decl." (Dkt. #104, 127)). In many cases, the parties have marked the same documents as exhibits; in such instances, the Court will provide only one citation to the document.

Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's Local Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* Local Civil Rule 56.1(c), (d).

For convenience, the Court will refer to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #102); Plaintiff's brief in opposition to Defendants' motion as "Pl. Opp." (Dkt. #126); and Defendants' reply brief as "Def. Reply" (Dkt. #134). The Court also adopts the parties' convention of referring collectively to both Defendant entities as "UBS" or "Defendants." (*See* Def. 56.1; Pl. Opp. 1).

On March 31, 2017, the Court filed an unredacted copy of this Opinion under seal. On that same day, the Court provided the parties with a copy of the unredacted Opinion and allowed the parties to propose redactions. (*See* Dkt. #139). Taking the parties' suggestions into consideration, the Court now publicly files this redacted Opinion.

### 1. Plaintiff's Employment and Termination

Plaintiff had two periods of employment with UBS. The first lasted from in or about May 2007 to September 2009. (Def. 56.1 ¶¶ 1, 8-9). During this period, Plaintiff was employed as a Strategist within UBS's Mortgage Strategy Group, where he focused on commercial mortgage-backed securities ("CMBS"). (*Id.* at ¶¶ 2-3). According to Defendants, Plaintiff was let go when his group and position were eliminated as part of a reduction in force prompted by the 2008 financial crisis. (*Id.* at ¶¶ 4-6, 8-9).

By early 2011 business had improved, and UBS looked to rebuild its Mortgage Strategy Group, which was located within the Global Interest Rates Strategy Group headed by Michael Schumacher. (Def. 56.1 ¶¶ 13-15; Pl. 56.1 Opp. ¶ 259). The Global Interest Rates Strategy Group, in turn, was a part of Macro Strategy, a division within UBS's Investment Bank (sometimes referred to as the "Bank"). (Def. 56.1 ¶¶ 13-21). Schumacher reported to Lawrence Hatheway, UBS's Chief Economist, Chief Strategist, and Head of Macro Strategy. (*Id.* at ¶¶ 16-17; Pl. 56.1 Opp. ¶ 260).

As part of its rebuilding effort, UBS engaged in a series of new hires, including Kenneth Cohen in May 2011 to run the U.S. Real Estate Finance Group, which included the non-research, business side of CMBS dedicated to, *inter alia*, origination, trading, and sales (collectively, the "CMBS Business"). (Def. 56.1 ¶ 32; Pl. 56.1 Opp. ¶¶ 257, 280-82, 345; Stulberg Decl., Ex. 21). The U.S. Real Estate Finance Group, and thus the CMBS Business, was housed within the Fixed Income, Currency, and Commodities ("FICC") division,

also within UBS's Investment Bank; Hatheway oversaw headcount (i.e., the number of UBS personnel) at FICC. (Def. 56.1 ¶¶ 22, 31-35; Pl. 56.1 Opp. ¶ 280).

UBS also hired several strategists and analysts, including Plaintiff. (Def. 56.1 ¶¶ 25, 49, 52). Thus, Plaintiff began his second stint with UBS on May 31, 2011, working as a CMBS Strategist within the Mortgage Strategy Group, where he reported directly to Schumacher, and where his responsibilities included writing research articles about the CMBS market and interfacing with clients. (*Id.* at ¶¶ 57, 59, 61; Pl. 56.1 Opp. ¶ 254). Plaintiff was the only such Strategist reporting to Schumacher during this period (Pl. 56.1 Opp. ¶ 263), and his role in this regard included supporting the CMBS Business, his "internal client" at the Bank. (*Id.* at ¶¶ 257-58). Plaintiff did not have responsibilities over any non-CMBS securitized products, such as residential-mortgage-backed securities ("RMBS") or Asset-Backed Securities ("ABS"). (*Id.* at ¶¶ 264-66).

Plaintiff believed that his research "was required to be independently conducted pursuant to SEC Guidelines and UBS compliance training." (Pl. 56.1 Opp. ¶ 256). After all, Plaintiff was required to certify in his research reports that "with respect to each security or issuer that the analyst covered in this report [i] all of the views expressed accurate[ly] reflect his or her personal views about those securities or issuers and were prepared in an independent manner, including with respect to UBS, and [ii] no part of his or her compensation was, is, or will be directly or indirectly related to the specific

recommendations or views expressed by that research analyst in this research report." (*Id.* at ¶ 256(a); Mondl Decl., Ex. 1 (Murray Dep.), at 135:7-24; 136:10-14). *See also* 17 C.F.R. § 242.501 (Regulation AC, a regulation issued by the Securities and Exchange Commission ("SEC") requiring analyst certifications concerning the accuracy and independence of their research reports). Plaintiff published research reports approximately every three to five weeks. (Pl. 56.1 Opp. ¶ 255).

About nine months into Plaintiff's second stint at UBS, on February 6, 2012, UBS terminated his employment. (Def. 56.1 ¶ 208; Pl. 56.1 Opp. ¶ 504). Defendants maintain that Plaintiff was let go as part of another reduction in force. (Def. Br. 11-12). Plaintiff argues that he was fired for whistleblowing to his supervisors about illegal efforts by CMBS Business personnel to sway his independent research analysis. (Pl. Opp. 11-14).

### 2. UBS's Renewed Financial Challenges

As the preceding suggests, Plaintiff's termination is presented as the denouement of two competing narratives. Defendants outline the turmoil in the global financial markets that reintroduced challenges to their business starting in mid-2011. (Def. 56.1 ¶¶ 90-91).[2] In July 2011, in response, UBS announced a cost-reduction program, and the next month it issued a press release describing restructuring changes and a plan to reduce headcount by approximately 3,500 employees. (*Id.* at ¶¶ 92-95). Defendants' difficulties were

---

[2] Defendants note that Plaintiff, too, recognized these financial challenges. (Def. 56.1 ¶¶ 100, 121-22).

then exacerbated when they discovered, in or about September 2011, that a London-based trader had engaged in unauthorized speculative trading, causing losses of over $2 billion. (*Id.* at ¶¶ 103-05). Defendants engaged in a reduction in force in November 2011, which affected [redacted] among others. (*Id.* at ¶¶ 113-15). Defendants' 2011 year-end Form 20-F filing with the SEC reported a $4.5 billion reduction in total operating income compared to 2010, due to the aforementioned unauthorized-trading incident and generally lower trading revenues in certain businesses; this reduction was felt acutely in the Investment Banking business. (*Id.* at ¶¶ 117-19).

The 2011 cost-cutting measures only "partly offset" UBS's lower operating income, and so Defendants' efforts to lower costs continued into 2012. (Def. 56.1 ¶ 118). For example, UBS reduced the overall 2011 bonus pool by about 40% compared to 2010, and the bonus pool for the Investment Bank in particular by about 60%. (*Id.* at ¶¶ 144-45). As part of another reduction in force, [redacted]. (*Id.* at ¶¶ 152, 154-55). Defendants contend that Plaintiff's termination was a result of "[redacted]" and [redacted]. (*Id.* at ¶¶ 158, 164).[3]

---

[3] Defendants' note that [redacted], another strategist in the Mortgage Strategy Group, though one focused on non-agency RMBS, was also separated at about this time. (Def. 56.1 ¶¶ 165, 194, 211). They also emphasize that Plaintiff was never replaced. (*Id.* at ¶ 216). Plaintiff counters that the evidence shows that Defendants considered hiring another CMBS Strategist shortly after Plaintiff's termination. (*See, e.g.*, Pl. 56. Opp. ¶¶ 216, 599).

### 3. Efforts to Undermine Plaintiff's Independent Analysis and Plaintiff's Reporting of Those Efforts

In sharp contrast to Defendants' focus on external, market-roiling events, Plaintiff maintains that his termination was due to his whistleblowing activities. (Pl. Opp. 11-14). Specifically, Plaintiff testified at his deposition to a series of incidents in which senior CMBS Business personnel, including Cohen and others, endeavored to skew or chill Plaintiff's independent research analysis when it did not favor the CMBS Business strategy. Those episodes, which are generally disputed by Defendants (*see generally* Def. 56.1 Opp.), are set forth below.

A few weeks after Plaintiff was rehired, he met with Cohen, who told him "that CMBS would be a significant revenue generator for the [B]ank, as evidenced by [Plaintiff's] joining the firm and the firm's increased staffing in the CMBS [B]usiness." (Pl. 56.1 Opp. ¶¶ 322-23). Cohen encouraged Plaintiff to write a research article with a specific viewpoint about "special servicers," a topic about which there had been anxiety in the CMBS market. (*Id.* at ¶¶ 325, 327). Cohen emphasized that "it was important that the topic not deter investors from becoming reacquainted and accustomed with the CMBS products." (*Id.* at ¶ 328). Thus, Cohen recommended that Plaintiff write a piece that presented "a benign and positive view" of special servicers so as to "assuage or sooth[e] investors' concerns about special servicers" (*id.* at ¶ 330); this view, however, was inconsistent with Plaintiff's own independent view of special servicers (*id.* at ¶ 331). Plaintiff considered Cohen's directive to express a biased viewpoint in an ostensibly independent research article to be an

7

improper attempt to influence Plaintiff's research. (*Id.* at ¶¶ 332, 334). Because Cohen's views were at odds with Plaintiff's, Plaintiff opted not to write *any* article about special servicers, rather than write a disingenuous piece. (*Id.* at ¶ 333).[4]

Subsequently, in September 2011, Cohen and David McNamara, head of the CMBS Trading Desk within the U.S. Real Estate Finance Group, instructed Plaintiff to "pre-clear" his ostensibly independent articles with them before the articles were published. (Def. 56.1 ¶¶ 43-44; Pl. 56.1 Opp. ¶¶ 339-41). Cohen recalled to Plaintiff an interaction that Cohen had had with an investor who questioned Plaintiff's conclusions in a prior article. (Pl. 56.1 Opp. ¶ 342). This caused Cohen concern "that views about [the] CMBS market were being published that [Cohen] wasn't in control of or aware of." (*Id.* at ¶ 344). Cohen explained that it was important "not to confuse the market with conflicting ideas of what Sales, Trading, and Research are saying," and "to maintain consistency of message within the CMBS Originations team, the CMBS Trading Desk, and [R]esearch in order to accomplish what we are trying to do here." (*Id.* at ¶ 345). Accordingly, Cohen told Plaintiff that he "was to cross all of [his] research articles and topics with the CMBS Trading Desk." (*Id.* at ¶ 346). McNamara concurred, and told Plaintiff that he should "cross everything [he] publishes with McNamara before he publishe[d] it." (*Id.* at ¶ 347). Thereafter,

---

[4]     In his deposition, Cohen denied having any recollection of the June 3 meeting or any in-person meeting with Plaintiff in or around that time (besides meeting Plaintiff during the latter's orientation). (Pl. 56.1 Opp. ¶ 335; Mondl Decl., Ex. 17 (Cohen Dep.), at 90:23-91:18).

Plaintiff generally sought pre-clearance for his research — "including as to the topic, the general subject of the article, and his point of view or opinion." (*Id.* at ¶ 348). Plaintiff would first orally clear his research ideas, subject, and point of view with the CMBS Trading Desk. (*Id.* at ¶ 349). Then, if the proposed article was cleared, Plaintiff would draft the article and provide the CMBS Trading Desk a copy of the final draft before the article was published. (*Id.* at ¶ 350). Between September 2011 and early December 2011, Plaintiff sought pre-clearance from the CMBS Trading Desk for about three articles. (*Id.* at ¶ 351).

In one instance, Plaintiff wanted to write a "cautious and bearish" article about his view that certain classes of bonds were overvalued or too expensive compared to other classes of bonds, and he wanted to use examples of specific bonds and deals to illustrate his point. (Pl. 56.1 Opp. ¶¶ 356-57). Plaintiff sought pre-clearance for the article from the CMBS Trading Desk, telling McNamara and CMBS trader Jamar Delauney about his vision for the article. (*Id.* at ¶ 357). Delauney responded that he had just purchased some of the bonds that Plaintiff considered "overvalued," and told Plaintiff not to write anything negative about them. (*Id.* at ¶ 359). McNamara agreed, instructing Plaintiff that he did not want anything negative in the market about those bonds, given that the Bank had just invested in them. (*Id.* at ¶¶ 358, 360). Because Plaintiff felt hamstrung from expressing his independent view about the topic, he once again opted not to write the article at all. (*Id.* at ¶ 361).

In early December 2011, Plaintiff published an article entitled, "2012 CMBS Outlook," which was intended to provide a forward-looking one-year projection for the CMBS market. (Pl. 56.1 Opp. ¶¶ 368-69; Stulberg Decl., Ex. 78 (2012 CMBS Outlook Article)). This time, Plaintiff drafted the article without preclearing the topic or the position it expressed with either Cohen or McNamara, a first for Plaintiff since the September 2011 meeting. (Pl. 56.1 Opp. ¶¶ 371, 376). In point of fact, Plaintiff knowingly defied Cohen's and McNamara's preclearance rule in this instance because "he was concerned that the 2012 Outlook article was too important to be subject to the influence of the CMBS [B]usiness." (*Id.* at ¶ 372). The article expressed a bearish and cautious view of the CMBS market. (*Id.* at ¶ 373; Stulberg Decl., Ex. 78 (2012 CMBS Outlook Article), at 1 ("[Redacted]")). About a week after the article was published, Cohen expressed his displeasure to Plaintiff in a tone that made Plaintiff think he had done something wrong; Cohen told Plaintiff the outlook was "too bearish," "off message," and "not really consistent with what we are trying to do around here." (Pl. 56.1 Opp. ¶ 374). McNamara, too, expressed his displeasure about the article to Plaintiff, telling him that it made it tough for McNamara to send the article to clients. (*Id.* at ¶ 375).

In mid-December 2011, Plaintiff complained to his direct supervisor Schumacher that the relationship with his internal client, i.e., the CMBS Business, had become untenable because the business side only interacted with him in order to steer and skew his research. (Pl. 56.1 Opp. ¶¶ 381-82). Plaintiff told Schumacher that he had been instructed to clear his research

topics, article content, and viewpoints with the CMBS Business before publishing his articles. (*Id.* at ¶ 383). He also told Schumacher that he felt the situation "was not only unethical but illegal," and that he "didn't see how it was going to end well." (*Id.* at ¶ 384). Schumacher sympathized with Plaintiff, saying that he understood that it was difficult to have a view contrary to what the business line wanted, but he told Plaintiff "to make sure" that he did not "alienate his internal client." (*Id.* at ¶¶ 386-87).[5]

Efforts to shape Plaintiff's independent views went beyond the article-writing process. Plaintiff recalled an instance in late 2011 where he, Cohen, and McNamara were on their way to meet with an institutional investor, and Cohen warned Plaintiff "not to say anything negative" about a certain product in which the investor was interested. (Pl. 56.1 Opp. ¶¶ 364-67).

In early January 2012, Plaintiff and other UBS employees attended an industry-wide conference in Miami, Florida. (Pl. 56.1 Opp. ¶ 388). Before the conference, Plaintiff learned that CMBS Business personnel had scheduled a series of client meetings at the conference, to which Plaintiff had not been invited. (*Id.* at ¶¶ 399, 403, 408). Plaintiff nonetheless attended one of these meeting uninvited, where he found Cohen and McNamara engaged in a discussion with a client investor. (*Id.* at ¶ 417). At the meeting, the client asked questions relating to defaulted loans, delinquency rates, and special-

---

[5]     Schumacher testified at his deposition that he was not certain whether he ever had a communication with Plaintiff in which Plaintiff communicated that the CMBS Trading Desk was only interacting with him in order to steer his articles. (Pl. 56.1 Opp. ¶ 385; Mondl Decl., Ex. 13 (Schumacher Dep.), at 130:9-19).

servicing prospects, topics on which Plaintiff's 2012 CMBS Outlook article had expressed a bearish viewpoint. (*Id.* at ¶¶ 418-19). Cohen responded "by purporting to communicate the analysis of the [B]ank's researchers," such as Plaintiff, on those topics. (*Id.* at ¶ 421). He said that the Bank's research and analysis had shown a benign outlook for the topics being discussed, despite the fact that Plaintiff's article had taken a cautious and bearish view of those topics. (*Id.* at ¶¶ 423-25). The client then turned to Plaintiff and remarked that Cohen's comments were "inconsistent with the viewpoint" expressed in Plaintiff's 2012 CMBS Outlook article. (*Id.* at ¶¶ 426-27). In response, Plaintiff "openly affirmed the client's observation, stated that he was a bit more cautious about the topics and directed the investor and other attendees to read [the] 2012 Outlook article." (*Id.* at ¶ 428).[6]

After the conference, Cohen asked Plaintiff what he was working on; Plaintiff responded that he was crafting a new article reacting to the conference where, in Plaintiff's view, everyone seemed "cautiously optimistic." (Pl. 56.1 Opp. ¶¶ 455-56). Plaintiff noted that part of his article "would express caution towards property sectors that faced the consumer and that obvious examples would be retail and hotel properties." (*Id.* at ¶ 457). When Plaintiff mentioned these two sectors, Cohen told him "to be sure not to write anything negative about the hotel sector because we're coming to market with [a securities offering involving the Fontainebleau Hotel in Miami] in a couple of months."

---

[6]     Meanwhile, Cohen testified that he did not recall communicating with Plaintiff at the conference and, indeed, that he did not even remember whether Plaintiff attended the conference. (Pl. 56.1 Opp. ¶¶ 430-31; Mondl Decl., Ex. 17 (Cohen Dep.), at 117:8-17).

(*Id.* at ¶ 458). Plaintiff defied Cohen's directive, and [redacted]. (*Id.* at ¶ 459; Stulberg Decl., Ex. 17).

Also in January 2012, Plaintiff tried to get access to a certain financial-data service, and proposed to Cohen that [redacted]. (Pl. 56.1 Opp. ¶¶ 500-02). Cohen responded that he would be willing to do so as long as members of the CMBS Business could access the data "so that we can all stay on 'message.'" (*Id.* at ¶¶ 502-03).

When Plaintiff met with Schumacher to go over Plaintiff's performance evaluation review in January 2012, Plaintiff informed Schumacher that his relationship with his internal client, the CMBS Business, had only worsened, and Plaintiff reiterated his displeasure with the pre-clearance regime to which his independent research and analysis were being subjected. (Pl. 56.1 Opp. ¶¶ 437, 440-41, 446-49).[7] Plaintiff told Schumacher that the pattern of behavior he had experienced over the course of the last several months had developed into an "overall clearer picture of illegal activity" and that Plaintiff "was deeply concerned about it." (*Id.* at ¶ 450). Plaintiff told Schumacher that, for example, the feedback he had received from CMBS Business personnel on the 2012 CMBS Outlook article was negative and made Plaintiff believe not just that the group disagreed with him, but that he was somehow in trouble for the

---

[7]     In mid-January 2012, Plaintiff also reported these activities to [redacted], a strategist focused on agency RMBS, and someone who had helped rehire Plaintiff. (Def. 56.1 ¶¶ 36, 41). Plaintiff told [redacted] that he was being forced to pre-clear his article topics and content with the CMBS Business and that the only interest the CMBS Business took in his research "was to be a shill for the market." (Pl. 56.1 Opp. ¶¶ 432-33).

views he expressed in the article. (*Id.* at ¶ 451). Schumacher was sympathetic to Plaintiff, but told him to "just write what the business line wanted." (*Id.* at ¶ 452).[8]

### 4. Plaintiff's Employment After His Termination from UBS

Defendants terminated Plaintiff's employment on February 6, 2012. (Def. 56.1 ¶ 208; Pl. 56.1 Opp. ¶ 504). In or about September 2013, Plaintiff accepted a position as a financial advisor with [redacted] in Charlotte, North Carolina. (Murray Decl. ¶¶ 24-26; Def. 56.1 ¶ 222). The position paid an annual salary of [redacted], without opportunity for a bonus. (Murray Decl. ¶ 27). By contrast, Plaintiff's annual salary at UBS was about [redacted] more, with opportunities for a [redacted] bonus. (*Id.*; Def. 56.1 ¶ 226; Pl. 56.1 Opp. ¶ 312). Moreover, after two years, the base salary for the [redacted] position would be [redacted]. (Murray Decl. ¶ 27; Stulberg Decl., Ex. 117).

Plaintiff left this position after about four months and accepted a new job as Chief Financial Officer for a hotel company called [redacted]. (Murray Decl. ¶ 29; Def. 56.1 ¶¶ 223, 229-332). The new role paid an annual salary of [redacted], double the [redacted] annual salary, but likewise offered no bonus opportunity. (Murray Decl. ¶ 30; Def. 56.1 ¶ 231; Stulberg Decl., Ex. 107). Plaintiff lost this position when [redacted]'s former controller returned and replaced Plaintiff. (Def. 56.1 ¶ 233; Mondl Decl., Ex. 1 (Murray Dep.), at 348:5-

---

[8]     Schumacher testified that he did not recall whether any topic other than Plaintiff's performance review was discussed during this meeting. (Pl. 56.1 Opp. ¶ 454; Mondl Decl., Ex. 13 (Schumacher Dep.), at 152:18-21).

23). Plaintiff continued to look for work thereafter. (Mondl Decl., Ex. 1 (Murray Dep.), at 353:23-25, 358:5-7).

## B. Procedural Background

Defendants filed their motion for summary judgment and supporting materials on March 2, 2016 (Dkt. #98, 102-04); Plaintiff filed his opposition brief and supporting materials on April 22, 2016 (Dkt. #126-29); and Defendants filed their reply brief and supporting materials on May 9, 2016 (Dkt. #134-35).[9]

## DISCUSSION

## A. Motions for Summary Judgment Under Rule 56

Rule 56(a) instructs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[10] "When ruling on a summary judgment motion, the district court must construe the

---

[9]     Unsealed copies of these filings were submitted to the Court and served on opposing counsel on these dates; the referenced docket entries reflect later dates on which sealed versions of these submissions were posted on the Court's electronic docket.

[10]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). As of this past year, the Second Circuit continues to use both formulations. *Compare, e.g., Smith* v. *Barnesandnoble.com, LLC*, 839 F.3d 163, 166 (2d Cir. 2016) ("The moving party bears the burden to demonstrate the absence of any genuine issues of material fact."), *with, e.g., Harris* v. *Miller*, 818 F.3d 49, 54 (2d Cir. 2016) ("[W]e conclude that there are genuine disputes of material fact[.]"). Indeed, the Circuit sometimes uses the terms interchangeably within the same decision. *Compare, e.g., Cross Commerce Media, Inc.* v. *Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016) ("[T]here is a genuine dispute of material fact[.]"), *with, e.g., id.* at 168 ("We therefore think that [the nonmovant] has raised a genuine issue of material fact[.]"). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent.

facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Pace* v. *Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)).

"A motion for summary judgment may properly be granted … only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz* v. *City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor* v. *Elec. Boat Corp.,* 609 F.3d 537, 545 (2d Cir. 2010)). In determining whether summary judgment is merited, "[t]he role of a court … is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *NEM Re Receivables, LLC* v. *Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y.) (internal quotation mark and citation omitted), *reconsideration denied*, 187 F. Supp. 3d 390 (S.D.N.Y. 2016).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp.* v. *Nordic Tankers Trading A/S*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986)). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC* v. *Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson* v. *Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986)).  And "[a] dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (quoting *Anderson*, 477 U.S. at 248).  If the movant satisfies its initial burden, then "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted).  To make this showing, a summary-judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, that opponent must adduce "evidence on which the jury could reasonably find for" him.  *Anderson*, 477 U.S. at 252.

**B.    Defendants Are Denied Summary Judgment on Plaintiff's Sarbanes-Oxley Retaliation Claim**

**1.    Applicable Law**

Congress enacted the Sarbanes-Oxley Act of 2002 in order "to safeguard investors in public companies and restore trust in the financial markets following the collapse of Enron Corporation."  *Lawson* v. *FMR LLC*, — U.S. —, 134 S. Ct. 1158, 1161 (2014).  Section 806 of the Act, codified at § 1514A of Title 18, creates a whistleblower provision designed "to combat what Congress identified as a corporate 'culture, supported by law, that discourage[s] employees from reporting fraudulent behavior not only to the proper authorities … but even internally.'"  *Bechtel* v. *Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 446-47 (2d Cir. 2013) (quoting S. Rep. No. 107-146, at 5 (2002)).  Accordingly, the provision "protects employees when they take lawful

acts to disclose information or otherwise assist in detecting and stopping

actions which they reasonably believe to be fraudulent." *Id.* at 446 (internal

quotation marks, citations, and alterations omitted).

Section 806 provides in relevant part:

> No [publicly traded company] may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee … to provide information [or] cause information to be provided … regarding any conduct which the employee reasonably believes constitutes a violation of [the fraud provisions of Title 18], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to … a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)[.]

18 U.S.C. § 1514A. "It is now well accepted that courts should construe [§] 806

broadly." *Leshinsky* v. *Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 440 (S.D.N.Y.

2013) (citing *Mahony* v. *KeySpan Corp.*, No. 04 Civ. 554 (SJ), 2007 WL 805813,

at *5 (E.D.N.Y. Mar. 12, 2007) ("The law was intentionally written to sweep

broadly, protecting any employee of a publicly traded company who took such

reasonable action to try to protect investors and the market.")).

Under the burden-shifting framework of § 806, the plaintiff bears the

initial burden of making a *prima facie* case. To do so, the plaintiff "must prove

by a preponderance of the evidence that [i] [he] engaged in protected activity;

[ii] the employer knew that [he] engaged in the protected activity; [iii] [he]

suffered an unfavorable personnel action; and [iv] the protected activity was a

contributing factor in the unfavorable action." *Bechtel*, 710 F.3d at 451 (citing 49 U.S.C. § 42121(b)(2)(B)(iii); 29 C.F.R. §§ 1980.109(a), 1980.104(e)(2)). If the plaintiff carries this burden, the employer may rebut the *prima facie* case "with clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior." *Id.* at 451 (citing 49 U.S.C. § 42121(b)(2)(B)(iv); 29 C.F.R. § 1980.109(b)).

"At the summary judgment stage, a plaintiff need only demonstrate that a rational factfinder could determine that [the] [p]laintiff has made his *prima facie* case," and if the plaintiff successfully does so, then "summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record *clearly and convincingly* demonstrates that the adverse action would have been taken in the absence of the protected behavior." *Leshinsky*, 942 F. Supp. 2d at 441 (emphasis in original). In light of this scheme, courts have correctly recognized that "the defendant's burden under [§] 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against [a] plaintiff[] in Sarbanes–Oxley retaliation cases a more difficult proposition." *Id.*

### 2.  Analysis

#### a.  Plaintiff Has Carried His *Prima Facie* Burden

Defendants' motion attacks the first and fourth elements of Plaintiff's *prima facie* case. They argue that Plaintiff's claim fails as a matter of law because Plaintiff did not engage in a protected activity and, even if he did, it did not contribute to Defendants' decision to terminate Plaintiff's employment.

(Def. Br. 14-22).  The Court disagrees.  At this stage, Plaintiff has adduced sufficient evidence to permit a reasonable jury to conclude that he engaged in a protected activity and that the protected activity was a contributing factor to his termination.

### i.      A Reasonable Jury Could Find That Plaintiff Engaged in a Protected Activity

Under § 806, a plaintiff's activity is protected if he (i) "provide[s] information," (ii) "regarding any conduct which the employee reasonably believes constitutes a violation of [the mail, wire, bank, and securities and commodities fraud provisions of Title 18], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," to, *inter alia*, (iii) "a person with supervisory authority over the employee."  18 U.S.C. § 1514A(a)(1).  Defendants contend that Plaintiff fails to satisfy the second of these elements; specifically, that Plaintiff did not have a reasonable belief that the conduct he reported was a violation of applicable laws or regulations.

"[W]hether the employee reported conduct that he or she reasonably believes constituted a violation of federal law" is the statute's "critical focus." *Nielsen* v. *AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Villanueva* v. *U.S. Dep't of Labor*, 743 F.3d 103, 109 (5th Cir. 2014)).  In its 2014 *Nielsen* decision, the Second Circuit rejected the prevailing, restrictive standard that "an employee's protected communications must relate 'definitively and specifically' to the subject matter … of the listed categories of fraud or securities violations."  *Id.* at 220.

Rather, the Circuit held that "relief pursuant to § [806] turns on the reasonableness of the employee's *belief* that the conduct violated one of the enumerated provisions — which is contrary to the 'definitively and specifically' standard." *Id.* at 221 (emphasis in original). "A reasonable belief contains both subjective and objective components," meaning a plaintiff "must show not only that he believed that the conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation." *Id.* (internal quotation marks omitted) (quoting *Livingston* v. *Wyeth, Inc.*, 520 F.3d 344, 352 (4th Cir. 2008)).

Defendants offer various arguments why Plaintiff could not have reasonably believed that unlawful conduct had occurred. They contend, first, that the reasonableness of Plaintiff's belief should be informed by the specific securities rule that he believes was violated — here, SEC Rule 10b-5. (Def. Br. 15). Such a belief would be unreasonable, Defendants maintain, because the rule outlaws material misstatements in connection with the sale or purchase of a security and no such statements were actually made; indeed, Plaintiff admits that he successfully resisted the pressure to publish skewed research reports and confirms that he published only accurate and independent reports. (Def. 56.1 ¶¶ 71-72, 76-77).

For similar reasons, Defendants maintain that Plaintiff's belief that there was a violation of Regulation AC, 17 C.F.R. § 242.501, is also unreasonable; no false analyst certification occurred because no inaccurate or biased reports were issued. (Def. Reply 2-4). Defendants further argue that Plaintiff's belief

that shareholder fraud occurred is unreasonable because shareholders never became aware of any of the alleged pressure directed toward Plaintiff to skew or chill his independent analysis. (Def. Br. 16). Finally, Defendants claim that Plaintiff's amorphous belief that efforts to influence his independence violated a variety of policies and procedures related to the independence of financial-market analyses is insufficient; his failure to identify the specific federal laws violated dooms his claim. (*Id.*).

Defendants' arguments are unpersuasive. For starters, Defendants offer no authority for the proposition that a plaintiff's failure to match the conduct he believes to be illegal with the precisely applicable securities law or regulatory provision forecloses a whistleblower claim.[11] Indeed, Defendants' proposed narrowing would be in tension with the Second Circuit's decision in *Nielsen*, which expressly held that an employee's reported conduct "need not 'definitively and specifically' relate to one of the listed categories of fraud or securities violations in § 1514A in order for that employee to claim protection under the statute." *Nielsen*, 762 F.3d at 224. *Nielsen* also recognized that "[m]any employees are unlikely to be trained to recognize legally actionable conduct by their employers" and, therefore, the whistleblower's "belief" that his "employer has engaged in wrongdoing" plays a "central[]" role in the analysis.

---

[11] The authorities that Defendants cite on this point are all distinguishable. (Def. Br. 16-17). For example, in *Villanueva* v. *U.S. Dep't of Labor*, 743 F.3d 103 (5th Cir. 2014), the court affirmed the grant of summary judgment because the plaintiff believed he was retaliated against for complaining that the defendant violated *a foreign country's* tax laws, which are not covered by § 806. *Id.* at 108-09. Affirmance was not on the grounds that the plaintiff had failed adequately to specify the exact law or regulation, among those covered by § 806, that had been violated.

*Id.* at 221; *see also Ashmore* v. *CGI Grp. Inc.*, 138 F. Supp. 3d 329, 343 (S.D.N.Y. 2015) (holding that the "critical focus" is whether the employee reported conduct that he reasonably believes constituted a violation of federal law and, so, "fulfills his duty … when he 'identifies conduct that falls within the ample bounds of the anti-fraud laws.'" (quoting *Leshinsky*, 942 F. Supp. 2d at 443)); *cf. Sharkey* v. *JPMorgan Chase & Co.*, 660 F. App'x 65, 68 (2d Cir. 2016) (summary order) (vacating grant of summary judgment in § 806 case where defendants presented evidence that plaintiff's proffered concerns "subsequently proved unfounded" and that plaintiff "may have failed to take reasonable steps to investigate her concerns"; finding that parties' factual dispute did not permit the "conclusion that, as a matter of law, the [plaintiff] could not have held a reasonable belief of illegal … activity").

Defendants' arguments tend also to assume, incorrectly, that the absence of a *completed* legal violation vitiates the reasonableness of Plaintiff's belief under § 806. "[A] whistleblower need not show that the corporate defendant committed fraud to prevail in [his] retaliation claim under § 1514A. The statute only requires the employee to prove that [he] 'reasonably believed' that the defendant's conduct violated federal law. The provision's focus [is] on the plaintiff's state of mind rather than on the defendant's conduct[.]" *Guyden* v. *Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008) (alterations omitted) (quoting 18 U.S.C. § 1514A(a)(1)), *superseded on other grounds by statute as described in Wong* v. *CKX, Inc.*, 890 F. Supp. 2d 411, 421 (S.D.N.Y. 2012).

Furthermore, one logical conclusion that flows from Defendants' argument would be that employees in Plaintiff's position are unprotected by the statute unless they actually capitulate to inappropriate influence, publish seemingly independent research that is in fact inaccurate or biased, and then blow the whistle.[12] That position is both untenable and wholly at odds with the purpose of § 806. As one court in this District has summarized:

> [I]mminent crimes, or at least crimes in their infancy, are within the scope of [§] 806. ... "[I]t would frustrate the purpose of Sarbanes-Oxley to require an employee, who knows that a violation is imminent, to wait for the actual violation to occur when an earlier report possibly could have prevented it." It furthers the purpose of [§] 806 to nip corporate wrongdoing in the bud, rather than permitting a scheme to blossom into a full-fledged crime before whistleblower protections take effect. Whistleblowers should not be asked to wait until executives have dotted the i's and crossed the t's before sounding an alarm.

*Leshinsky*, 942 F. Supp. 2d at 446 (alterations omitted) (quoting *Wiest* v. *Lynch*, 710 F.3d 121, 133 (3d Cir. 2013)); *id.* (citing *Walters* v. *Deutsche Bank AG*, No. 2008 SOX 70, 2009 WL 6496755, at *9 (ALJ Mar. 23, 2009) ("Senator Leahy justified the protection [§] 806 affords to whistleblowers based on the importance of the unique, inside, financial perspective they can provide ... [§ 806 was] designed to encourage insiders to come forward without fear of retribution.")).

---

[12] Requiring the putative whistleblower to capitulate to demands that he or she engage in improper conduct would also, presumably, reduce incidents of retaliation for precisely the wrong reasons, thereby contravening the purpose of § 806.

Here, Plaintiff believed it was illegal to skew or falsely certify his independent research reports in order to benefit UBS's CMBS Business. So he did not do it. He also believed that the CMBS Business campaign to skew or chill his independent analysis was itself illegal. So he reported it and, construing the evidence in his favor and as discussed *infra*, got fired for doing so. Moreover, Plaintiff's securities licenses and experience, while notable, do not make him a securities lawyer or compliance official attuned to the elements of specific statutory or regulatory violations of the securities laws, and certainly do not foreclose a whistleblower claim as a matter of law. It suffices to say at this stage that Plaintiff's belief did not "exist wholly untethered" from the enumerated provisions in § 806, *Nielsen*, 762 F.3d at 221 n.6 — Plaintiff believed that efforts to pressure him into publishing biased and inaccurate, but ostensibly independent, reports touching on the CMBS securities market were a violation of federal securities laws and regulations. (Pl. 56.1 Opp. ¶¶ 256, 378-79; Mondl Decl., Ex. 1 (Murray Dep.), at 249:18-250:25).

The evidence, viewed in the light most favorable to Plaintiff, permits a rational jury to conclude that he was both objectively and subjectively reasonable in believing that Defendants' CMBS Business members "engaged in wrongdoing" of the sort cognizable under § 806. *See Nielsen*, 762 F.3d at 221; *see also Leshinsky*, 942 F. Supp. 2d at 447.

        ii.      **A Reasonable Jury Could Find That Plaintiff's Protected Activity Was a Contributing Factor in Defendants' Unfavorable Action**

Under § 806, Plaintiff must also demonstrate that his protected activity was "a contributing factor in the unfavorable action." *Bechtel*, 710 F.3d at 451. The phrase "a contributing factor" means "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Leshinsky*, 942 F. Supp. 2d at 449 (internal quotation marks omitted) (quoting *Pardy* v. *Gray*, No. 07 Civ. 6324 (LAP) 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008)). "A plaintiff need not prove that [his] protected activity was the *primary* motivating factor in [his] termination, or that the employer's articulated reason was pretext in order to prevail." *Perez* v. *Progenics Pharm., Inc.*, 965 F. Supp. 2d 353, 366 (S.D.N.Y. 2013) (internal quotation marks omitted) (quoting *Barker* v. *UBS AG*, 888 F. Supp. 2d 291, 300 (D. Conn. 2012) (Droney, *J.*)). Factors that may be considered include "the amount of time between the protected activity and the adverse employment action, the existence of a strained relationship between the party and the employer, any isolation of the employee from the company, and changed performance evaluations." *Id.* (internal quotation marks omitted) (quoting *Barker* v. *UBS AG*, No. 09 Civ. 2084 (CFD), 2011 WL 283993, at *4 (D. Conn. Jan. 26, 2011)); *accord Mahony*, 2007 WL 805813, at *6 (same).

Plaintiff and Defendants offer different narratives for why Plaintiff was terminated. Construing the evidence in the light most favorable to Plaintiff, the record demonstrates that Plaintiff's reporting of efforts by CMBS Business personnel, including Cohen, to skew or chill his independent analysis was a contributing factor to his termination. (Pl. Opp. 14-15). For example, Plaintiff

asserts that Cohen was involved in the decision to terminate Plaintiff (*see, e.g.,* Mondl Decl., Ex. 16 (Hatheway Dep.), at 137:5-25 (acknowledging that Hatheway and Cohen spoke regarding Plaintiff's termination before the termination decision was finalized)); that Cohen and McNamara were aware of Plaintiff's complaints and resistance to their pressure (*see, e.g.,* Pl. 56.1 Opp. ¶ 200; Mondl Decl., Ex. 1 (Murray Dep.), at 398:4-400:3); and that Cohen rejected efforts to save Plaintiff's job (*see, e.g.,* Mondl Decl., Ex. 1 (Murray Dep.), at 286:21-287:4 (testifying that Schumacher told Plaintiff that he had personally appealed to Cohen and McNamara to try to save Plaintiff's job but that Cohen and McNamara said no); Pl. 56.1 Opp. ¶¶ 565-67 (describing testimony that, in January 2012, Schumacher discussed with McNamara [redacted], a move that would require Cohen's approval); Stulberg Decl., Ex. 45 (notes from a human-resources manager's meeting with Schumacher regarding Plaintiff's termination stating that "Ken Cohen not taking [Plaintiff] on")).

Defendants respond that Plaintiff had already been identified as a candidate for termination by the time Hatheway and Cohen spoke, even if the final decision had not yet been made. (Def. 56.1 ¶¶ 164-65, 169; Def. 56.1 Opp. ¶¶ 523-24). Indeed, Defendants argue, Cohen favored retaining Plaintiff. (Def. Reply 7; Def. 56.1 ¶¶ 181-82, 188). They also point out that Hatheway, who was the ultimate decision-maker when it came to terminating Plaintiff, was unaware of Plaintiff's whistleblowing and that Plaintiff was terminated solely for business reasons. (Def. 56.1 ¶¶ 163-65, 191). These business reasons tie into Defendants' broader narrative that financial considerations

were the sole reason for Plaintiff's termination: Defendants were experiencing financial difficulties in the period leading up to Plaintiff's termination and had undergone cost-cutting measures, such as slashed bonuses and multiple reductions in force. (Def. Br. 18-19). Plaintiff was simply the victim of one such reduction. (*Id.*).

The Court finds that genuine disputes of material fact preclude summary judgment. Defendants criticize Plaintiff's heavy reliance on his own deposition testimony. (*See, e.g.,* Def. Br. 1 ("[D]espite extensive discovery, plaintiff has failed to develop any support for his 'whistleblower' claim, apart from his own self-serving testimony and conjecture."); *id.* at 5 n.4 ("[Plaintiff's] deposition testimony is the only evidence supporting his claim that any of these incidents of improper pressure occurred. There is no corroborating testimony, and no contemporaneous documentation of any kind.")). But such criticism is unwarranted: Plaintiff may appropriately rely upon his own testimony to defeat summary judgment where, as here, that "testimony [i]s not contradictory or rife with inconsistencies such that it [i]s facially implausible." *Fincher* v. *Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see Danzer* v. *Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998) (declining to hold allegations insufficient to survive summary judgment merely because they were "self-serving"); *see also Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) ("[I]t is undoubtedly the duty of district courts not to weigh the credibility of the parties.").

Indeed, just a few months ago in *Yang* v. *Navigators Group, Inc.*, the Second Circuit reversed a district court's grant of summary judgment in a similar § 806 whistleblower-retaliation action because the lower court had improperly deemed the plaintiff's own deposition testimony to be insufficient to support her claim. *See* No. 16-77-cv, 2016 WL 7436485, at *1 (2d Cir. Dec. 22, 2016) (summary order). The Circuit held that

> [the plaintiff's] own testimony ... constituted admissible evidence and, thus, should not have been excluded from consideration in reviewing [the] defendant's summary judgment motion. To the contrary, the testimony should have been viewed in the light most favorable to [the plaintiff], in which circumstances it sufficed to give rise to a genuine dispute of material fact as to protected activity that precluded summary judgment.

*Id.* (internal citations omitted).

At best, then, Defendants' counter-narrative implicates genuine disputes of material fact, including assessments of witness credibility, concerning how and why Plaintiff was actually terminated. *See, e.g., Perez*, 965 F. Supp. 2d at 368 (denying summary judgment and holding that the weighing of competing reasons why the plaintiff was terminated would require the court "to evaluate the credibility of the [p]laintiff and [the defendant's general counsel], a task outside the Court's domain at the summary judgment stage"); *cf. Fincher*, 604 F.3d at 726 (denying summary judgment where plaintiff's own account established genuine dispute of material fact).

At worst, Defendants' cost-cutting narrative is reconcilable with their own liability; that is, Plaintiff could have been selected as a candidate for termination because of financial reasons *and* because he had been a thorn in

the side of his whistleblowing targets. After all, Plaintiff "need not prove that [his] protected activity was the *primary* motivating factor in [his] termination," only that it was "*a* contributing factor," meaning that "alone or in connection with other factors" it "affect[ed] in *any* way the outcome of the decision." *Leshinsky*, 942 F. Supp. 2d at 449 (emphases added) (internal quotation marks and citations omitted). Moreover, Hatheway's status as the ultimate decision-maker, coupled with his ignorance of Plaintiff's protected activity, do not preclude causation. Drawing all inferences in Plaintiff's favor, the evidence demonstrates that before making a final decision Hatheway consulted Cohen — who was one of Plaintiff's primary antagonists, was aware of Plaintiff's complaints and resistance, and could have prompted Plaintiff's final selection for termination. A jury could thus conclude that Plaintiff's protected activity was a contributing factor to his termination. *Cf. Staub* v. *Proctor Hosp.*, 562 U.S. 411, 419 (2011) (holding that an employer may be held liable when a supervisor is a proximate cause of the termination, even if the ultimate decision-maker lacks the requisite animus); *accord Leshinsky*, 942 F. Supp. 2d at 450-51.

In sum, the Court finds that there are genuine disputes of material fact concerning the reason for Plaintiff's termination and, drawing inferences in Plaintiff's favor, further finds that a reasonable jury could conclude that Plaintiff's protected activity was a contributing factor to his termination.

### b.    Defendants Fail to Rebut Plaintiff's *Prima Facie* Case

"If a plaintiff carries the burden, the defendant employer can still secure

a favorable judgment by showing no genuine dispute that the record clearly

and convincingly demonstrates that the employer's adverse action would have

been taken even in the absence of protected activity." *Yang*, 2016 WL

7436485, at *1 (citing *Bechtel* and *Leshinsky*).  For the reasons set forth in

section B.2.a.ii of this Opinion, *supra*, wherein the Court described genuine

disputes of material fact concerning whether whistleblower-retaliation

contributed to Defendant's termination of Plaintiff, Defendants cannot show

the absence of a genuine dispute that the record "clearly and convincingly"

demonstrates that Plaintiff would have been terminated even in the absence of

his whistleblowing activity.  *See Leshinsky*, 942 F. Supp. 2d at 451 (rejecting

defendant's non-retaliatory rationale for the same reasons that genuine

disputes of material fact precluded summary judgment on the contributing-

factor element).

### C.    Defendants Are Denied Summary Judgment on Plaintiff's Back-Pay Remedy

Defendants argue that even if their motion fails as to Plaintiff's retaliation

claim, the Court should hold that Plaintiff cannot recover back-pay damages

after February 12, 2014, the date on which Plaintiff accepted employment with

hotel company [redacted] and ceased looking for work.  (Def. Br. 24-25).[13]

---

[13]    Both Plaintiff and Defendants rely on damage-mitigation principles from the traditional employment-discrimination context in support of their arguments.  (*See, e.g.,* Def. Br. 24-25; Pl. Opp. 17).  *See also Perez*, 204 F. Supp. 3d at 563 (applying Title VII damage-mitigation principles in § 806 whistleblower-retaliation action).

"A discharged employee must use reasonable diligence in finding other suitable employment, which need not be comparable to their previous positions." *Greenway* v. *Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998) (internal quotation marks and citation omitted). "This obligation is not onerous and does not require [him] to be successful." *Hawkins* v. *1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998) (citing *Dailey* v. *Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997)). "In order to reduce the meritorious claimant's entitlement to backpay, the defendant employer has the burden of demonstrating that [the former employee] has failed to attempt to mitigate. This burden may be met by establishing [i] that suitable work existed, and [ii] that the employee did not make reasonable efforts to obtain it." *Id.*; *cf. Broadnax* v. *City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005). "An employer … is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." *Greenway*, 143 F.3d at 53. For example, "a claimant who voluntarily resign[s] from comparable employment for personal reasons would not have adequately mitigated damages, but 'a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions *or an earnest search for better employment*.'" *Hawkins*, 163 F.3d at 696 (emphasis added) (quoting *EEOC* v. *Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992)).

Here, there are sufficient facts to permit a jury to conclude that Plaintiff has made reasonable efforts to find comparable employment. (Pl. Opp. 17). A

jury may find that the [redacted] position was not comparable to Plaintiff's position with Defendants, even accounting for cost-of-living adjustments; after all, not only did the position pay [redacted] less and no bonus, it was also structured to [redacted]. (Murray Decl. ¶¶ 24-27; Stulberg Decl., Ex. 117). *See Elmessaoudi* v. *Mark 2 Rest. LLC*, No. 14 Civ. 4560 (PGG), 2016 WL 4992582, at *15 (S.D.N.Y. Sept. 15, 2016) ("Given that Plaintiff has had employment since his termination, and given the evidence of his efforts to find work, Defendant is not entitled to judgment as a matter of law that Plaintiff has failed to mitigate his damages. Under the circumstances here, it is a jury question whether Plaintiff made reasonable efforts to mitigate his damages."). Furthermore, Plaintiff's resignation from [redacted] and acceptance of an offer with [redacted], viewed favorably, can be considered "an earnest search for better employment" that does not cut off his damages. *Hawkins*, 163 F.3d at 696. (*See* Murray Decl. ¶ 31). In sum, genuine disputes of material fact preclude summary judgment in favor of Defendants on Plaintiff's mitigation of back-pay damages.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is DENIED.  The parties shall appear via telephone for a conference with the Court on **April 14, 2017, at 4:30 p.m.** to discuss a schedule for trial in this matter.  The parties shall contact Chambers at (212) 805-0290 with all parties present on the line.

SO ORDERED.

Dated:　　　March 31, 2017
　　　　　　New York, New York

_____
　　　KATHERINE POLK FAILLA
　　　United States District Judge