UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                :
TREVOR MURRAY,                                  :
                                                :
                    Plaintiff,                  :
                                                :
        -against-                               :     Civil Action No. 14 Civ. 0927 (KPF)
                                                :
UBS SECURITIES, LLC and UBS AG,                 :
                                                :
                    Defendants.                 :
                                                :
--------------------------------------------------------x


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW**

Gabrielle Levin
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 48th Floor
New York, N.Y. 10166
Telephone: (212) 351-3901
Facsimile: (212) 351-5301
glevin@gibsondunn.com

Eugene Scalia (*Admitted Pro Hac Vice*)
Daniel P. Chung
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 467-0539
escalia@gibsondunn.com
dchung@gibsondunn.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD.......................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.    PLAINTIFF HAS FAILED TO PROVE RETALIATION AS A MATTER OF
FACT AND LAW......................................................................................................... 4

    A.    Plaintiff Has Failed To Prove That His Alleged Protected Activity Was A
Contributing Factor To His Termination .................................................... 4

    B.    Plaintiff Has Failed To Prove That He Engaged In Protected Activity ................. 9

        1)    Plaintiff Has Failed To Prove That He Reasonably Believed That
Any UBS Employee Engaged In Shareholder Fraud................................. 9

        2)    Plaintiff Has Failed To Prove That He Had A Reasonable Belief
That Any UBS Employee Violated Regulation AC ................................ 14

        3)    Plaintiff Has Not Established That He Provided Information About
Purportedly Illegal Conduct.................................................................... 15

    C.    Plaintiff Has Failed To Prove That UBS Had Knowledge Of His Alleged
Protected Activity ..................................................................................... 16

II.    PLAINTIFF HAS FAILED TO PROVE THAT HE IS ENTITLED TO ANY
DAMAGES................................................................................................................. 17

    A.    Plaintiff Is Not Entitled To Lost Pay After December 2012, When His
Employment At UBS Would Have Ended In Any Event................................... 18

    B.    Plaintiff Is Not Entitled To Lost Pay Damages After February 2014, When
He Ceased Looking For Work .................................................................... 19

    C.    Plaintiff Has Failed to Mitigate His Damages Since Leaving KKHG................. 19

    D.    Plaintiff Has Failed To Demonstrate That He Is Entitled To Reinstatement
Or Any Front Pay Damages....................................................................... 20

    E.    Plaintiff is Not Entitled To Any Lost Pay Based On Projected Pay Raises
Or Bonuses................................................................................................ 22

    F.    Plaintiff Has Failed To Demonstrate That He Is Entitled To Damages
Arising From Emotional Distress ............................................................... 24

    G.    Plaintiff Has Failed To Demonstrate That He Is Entitled To Compensatory
Damages Arising From Reputational Harm ................................................. 25

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................................3

*Bechtel v. Admin. Review Bd.*,
   710 F.3d 443 (2d Cir. 2013)....................................................................................4, 16

*Beckman v. U.S. Postal Serv.*,
   79 F. Supp. 2d 394 (S.D.N.Y. 2000).........................................................................15

*Bonura v. Chase Manhattan Bank, N.A.*,
   629 F. Supp. 353 (S.D.N.Y. 1986).............................................................................21

*Boston v. Taconic Eastchester Mgmt.*,
   2016 WL 5719751 (S.D.N.Y. Sept. 30, 2016)............................................................7

*Brondyke v. Bridgepoint Educ., Inc.*,
   2014 WL 12768332 (S.D. Iowa Apr. 25, 2014) .........................................................8

*Buckley v. Reynolds Metals Co.*,
   690 F. Supp. 211 (S.D.N.Y. 1988).............................................................................23

*Chamberlin v. Principi*,
   247 F. App'x 251 (2d Cir. 2007) ................................................................................9

*Chisholm v. Mem. Sloan-Kettering Cancer Ctr.*,
   824 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................23

*Chisolm v. Liberty Lines Transit Inc.*,
   2013 WL 452408 (S.D.N.Y. Feb. 6, 2013)................................................................21

*DeMarco v. Ben Krupinski Gen. Contractor, Inc.*,
   2014 WL 3531276 (E.D.N.Y. July 14, 2014)...........................................................20

*Diaz v. Transatlantic Reinsurance Co.*,
   2016 WL 3568071 (S.D.N.Y. June 22, 2016) ..........................................................15

*Dominic v. Consol. Edison Co. of N.Y., Inc.*,
   822 F.2d 1249 (2d Cir. 1987).....................................................................................23

*E.E.O.C. v. Best Clothing Mfg., Inc.*,
   2005 WL 1594153 (E.D.N.Y. July 7, 2005)..............................................................24

*E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*,
   164 F.3d 89 (2d Cir. 1998).........................................................................................23

## TABLE OF AUTHORITIES
(continued)

Page

*El Sayed v. Hilton Hotels Corp.*,
    627 F.3d 931 (2d Cir. 2010) (per curiam) ...............................................................8

*Fraser v. Fiduciary Trust Co. Int'l*,
    2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009) ...................................................8, 13

*Gallo v. Prudential Residential Servs., L.P.*,
    22 F.3d 1219 (2d Cir. 1994) .....................................................................................5

*Greenway v. Buffalo Hilton Hotel*,
    143 F.3d 47 (2d Cir. 1998) ..............................................................................19, 20

*Hill v. Airborne Freight Corp.*,
    2003 WL 366641 (E.D.N.Y. Feb. 20, 2003) ........................................................21

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ...............................................................................................13

*Jeffreys v. City of N.Y.*,
    426 F.3d 549 (2d Cir. 2005) ...................................................................................12

*Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*,
    716 F.3d 10 (2d Cir. 2013) .....................................................................................16

*Leshinsky v. Telvent GIT, S.A.*,
    942 F. Supp. 2d 432 (S.D.N.Y. 2013) .................................................................4, 8

*In re Magnum Hunter Res. Corp. Sec. Litig.*
    26 F. Supp. 3d 278 (S.D.N.Y. 2014) .....................................................................13

*Meimaris v. Braich*,
    2011 WL 13128211 (S.D.N.Y. Aug. 1, 2011) ......................................................23

*Mermaid Neptune Dev. Corp. v. Home Owners Warranty Corp.*,
    1988 WL 45653 (S.D.N.Y. 2012) .........................................................................25

*Nagel v. Cty. of Orange*,
    2013 WL 1285465 (S.D.N.Y. Mar. 28, 2013) ......................................................15

*Nielsen v. AECOM Tech. Corp.*,
    762 F.3d 214 (2d Cir. 2014) ...............................................................................9, 12

*Norris v. N.Y. City Coll. of Tech.*,
    2009 WL 82556 (E.D.N.Y. Jan. 14, 2009) ......................................................18, 19

## TABLE OF AUTHORITIES
(continued)

Page

*Pardy v. Gray*,
2008 WL 2756331 (S.D.N.Y. July 15, 2008) ........................................................................9

*Perez v. Progenics Pharms., Inc.*,
204 F. Supp. 3d 528 (S.D.N.Y. 2016).................................................................................22

*Press v. Concord Mortg. Corp.*,
2009 WL 6758998 (S.D.N.Y. Dec. 7, 2009) .......................................................................22

*Press v. Concord Mortg. Corp.*,
2010 WL 3199684 (S.D.N.Y. Aug. 11, 2010) .....................................................................22

*Raimondo v. AMAX, Inc.*,
843 F. Supp. 806 (D. Conn. 1994) ......................................................................................23

*Rivera v. Baccarat, Inc.*,
34 F. Supp. 2d 870 (S.D.N.Y. 1999)..............................................................................20, 24

*Schonfeld v. Hilliard*,
218 F.3d 164 (2d Cir. 2000)...................................................................................................3

*Sharkey v. J.P. Morgan Chase & Co.*,
2017 WL 374735 (S.D.N.Y. Jan. 26, 2017) .......................................................................22

*Sir Speedy, Inc. v. L & P Graphics, Inc.*,
957 F.2d 1033 (2d Cir. 1992)..................................................................................................4

*Sosa v. Local Staff, LLC*,
618 F. App'x 19 (2d Cir. 2015) ..........................................................................................12

*Thomas v. iStar Fin., Inc.*,
508 F. Supp. 2d 252 (S.D.N.Y. 2007).................................................................................22

*Vasquez v. Empress Ambulance Serv., Inc.*,
835 F.3d 267 (2d Cir. 2016)...................................................................................................7

*Whittlesey v. Union Carbide Corp.*,
742 F.2d 724 (2d Cir. 1984).................................................................................................21

*William Wrigley Jr. Co. v. Waters*,
890 F.2d 594 (2d Cir. 1989).................................................................................................24

**Statutes**

18 U.S.C. § 1514................................................................................................................12

## TABLE OF AUTHORITIES
(continued)

Page

18 U.S.C. § 1514A ...........................................................................................................7

18 U.S.C. § 1514A(a) .................................................................................................4, 6, 8

18 U.S.C. § 1514A(a)(1)..........................................................................................4, 9, 15

18 U.S.C. § 1514A(b)(2)(C) ..........................................................................................4

49 U.S.C. § 42121(b)(2)(B)(i) ........................................................................................4

**Regulation**

17 C.F.R. § 242.501(a)...............................................................................................2, 14

**Rule**

Fed. R. Civ. P. 50(a) ..................................................................................................1, 3

**Other Authorities**

*In Re Regulation Analyst Certification*, Securities Act Release No. 33-8193 (Feb. 20, 2003) .....14

9 James Wm. Moore *et al.*, *Moore's Federal Practice* § 50.05[4] (3d ed. 2017) .........................18

## INTRODUCTION

No reasonable juror could conclude based on the evidence offered by Plaintiff Trevor Murray against Defendants UBS Securities LLC and UBS AG (collectively, "UBS") that he was a "whistleblower," was retaliated against, or is entitled to any damages from UBS.  UBS therefore respectfully moves pursuant to Federal Rule of Civil Procedure 50(a) for judgment as a matter of law.

The evidence demonstrates that the illegal "pressure" that Plaintiff claims he was put under by Ken Cohen and members of the UBS CMBS Business did not occur; Plaintiff could not have believed that he was being subjected to such pressure; he did not report the supposed pressure to his supervisor, Michael Schumacher (or anyone, for that matter); and the selection of Plaintiff's position for inclusion in a reduction in force—a reduction that eliminated 128 other positions—was based entirely on economic expectations for UBS at the time.  Plaintiff offers only his own inconsistent, self-serving testimony in support of his claim that he experienced pressure to skew his research and reported it to Schumacher.  Plaintiff's testimony is not only contradicted by contemporaneous documentary evidence—which shows that, among other things, Plaintiff believed that UBS wanted him to "call it like [he saw] it"—but also by Plaintiff's own prior statements, which conflict with his trial testimony in several key respects. No reasonable juror could weigh Plaintiff's testimony against the substantial amount of evidence refuting that testimony and conclude that Plaintiff carried his burden to establish his claim by a preponderance of the evidence.  Further, and in light of Plaintiff's own repeated admissions that his research reports accurately reflected his personal views, no juror could conclude that Plaintiff reasonably believed that he reported shareholder fraud or a violation of "Regulation AC," which

requires that "the views expressed in [a] research report accurately reflect the research analyst's personal views."  17 C.F.R. § 242.501(a).

In any event, Plaintiff's testimony standing alone is insufficient to send this case to the jury.  Plaintiff did not—and indeed cannot—testify as to who made the decision to eliminate his position.  Although other evidence establishes that Larry Hatheway, the Global Head of Macro Strategy, made the decision to eliminate Plaintiff's positon, there is *no* evidence—whether in Plaintiff's testimony or otherwise—as to why Hatheway made that decision.  Further, Plaintiff has provided no evidence that Schumacher made the decision to eliminate Plaintiff's position or that Plaintiff's supposed report to Schumacher contributed to that decision in any way.  At most, Plaintiff has shown that Schumacher raised the possibility of eliminating Plaintiff's position as part of a reduction in force.  Every salient fact, however, demonstrates that Schumacher did not make the decision to eliminate Plaintiff's position, and in fact supported Plaintiff and made an effort to keep him employed at UBS as a desk analyst.

Although there is no evidence of retaliation, Plaintiff nevertheless seeks to hold UBS liable based on Schumacher's purported role in the process that led to the decision to eliminate Plaintiff's position as part of a reduction in force.  Even if Schumacher played some role in that decisionmaking process, that fact is insufficient as a matter of law to establish liability.  The Sarbanes-Oxley Act prohibits protected activity, not employees with knowledge of protected activity, from contributing to a termination decision.  The Act does not preclude an employee from participating in employment decisionmaking based on legitimate reasons and in the ordinary course of their duties.  Plaintiff contends that the mere fact of an employee with knowledge of the protected activity playing some role in the termination decision automatically

establishes liability.  This position implausibly removes the causation element of a Sarbanes-Oxley Act claim from the statute.

Plaintiff also fails to demonstrate that he is entitled to damages of any sort.  Even if UBS retaliated against Plaintiff—which it did not—the evidence establishes that UBS would have eliminated Plaintiff's position later in 2012, cutting off any award of damages.  Further, the evidence establishes that Plaintiff sought to change careers following his layoff, obtained two new jobs in finance after his employment with UBS ended, and stopped looking for work after accepting the second position as the Chief Financial Officer of KKHG.  Finally, any award of front pay would be unduly speculative as Plaintiff has failed to introduce any evidence establishing that he would have received the amount of annual compensation that he now seeks or the number of years that he would have continued to work at UBS.

For the foregoing reasons, UBS respectfully requests that the Court enter judgment as a matter of law in favor of UBS.

## **LEGAL STANDARD**

Judgment as a matter of law is appropriate when "a party has been fully heard . . . during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1).  In other words, where there "can be but one reasonable conclusion as to the verdict," the court should direct a verdict for the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In addition, because "[d]amages may not be merely speculative, possible or imaginary," *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (quotation omitted), a court should direct a verdict on damages against a plaintiff who has failed to "present evidence that provides the

finder of fact with a reasonable basis upon which to calculate the amount of damages." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

## ARGUMENT

## I. PLAINTIFF HAS FAILED TO PROVE RETALIATION AS A MATTER OF FACT AND LAW

Plaintiff has failed to meet his burden of proof with respect to his claim for retaliation in violation of the Sarbanes-Oxley Act. Dkt 25, Am. Compl. The Sarbanes-Oxley Act requires Plaintiff to prove each of the following elements of a *prima facie* case of retaliation by a preponderance of the evidence: (1) he engaged in protected activity; (2) UBS knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in that personnel action. *See Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013); *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 441 (S.D.N.Y. 2013). To establish protected activity, Plaintiff must prove that he reported conduct that he "reasonably believe[d] constitute[d] a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1). Ultimately, it is Plaintiff's burden to establish that he suffered adverse action "because of" protected activity. *Id.* § 1514A(a).

### A. Plaintiff Has Failed To Prove That His Alleged Protected Activity Was A Contributing Factor To His Termination

A violation of the Sarbanes-Oxley Act occurs when a company discharges an employee "because of" the employee's protected activity. 18 U.S.C. § 1514A(a). As part of establishing the requisite causation, Plaintiff must demonstrate by a preponderance of the evidence that his protected activity was a "contributing factor" in his termination. *See id.* § 1514A(b)(2)(C); 49 U.S.C. § 42121(b)(2)(B)(i). Plaintiff has failed to produce any direct or indirect evidence—not

even his own testimony—on which any reasonable juror could conclude that Plaintiff's alleged protected activity contributed in any way to his termination.

The evidence establishes that UBS experienced significant financial challenges in 2011, and, in order to address those challenges, UBS management decided to reduce costs by undertaking a reduction in force in early 2012.  Trial Tr. 826:11-828:14.  Reductions in force are a legitimate basis for discharging employees.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1226 (2d Cir. 1994) (a reduction in force implemented "to meet [the firm's] budgetary goals" during "a business downturn" was a legitimate reason for terminating the employee).

UBS's senior management determined that 129 positions would be eliminated from FICC as part of the early 2012 reduction in force, seven of which would be eliminated from FICC Research.  DX-94.  Plaintiff has not introduced any evidence establishing why Hatheway made the decision to include his position among the seven eliminated, and thus fails to establish that his alleged protected activity played any role in the decision.  Moreover, Plaintiff has introduced no evidence establishing that the reduction in force was unnecessary or that another position within FICC Research should have been eliminated instead of his.  Indeed, Plaintiff acknowledges that there were legitimate reasons for the elimination of his position.  Trial Tr. 358:18-23 ("Q. All right.  And you claim that UBS fired you in retaliation for blowing the whistle to Mr. Schumacher, correct?  A. That it was a contributing factor.  Q. Yes.  That that is – you're claiming that they fired you, that that was a reason, correct?  A. That was one of the reasons why I was terminated, yes.").

Plaintiff attempts to escape the complete lack of evidence that retaliation played a part in the decision to eliminate his position by focusing on Schumacher's purported role in the process. This fails for multiple reasons.

First, no reasonable juror could conclude that Plaintiff complained to Schumacher about illegal conduct, *see infra* Section I.B.3, and so could not conclude that Schumacher sought to terminate Plaintiff because of any alleged protected activity.

Second, even if Plaintiff complained to Schumacher, Plaintiff fails to demonstrate by a preponderance of the evidence that his protected activity was a contributing factor in the decision to eliminate his position as part of a reduction in force. Schumacher testified that he did not make the decision to eliminate Plaintiff's position, Trial Tr. 755:8-756:2, and Plaintiff has provided no evidence to the contrary. While Schumacher did identify various options for Hatheway, his supervisor, Trial Tr. 756:4-10, PX-92, there is no evidence that he did so "because of" Plaintiff's protected activity. 18 U.S.C. § 1514A(a). Indeed, Plaintiff has failed to produce any evidence that Schumacher possessed any sort of retaliatory animus toward him at all, much less connect any such animus to the termination decision. To the contrary, the evidence establishes that Schumacher was *supportive* of Plaintiff. Schumacher gave Plaintiff a positive performance review. *See* PX-56. Plaintiff testified that Schumacher expressed sympathy for him. *See, e.g.*, Trial Tr. 603:17-24. Schumacher also raised the possibility of transferring Plaintiff to a desk analyst position, which would have kept Plaintiff employed by UBS. PX-92. While another position for Plaintiff ultimately was not secured, no reasonable juror could find that Schumacher sought to retaliate against Plaintiff based on these facts.

Moreover, even if there were any evidence that Schumacher sought to retaliate against Plaintiff, Plaintiff fails to introduce evidence that Hatheway "act[ed] *negligently* with respect to

6

the information provided by [Schumacher] . . . thereby afford[ing] [Schumacher] an outsize role in [the] employment decision." *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 275 (2d Cir. 2016). Indeed, there is no evidence showing that Schumacher's involvement had any influence on the decision to eliminate Plaintiff's position. Plaintiff fails to carry his burden in these circumstances. *See Boston v. Taconic Eastchester Mgmt.*, 2016 WL 5719751, at *8 (S.D.N.Y. Sept. 30, 2016) ("Even assuming Pauv harbored discriminatory animus towards Plaintiff—a proposition that the record does not support—Plaintiff is unable to show that Taconic negligently relied on Pauv's statements.").

Third, Schumacher testified extensively regarding the legitimate business reasons underlying the option he identified to Hathaway regarding eliminating Plaintiff's position or moving Plaintiff to a desk analyst position. *See* Trial Tr. 783:7-790:11. Schumacher testified in particular that his observation that Mr. Murray would be a better fit as a desk analyst was based on his observation that the CMBS market had become less liquid, meaning that a strategist would have less access to information and therefore less about which to write. Trial Tr. 786:25-788:25. Plaintiff has offered no evidence to rebut this rationale, and the documents in evidence establish that Plaintiff *agreed* with Schumacher's view regarding the liquidity of the CMBS market. *See, e.g.*, PX-26 at UBS_TMurray_021808 ("The shrinking role of CMBS in benchmark indices exacerbates the liquidity situation further."); PX-29 at UBS_TMurray_00891 ("CMBS will likely underperform the more liquid/stable investment grade corporate market.").

Fourth, Plaintiff's contention that causation is established so long as an employee with knowledge of the protected activity played "some role" in the termination decision is unavailing. *See* Dkt 177, Plaintiff's Proposed Jury Charges at 43-44. The Sarbanes-Oxley Act is implicated when protected activity is a contributing factor in a termination decision. 18 U.S.C. § 1514A. It

does not prohibit an employee with knowledge of the protected activity from playing any role in the termination process. *See, e.g.*, *Brondyke v. Bridgepoint Educ., Inc.*, 2014 WL 12768332, at *8 (S.D. Iowa Apr. 25, 2014) (finding report was not a contributing factor to termination decision despite comments made to decisionmaker by employees with knowledge of report). Plaintiff's reading not only contravenes the plain language of the statute, 18 U.S.C. § 1514A(a) (stating that an employee may not be discharged "because of any lawful act done by the employee"), but also would convert Sarbanes-Oxley from a statute designed to prevent retaliation to a statue immunizing employees from termination for any reason.  Under Plaintiff's interpretation, no employee could be fired for any reason so long as he notified a potential decisionmaker of his or her alleged protected activity.  As a result, Plaintiff cannot, as a matter of law, satisfy his burden of proof based on Schumacher's identification of options to Hatheway.

A reasonable juror also cannot conclude that Plaintiff satisfied his burden of proof based only on any temporal proximity between Plaintiff's alleged whistleblowing and the termination of his employment.  Temporal proximity is "not necessarily determinative" of "the motivating factors behind terminating an employee." *Leshinsky*, 942 F. Supp. 2d at 450.  To the contrary, a "legitimate intervening basis for the adverse action" severs any causal link. *Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009), *aff'd*, 396 F. App'x 734 (2d Cir. 2010) (quotation omitted).  For this reason, while courts may draw inferences from temporal proximity when evaluating pretrial pleadings, temporal proximity is not evidence that may carry a plaintiff's burden of proof at trial.  Indeed, it is well established that temporal proximity alone cannot establish that Plaintiff's protected activity was a contributing factor to his termination. *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (per curiam) (holding that

temporal proximity "without more" was insufficient to create triable issue of fact when

defendant proffered legitimate, non-retaliatory reasons for discharging plaintiff).[1]

For the foregoing reasons, Plaintiff failed to carry his burden of proof to establish that his

alleged protected activity was a contributing factor to his termination, and no reasonable juror

could conclude otherwise.

### B.    Plaintiff Has Failed To Prove That He Engaged In Protected Activity

Plaintiff has failed to produce any evidence, let alone prove by a preponderance of the

evidence, that he reasonably believed that any UBS employee engaged in conduct that

constituted shareholder fraud or that he provided information about such conduct to his

supervisor.  This failure precludes a reasonable juror from finding that Plaintiff engaged in

protected activity as defined in the Sarbanes-Oxley Act.  18 U.S.C. § 1514A(a)(1).

### 1)    Plaintiff Has Failed To Prove That He Reasonably Believed That Any UBS Employee Engaged In Shareholder Fraud

Plaintiff has alleged that he "reasonably believed that he was being pressured . . . in

violation of federal laws relating to fraud against shareholders, including, but not limited to SEC

Rule 10b-5."  Dkt. 25, Am. Compl. at ¶ 23.  "A reasonable belief [under SOX] contains both

subjective and objective components."  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d

Cir. 2014).  Thus, in order to establish that his belief was reasonable, Plaintiff "must show not

only that he believed that the conduct constituted a violation, but also that a reasonable person in

his position would have believed that the conduct constituted a violation."  *Id.* (quotation

omitted).

---

[1] *See also Chamberlin v. Principi*, 247 F. App'x 251, 254 (2d Cir. 2007) (affirming district court finding of no causal connection between alleged acts and protected activity "based on temporal proximity alone"); *Pardy v. Gray*, 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008) ("Mere temporal proximity, however, does not compel a finding of retaliatory intent.").

Plaintiff has failed to put forward any evidence, aside from his own contradictory and self-serving testimony, that during his employment with UBS he believed that UBS employees engaged in shareholder fraud.  Instead, the evidence establishes that Plaintiff did not believe anything was amiss at UBS at all.  First, the *only* documentary evidence that exists regarding how UBS viewed Plaintiff's research squarely contradicts Plaintiff's claims about pressure. After a friend suggested that some within UBS would be unhappy with the position that Plaintiff had taken in an article, Plaintiff defended UBS, declaring that "internally they want me to call it like I see it which gives us credibility with clients."  DX-69.

Second, a compliance representative generally sits near trading desks, Trial Tr. 815:24-816:8 (Montanaro), and Plaintiff himself sat near the Commercial Mortgage Backed Securities ("CMBS") trading desk, Trial Tr. 190:4-10 (Murray) (testifying that he sat between twelve and fifteen feet away from CMBS Trading Desk);  the Compliance Department was attuned to research independence issues that could arise from trading employees reading drafts of Plaintiff's research reports, PX-11; PX-14; Trial Tr. 440:16-20; and Plaintiff admitted that if he had told the Compliance Department about the pressure that he claims he was experiencing, the Compliance Department would have taken action to stop it.  Trial Tr. 441:4-11.  No reasonable juror could accept Plaintiff's claim that he reported the pressure to Schumacher twice given Plaintiff's testimony that the Compliance Department would have stopped the pressure if he had reached out to them, and that, at the time of the first supposed report, Schumacher directed him to "not alienate his internal client."  Trial Tr. 516:18-517:23.  The only reasonable explanation for why Plaintiff did not raise concerns with the Compliance Department about purportedly illegal pressure to skew his research is that Plaintiff did not, in fact, have any such concerns.

Finally, Plaintiff certified that each and every article that he wrote at UBS—19 in total (including reprints)—"accurately reflect[ed] [his] personal views" and was "prepared in an independent manner, including with respect to UBS." *See, e.g.*, PX-58 at UBS_TMurray_00564; Trial Tr. 241:5-9. Although Plaintiff testified at trial for the first time and in contradiction of his deposition testimony that the certifications were in part inaccurate, Trial Tr. 448:8-9, the evidence demonstrates that, at the time he made the certifications, Plaintiff believed they were accurate. *See* Trial Tr. 447:14-16 ("Q. But you've testified that this certification was true every time that you made it, correct? A. That is correct."). No reasonable juror could find that Plaintiff believed that UBS engaged in fraud when he repeatedly certified that there was no fraud and testified that the certifications were accurate when he made them. Trial Tr. 447:14-16.

Plaintiff's own testimony that he believed he was being pressured to skew his research and that this pressure was illegal is insufficient to carry his burden. In addition to being self-serving, Plaintiff's statements regarding the nature of the alleged shareholder fraud must not be credited because key details have changed over time. For example, Plaintiff claimed at trial that, as part of the process by which he cleared his research articles with the CMBS Trading Desk, he would print out a copy of his draft and hand deliver it to a CMBS Trader. Trial Tr. 269:2-15. Plaintiff told an investigator from the Office of Safety and Health Administration in October 2012, however, that he only was required to clear his article's topics in advance of publication and that he never submitted any written drafts to members of UBS's CMBS Trading Desk. DX-192 at 60:12-24; 109:1-10. Further, Plaintiff claimed that the whole point of the CMBS Trading Desk forcing him to preclear his articles in advance of publication was to control the message. Trial Tr. 446:11-15. He later testified, however, that he "never even had the privilege of knowing what [Cohen's] message was." Trial Tr. 620:21-621:13. It is implausible that the

11

CMBS Trading Desk would go to the effort of implementing an illegal scheme to control Plaintiff's message, but then fail to inform Plaintiff of the message so that their scheme would work.  In light of this, no reasonable juror could conclude from Plaintiff's testimony alone that Plaintiff actually believed that UBS employees engaged in shareholder fraud.  *See Jeffreys v. City of N.Y.*, 426 F.3d 549, 555 (2d Cir. 2005) ("[W]e hold that the District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony— which was largely unsubstantiated by any other direct evidence—was 'so replete with inconsistencies and improbabilities' that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint.").

Nor does the evidence prove that Plaintiff possessed an objectively reasonable belief that the conduct of UBS employees constituted a violation of a federal law enumerated in the Sarbanes-Oxley Act.  Objective reasonableness is not established by evidence that the complained of behavior was simply wrong as opposed to illegal.  Rather, "the objective reasonableness of an employee's belief . . . must be measured against existing substantive law, because a failure to do so would eviscerate the objective component of [the Court's] reasonableness inquiry."  *Sosa v. Local Staff, LLC*, 618 F. App'x 19, 19-20 (2d Cir. 2015) (quotation omitted).  Accordingly, witness testimony that the purported pressure was "wrong," "inappropriate," or even "illegal" cannot by itself establish an objectively reasonable belief that it violated a provision enumerated in the Act.  18 U.S.C. § 1514A(a).

Plaintiff has alleged that he believed that UBS employees "violat[ed] federal laws relating to fraud against shareholders, including, but not limited to SEC Rule 10b-5."  Dkt. No. 25, Am. Compl. at ¶ 23.  This requires that Plaintiff's supposed whistleblowing report, and the evidence supporting it, relate to the elements of shareholder fraud.  *See Nielsen*, 762 F.3d at 221

n.6 ("[T]he statutory language [of the Sarbanes-Oxley Act] suggests that, to be reasonable, the purported whistleblower's belief cannot exist wholly untethered from these specific provisions.").  Plaintiff fails to meet this standard.

The pressure that Plaintiff claims constitutes shareholder fraud consists of negative feedback and "grumbling" about his published views.  Trial Tr. 480:1-8.  This is not fraud. There is no evidence that any shareholder was ever aware of the "grumblings" alleged by Plaintiff, much less affected by them.  Trial Tr. 480:6-22.  *See also Fraser*, 2009 WL 2601389, at *6 (no reasonable belief of shareholder fraud where plaintiff recognized that allegedly fraudulent document never distributed externally); *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 144 (2011) ("[D]ismissal of the complaint was proper because the public could not have relied on the entities' undisclosed deceptive acts.").  As Plaintiff acknowledges, traders are allowed to possess views on the markets in which they operate, and those views may differ from those of strategists.  *See* Trial Tr. 508:6-8 ("Q. In fact, [Mr. Cohen] could discuss and disagree with your published research, correct?  A. Absolutely.").

Nor can Plaintiff now argue that the analyst certifications themselves are fraudulent statements made to shareholders, citing his trial testimony that the certifications inaccurately indicated the articles were *prepared* independently.  As a threshold matter, no juror could accept Plaintiff's position in light of his repeated prior testimony that the certifications were accurate when made.  Moreover, Plaintiff has never claimed that he was blowing the whistle on fraudulent statements he himself made.  In any event, even if the certifications were inaccurate— which they were not—any inaccuracies were not material under Rule 10b-5 because there is no "substantial likelihood that a reasonable person would consider" the purportedly inaccurate aspect of the certification "important in deciding whether to buy or sell" an investment, *In re*

*Magnum Hunter Res. Corp. Sec. Litig.* 26 F. Supp. 3d 278, 291 (S.D.N.Y. 2014), given that

Plaintiff himself testified that the content of the articles themselves were accurate and

represented Plaintiff's own views.  Trial Tr. 447:7-9 ("I did not lie that the views expressed in

the article were my own[.]").  The jury cannot find that any reasonable person would believe the

actions described by Plaintiff constituted shareholder fraud, much less that a reasonable person

with Plaintiff's extensive experience and training in the financial industry would consider this

fraud.  *See* DX-155 at P739.

> 2)   Plaintiff Has Failed To Prove That He Had A Reasonable Belief That Any
>      UBS Employee Violated Regulation AC

Plaintiff's belated reliance on Regulation AC is also unavailing.  As relevant here,

Regulation AC simply requires a certification that "the views expressed in the research report

accurately reflect the research analyst's personal views."  17 C.F.R. § 242.501(a).  Plaintiff has

repeatedly and consistently testified that the research he published was "accurate" and did not

run "contrary" to his own views.  *See* Trial Tr. 447:14-16, 19-20; *id.* 448:16-19.  Notably,

Regulation AC does *not* require that the analyst certification include any statement regarding the

*manner* in which the reports were prepared.  Thus, for purposes of determining whether a

violation of Regulation AC has occurred, it is irrelevant whether the certification about the report

being "prepared in an independent manner" was accurate.  Indeed, the regulation explicitly

contemplates review and input.  As the SEC explained, "[t]he certification . . . does not impede .

. . oversight or review of research reports," and "[i]f, at the end of the revision process, the

analyst still believes that the report accurately reflects his or her personal views about the subject

securities or issuers, then *that analyst may certify and the firm may use the research report.*"  *In*

*Re Regulation Analyst Certification*, Securities Act Release No. 33-8193, at *11 (Feb. 20, 2003)

(emphasis added); *see id.* (Regulation AC "makes explicit the representations that are already

implicit when an analyst publishes his or her views—that the analysis of a security published by the analyst reflects the analyst's honestly held views." ).[2]  The bottom line is that any purported falsity of the "independent manner" certifications has no legal significance under Regulation AC, and it cannot satisfy the objective prong of the reasonable belief requirement.

Additionally, Plaintiff did not raise the notion that Regulation AC was the relevant legal authority until his opposition to summary judgment, and "[i]t is well-settled that a party may not raise new claims or theories of liability for the first time in opposition to summary judgment," *Nagel v. Cty. of Orange*, 2013 WL 1285465, at *5 (S.D.N.Y. Mar. 28, 2013), because the defense cannot "tailor its discovery to prepare an appropriate defense."  *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000).  That alone is sufficient reason to dispose of any Regulation AC-based argument.  Finally, Sarbanes-Oxley protects reports of alleged fraud, not of any conceivable SEC rule or regulation even in the absence of suspected fraud.

       3)     <u>Plaintiff Has Not Established That He Provided Information About Purportedly Illegal Conduct</u>

In addition to possessing a reasonable belief, Plaintiff also must establish that he "provid[ed] information" about conduct that he reasonably believed violated the law.  18 U.S.C. § 1514A(a)(1).  Plaintiff's claim that he reported his allegedly reasonable belief similarly fails to find any support in the record.

Plaintiff claims that he complained about shareholder fraud to Schumacher, *see, e.g.*, Trial Tr. 295:22-296:22, but Schumacher denies that Plaintiff ever made such a complaint.  Trial Tr. 777:6-9.  The evidence demonstrates that Plaintiff would send emails following up on meetings.  *See, e.g.*, PX-13 (following up with Cohen regarding June 3, 2011 meeting and stating

---

[2]  To the extent the "independent manner" certification was required by UBS policy, that is similarly irrelevant, because the Sarbanes-Oxley Act's protections do not extend to complaints of violations of internal company policies.  *See Diaz v. Transatlantic Reinsurance Co.*, 2016 WL 3568071, at *5-6 (S.D.N.Y. June 22, 2016).

"let's keep the dialogue going").  There is no email, however, in which Plaintiff follows up on his meeting with Schumacher.

At most, Plaintiff has introduced evidence that he informed Schumacher of disagreements that he had with other UBS employees over his published views.  Plaintiff concedes that disagreements are not fraud, Trial Tr. 475:12-476:11, and no reasonable juror could conclude that Schumacher understood, based on Plaintiff's alleged discussion of such disagreements, that Plaintiff was "provid[ing] information" about any illegal conduct, much less shareholder fraud. *Cf. Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs*, 716 F.3d 10, 15 (2d Cir. 2013) ("[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII.") (quotation omitted).

Based on the evidence, no reasonable juror could conclude that Plaintiff carried his burden to establish, by a preponderance of the evidence, that he engaged in protected activity.

### C.    Plaintiff Has Failed To Prove That UBS Had Knowledge Of His Alleged Protected Activity

Plaintiff is required to establish by a preponderance of the evidence that UBS "knew that [he] engaged in the protected activity." *Bechtel*, 710 F.3d at 447 (quotation omitted).  This means Plaintiff must establish that the UBS manager taking the action at issue was on notice in such a way that the manager understood, or reasonably could have understood, that Plaintiff was providing information about conduct that he reasonably believed constituted a violation of federal law relating to shareholder fraud. *See Kelly*, 716 F.3d at 15.  As explained in Section I.B., however, Plaintiff has failed to prove by a preponderance of the evidence that he ever engaged in any protected activity—Schumacher testified that Plaintiff never complained to him about illegal activity and there are no documents corroborating Plaintiff's testimony.  Since

16

Plaintiff did not establish that he engaged in protected activity, Plaintiff necessarily fails to establish UBS's knowledge of any protected activity.  UBS cannot possess knowledge of something that never happened.

*      *      *

Plaintiff has failed to carry his burden of proof with respect to his claim.  Because he has failed to prove by a preponderance of the evidence that he engaged in protected activity, that UBS knew that he engaged in the protected activity, and that his alleged protected activity was a contributing factor to the termination of his employment, the Court should enter judgment as a matter of law in favor of UBS on Plaintiff's claim.

## II.   PLAINTIFF HAS FAILED TO PROVE THAT HE IS ENTITLED TO ANY DAMAGES

Plaintiff claims that he is entitled to damages in the form of back pay, reinstatement, or front pay in lieu of reinstatement, and other compensatory damages, including emotional and reputational harm.  Proposed Joint Pretrial Order at 11.  Because Plaintiff has failed to carry his burden of proof on liability, he has failed to prove that he is entitled to any measure of damages at all.  Even assuming that he were able to demonstrate unlawful retaliation—which he has failed to do—he has not established by a preponderance of the evidence that he can receive any lost pay after December 2012 (the point by which he would have lost his job in any event), much less after early 2014 (when he concedes he stopped looking for comparable work), or since leaving KKHG (when he continued to fail to mitigate), and certainly not based on the specious premise he would have remained at UBS for another twenty years.  Moreover, even within those timeframes, he has offered only speculative bases for calculating lost pay, and he has similarly

17

failed to carry his burden for any other category of compensatory damages.  Thus, the evidence is insufficient to support an award of damages as a matter of law.[3]

### A.   Plaintiff Is Not Entitled To Lost Pay After December 2012, When His Employment At UBS Would Have Ended In Any Event

An award of damages for unlawful retaliation ceases to accrue after the date on which the evidence establishes that the plaintiff would have been fired regardless of any alleged protected activity.  *See Norris v. N.Y. City Coll. of Tech.*, 2009 WL 82556, at *10 (E.D.N.Y. Jan. 14, 2009) (describing "commonsense conclusion" that "lost wages . . . cease to flow if the employer establishes that the employee would have been terminated for lawful reasons at some later date").  The evidence establishes that, following a $2 billion loss in September 2011, UBS appointed a new CEO who brought with him a new strategy for how UBS would operate going forward.  *See* Trial Tr. 826:25-828:23; DX-59.  In order to offset the financial losses UBS suffered in 2011 and to execute this change in strategy, UBS undertook multiple reductions in force, including the reduction in force that eliminated Plaintiff's position.  In October 2012, approximately eight months after Plaintiff was let go, UBS announced "Project Accelerate," a restructuring of UBS's Investment Bank that included reductions in force.  *See* Trial Tr. 850:6-20; 859:16-860:2.

The evidence demonstrates that Plaintiff's position would have been among those eliminated as part of Project Accelerate in 2012.  The reduction in force significantly affected the Macro Strategy group in which Plaintiff worked.  Indeed, seven employees, including five strategists, were laid off from Macro Research in the United States alone in 2012.  DX-196.  The

---

[3]   Even if it declines to grant the motion on liability, the Court is free at this juncture to find, as a matter of law, that all or certain damages are unavailable.  *See* Fed. R. Civ. P. Advisory Committee's note to 1993 amendment (explaining that Rule 50 motions "may be entered . . . with respect to issues or defenses that may not be wholly dispositive of a claim or defense"); 9 James Wm. Moore *et al.*, *Moore's Federal Practice* § 50.05[4] (3d ed. 2017) ("A granted motion for judgment as a matter of law need not dispose of an entire case," but rather can be resolved on an "issue-by-issue basis.").

fact that UBS has not hired a replacement CMBS strategist in the nearly six years since Plaintiff stopped working for UBS, confirms that Plaintiff's position—like many other research positions—certainly would have been eliminated as part of Project Accelerate. *See* Trial Tr. 1467:2-4 (Nass) ("Q.  Has UBS had a CMBS strategist at any point between February 2012 and today?  A.  No.").

Plaintiff does not—and indeed cannot—provide any evidence to rebut the implementation of Project Accelerate, nor has he shown that his position would not have been eliminated in 2012 as part of Project Accelerate.  His failure precludes a reasonable juror from awarding damages after December 2012. *Norris*, 2009 WL 82556, at \*10.

### B.    Plaintiff Is Not Entitled To Lost Pay Damages After February 2014, When He Ceased Looking For Work

Even if Plaintiff can establish that he would have worked at UBS past 2012—which he cannot—he has failed to prove he is entitled to lost pay damages after, at the latest, February 2014, when he accepted employment with a hotel company and ceased looking for other work. Plaintiff previously admitted that he stopped looking for work after accepting the position at KKHG, Trial Tr. 580:4-9 (impeaching with DX-188 at 350:11-14), and testified at trial that he believed the KKHG position was permanent when he took it.  Trial Tr. 592:7-12.  As discussed in Defendants' request to amend their proposed jury instructions, Dkt 241, which is incorporated herein by reference, Plaintiff's acceptance of a new job and his subsequent decision to stop looking for work precludes his recovery of lost pay after February 2014.

### C.    Plaintiff Has Failed to Mitigate His Damages Since Leaving KKHG

Relatedly, Plaintiff bears a duty to mitigate his damages, meaning he must "use reasonable diligence in finding other suitable employment" following his termination. *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53 (2d Cir. 1998) (quotation omitted).  No reasonable juror

19

could conclude that Plaintiff satisfied his duty for the period after he left KKHG in late 2014.

Plaintiff claims he has diligently pursued employment, but the evidence shows that several of the jobs that Plaintiff applied for bear no relation to finance or real estate and cannot be considered comparable employment. *See, e.g.*, Trial Tr. 583:5-7 (discussing interviews with Fresh Market, IKEA, and Earth Fare). Moreover, Plaintiff has failed to apply to major financial institutions located in Charlotte, North Carolina. Trial Tr. 583:11-584:19. Plaintiff has also abandoned working with the numerous headhunters that he previously worked with based solely on his perception that they did not have anything of interest to him. *See, e.g.*, Trial Tr. 581:21-583:1 (impeaching with DX-190 at 15:2-10). Plaintiff's own expert testified that Plaintiff gave up looking for work. Trial Tr. 964:16-21. No reasonable juror could conclude that these actions constitute "reasonabl[y] diligen[t]" efforts to find comparable employment. *Greenway*, 143 F.3d at 53 (quotation omitted).

### D.   Plaintiff Has Failed To Demonstrate That He Is Entitled To Reinstatement Or Any Front Pay Damages

Plaintiff's claims for reinstatement or front pay in lieu of reinstatement must fail based on the evidence. For the reasons stated in Defendants' motion *in limine* regarding reinstatement, Dkt 185, 231, which is incorporated herein by reference, reinstatement is entirely unavailable as a matter of law in this case. In addition, Plaintiff's claims for any lost pay are cut off, at the latest, in February 2014 when he took a permanent job and he ceased looking for other work. *See supra* Section II.B. That fully precludes any front pay. However, Plaintiff's claim for front pay (i.e., lost pay starting in December 2017) is *also* barred by the rule that "under no circumstances" can an award of front pay be based on "undue speculation." *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 878 (S.D.N.Y. 1999); *see also DeMarco v. Ben Krupinski Gen. Contractor, Inc.*, 2014 WL 3531276, at *16 (E.D.N.Y. July 14, 2014) (holding that denial of lost

20

pay is "prope[r] . . . if the proposed methods for calculating the award are too speculative" (quotation and alteration omitted)).

When it is clear the plaintiff would not have had the previous job *at all* after a certain time, any compensation for lost pay beyond that point is inherently "unduly speculative." As explained above, *see supra* Section II.A, the evidence is clear that Plaintiff would have left UBS no later than the end of 2012 as a result of Project Accelerate. In addition, Plaintiff's own work history demonstrates that he routinely changed jobs every few years. DX-155 at P739. Plaintiff offers nothing to rebut this evidence. Under these circumstances, no reasonable juror could conclude that Plaintiff would still be employed at UBS as of the date of judgment, nearly six years after his layoff, much less twenty years from now. Thus, *any* award of front pay is inappropriate. *See Bonura v. Chase Manhattan Bank, N.A.*, 629 F. Supp. 353, 362 n.3 (S.D.N.Y. 1986) (denying front pay for eleven and sixteen years—through retirement—requested by former credit factoring professionals); *Hill v. Airborne Freight Corp.*, 2003 WL 366641, at *5 (E.D.N.Y. Feb. 20, 2003) (citing cases limiting front pay to approximately one year).

Moreover, front pay is *also* (and separately) limited to the period in which "the plaintiff has *no reasonable prospect* of obtaining comparable alternative employment" as a result of the defendants' conduct. *Chisolm v. Liberty Lines Transit Inc.*, 2013 WL 452408, at *6 (S.D.N.Y. Feb. 6, 2013) (emphasis added) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 729 (2d Cir. 1984)). It would not be reasonable to conclude that Plaintiff has "no reasonable prospect" of comparable employment, and will not for the next two decades. He has already obtained two separate jobs in finance since leaving UBS. He is a well-credentialed forty-six-year-old with degrees from the University of Notre Dame and the Massachusetts Institute of Technology, has passed several securities industry licensing exams, and has worked for several

21

well-known financial institutions, including Bank of America, Credit Suisse, Morgan Stanley, and UBS.  *See, e.g.*, *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 260-61 (S.D.N.Y. 2007) (holding it was "simply too speculative to allow" front pay for more than "one, or at the most two years" for a forty-seven-year-old with "significant work experience in the accounting field").[4]  Plaintiff, in fact, previously requested leave (belatedly) to engage an expert to address these issues, but withdrew the request (*see* Dkt 84 at 1), and introduced no evidence at trial that could reasonably justify anything resembling the requested award.

In any event, these forward-looking remedies are equitable issues for the Court to decide, not for the jury.  There is no case finding a right to a binding jury determination of these remedies under the Sarbanes-Oxley Act.  Indeed, the parties agree that reinstatement is an issue for the Court and not the jury, Dkt 185, Trial Tr. 1319:7-12, and the two most recent decisions in this District addressing the issue squarely rejected jury consideration of front pay.  *See Perez v. Progenics Pharmaceuticals, Inc.*, 204 F. Supp. 3d 528, 551 (S.D.N.Y. 2016); Oct. 1, 2014 Hrg. Tr. at 28:25-293, No. 1:10-cv-8278 (S.D.N.Y. Oct. 2, 2014), ECF No. 162; *Sharkey v. J.P. Morgan Chase & Co.*, 2017 WL 374735, at *3 (S.D.N.Y. Jan. 26, 2017).[5]

### E.    Plaintiff is Not Entitled To Any Lost Pay Based On Projected Pay Raises Or Bonuses

In addition, any claim that Plaintiff might make to lost pay (back or front) based on theoretical pay raise(s) or bonus(es) at UBS is barred as a matter of law.  The evidence presented at trial demonstrates that raises and bonuses awarded to UBS employees, if any, were entirely

---

[4]  *See also, e.g.*, *Press v. Concord Mortg. Corp.*, 2009 WL 6758998, at *2 (S.D.N.Y. Dec. 7, 2009) and 2010 WL 3199684, at *2, *6 (S.D.N.Y. Aug. 11, 2010) (denying five years of requested front pay (through retirement) for a former "Branch Chief Information Officer and Senior Mortgage and Financial Services Consultant," because he had "not adequately explain[ed] why he would be unable to find work in the mortgage and financial sector").

[5]  In those cases in which the jury *did* determine the issue, the point was not contested.  That includes *Zulfer v. Playboy Enterprises*, No. 2:12-cv-8263 (C.D. Cal.), a case Plaintiff cited to the Court on December 12, in which the jury did award front pay.  *See* Trial Tr. 1089:16-1090:25; Jointly Submitted Special Verdict Form With Disputes 7, *Zulfer v. Playboy Enters.*, No. 2:12-cv-8263 (Jan. 23, 2014), ECF No. 110; *see also* Dkt. 185, Mot. *In Limine* on Reinstatement at 2-3; Dkt 184, Mot. *In Limine* on Monetary Damages at 3-5.

within the discretion of UBS and based upon numerous factors.  PX-7 at UBS_TMurray_00001;

PX-111 at UBS_TMurray_00198; Trial Tr. 855:4-8; *id.* 857:7-858:6 (Montanaro); Trial Tr.

1179:25-1180:8 (Seitles).  Plaintiff has offered no actual evidence establishing that he would

have received either a raise or bonus if he had remained at UBS, let alone a non-speculative

manner of determining the amount of such hypothetical income.

Against this lack of evidence, any back pay award that assumes raises or bonuses would

be based entirely on speculation and impermissible under the law.  Back pay cannot be based on

"highly speculative" projections of pay raises, *E.E.O.C. v. Joint Apprenticeship Comm. of Joint*

*Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 102 (2d Cir. 1998), even where there is a past history

(not present here) of "steady pay raises."  *Dominic v. Consol. Edison Co. of N.Y., Inc.*, 822 F.2d

1249, 1258 (2d Cir. 1987); *see also, e.g.*, *Buckley v. Reynolds Metals Co.*, 690 F. Supp. 211, 217-

18 (S.D.N.Y. 1988) (awarding lost pay based on last actual salary).  The same is true with

respect to bonuses.  *See Meimaris v. Braich*, 2011 WL 13128211, at *5 (S.D.N.Y. Aug. 1, 2011)

(awarding nominal damages of $1 where plaintiff was seeking a "purely speculative" $3 million

in unpaid bonuses and commissions); *Raimondo v. AMAX, Inc.*, 843 F. Supp. 806, 810 (D. Conn.

1994) (finding award "would be purely speculative and inappropriate" where "bonus system is

not mandatory").

Any front pay award based on such hypothetical bonuses or raises in future years would

be even *more* unduly speculative, and therefore are also barred.  *See Chisholm v. Mem'l Sloan-*

*Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 577-78 (S.D.N.Y. 2011) (finding insufficient

evidence to award front pay damages based on projected overtime and annual raises given

plaintiff's strained relationship with management and the global economic crisis of 2008).

Allowing front pay that encompasses anticipated bonuses and pay raises here would be directly

contrary to the rule that "under no circumstances" can an award of front pay be based on "undue speculation." *Rivera*, 34 F. Supp. 2d at 878.

### F.    Plaintiff Has Failed To Demonstrate That He Is Entitled To Damages Arising From Emotional Distress

A reasonable juror also could not conclude that Plaintiff suffered emotional distress or mental anguish based on the evidence.  It is his "burden to submit competent evidence of the alleged emotional distress." *E.E.O.C. v. Best Clothing Mfg., Inc.*, 2005 WL 1594153, at *2 (E.D.N.Y. July 7, 2005).  Further, it is "axiomatic" that these types of damages, like other compensatory damages, can only be awarded for a "loss directly and proximately caused by a party's . . . tortious conduct."  *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 604 (2d Cir. 1989).  Under that standard, Plaintiff's emotional damage claim fails.

Plaintiff has not only failed to establish that he has suffered compensable damages but also has failed to establish that UBS caused any damages that he did suffer.  Plaintiff's *own* expert admitted that Plaintiff had an "up and down" relationship with his then-girlfriend and now-wife that included "relationship problems" and "arguments and fights," including a significant fight only two days before Mr. Murray was laid off by UBS, that served as an "independent stressor" in Mr. Murray's life.  Trial Tr. 1040:20-1041:19.  Further, Dr. Goldstein cannot rule out that Plaintiff's unexpected loss of his job at KKHG at the end of 2014—a job that Plaintiff considered a "good job" and "[e]xciting and challenging" and where he "[a]bsolutely" "like[d] the people" he worked with, PX-158 (transcribed at PX-185 224:25-227:10)— contributed to Plaintiff's condition in 2015.  Trial Tr. 1017:25-1018:5.  Finally, Plaintiff has declined to pursue either therapy or medication, even though his own expert admits that it can produce a 50% reduction in symptoms in approximately 40 to 50% of patients, Trial Tr. 975:14-

976:16, and even though he stated that his wife has found "really inexpensive" therapy in their hometown so that "cost is not an issue." PX-158 (transcribed at PX-185 at 219:11-12).

Accordingly, no reasonable jury could find for Plaintiff on his claim for emotional harms.

### G.   Plaintiff Has Failed To Demonstrate That He Is Entitled To Compensatory Damages Arising From Reputational Harm

Plaintiff has also failed to demonstrate that he is entitled to any measure of compensatory damages based on supposed reputational harm. Plaintiff obtained not one, but two finance-related jobs following his layoff at UBS. One of these positions was with Morgan Stanley, a well-known and well-respected financial institution. As Plaintiff told Dr. Kleinman, it was "not that hard" to obtain the Morgan Stanley position and, in fact, "with [his] background . . . they jumped all over [him]." Trial Tr. 575:18-576:3; PX-158 (transcribed at PX-185 at 265:6-23). Plaintiff admits that he was highly sought after by Morgan Stanley even though he disclosed his lawsuit against UBS to them as part of the application process and that he had the opportunity to earn commissions if he remained at Morgan Stanley. Trial Tr. 570:12-572:1. KKHG was also aware when it hired Plaintiff that Plaintiff had filed a lawsuit against UBS, a prior employer. Trial Tr. 576:14-25. No reasonable juror could conclude that Plaintiff's reputation suffered based on this record, and thus no compensatory damages for this supposed injury are available. *See Mermaid Neptune Dev. Corp. v. Home Owners Warranty Corp.*, 1988 WL 45653, at * 3 (S.D.N.Y. 2012) ("In the absence of facts showing actual injury to Mermaid's reputation, Linard's conclusory allegations are insufficient to create a genuine issue of fact.").

### <u>CONCLUSION</u>

For the foregoing reasons, UBS respectfully requests that the Court enter judgment as a matter of law in favor of UBS on Count 1 of Plaintiff's Amended Complaint.

Dated:  December 14, 2017                    Respectfully submitted,


By: /s/ Gabrielle Levin

        Gabrielle Levin
        GIBSON, DUNN & CRUTCHER LLP
        200 Park Avenue, 48th Floor
        New York, N.Y. 10166
        Telephone:  (212) 351-3901
        Facsimile:  (212) 351-5301
        glevin@gibsondunn.com

        Eugene Scalia (*Admitted Pro Hac Vice*)
        Daniel P. Chung
        GIBSON, DUNN & CRUTCHER LLP
        1050 Connecticut Avenue, N.W.
        Washington, D.C. 20036
        Telephone: (202) 955-8500
        Facsimile: (202) 467-0539
        escalia@gibsondunn.com
        dchung@gibsondunn.com

        *Attorneys for Defendants*