UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TREVOR MURRAY,

                              Plaintiff,

                -v.-

UBS SECURITIES, LLC and UBS AG,

                              Defendants.

14 Civ. 927 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Trevor Murray brought two lawsuits in this District against his former employer, UBS Securities, LLC, and its parent company, UBS AG (collectively, "Defendants" or "UBS"), alleging that UBS's decision to terminate his employment was motivated, at least in part, by his whistleblowing activities. Plaintiff pursued one of these suits to a jury trial at which he was awarded compensatory damages, and his attorneys now seek recovery of fees and costs expended in pursuing the lawsuits. For the reasons set forth in the remainder of this Opinion, Plaintiff's attorneys are awarded attorneys' fees in the aggregate amount of $1,639,923.57 and litigation costs in the aggregate amount of $129,463.95.

## PROCEDURAL HISTORY

### A.    Overview of Plaintiff's Litigation History

The history of Plaintiff's litigation against UBS is both lengthy and complex, spawning five published decisions and several oral opinions. The decisions include: *Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (JMF), 2013 WL 2190084 (S.D.N.Y. May 21, 2013) ("*Murray I*") (denying motion to dismiss);

*Murray* v. *UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 285093 (S.D.N.Y.

Jan. 27, 2014) ("*Murray II*") (granting motion to compel arbitration); *Murray* v.

*UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 1316472 (S.D.N.Y. Apr. 1,

2014) ("*Murray III*") (denying motion for amendment and certification for

interlocutory appeal); *Murray* v. *UBS Sec., LLC*, No. 14 Civ. 927 (KPF), 2015 WL

769586, at *1 (S.D.N.Y. Feb. 24, 2015) ("*Murray IV*") (granting in part and

denying in part motion to dismiss second litigation); *Murray* v. *UBS Sec., LLC*,

No. 14 Civ. 927 (KPF), 2017 WL 1498051, at *1 (S.D.N.Y. Apr. 25, 2017)

("*Murray V*") (denying motion for summary judgment); *see also* Dkt. #155

(transcript of oral opinion resolving motion to reconsider in part decision on

summary judgment motion); Dkt. #346 (transcript of oral opinion resolving

various post-trial motions).  The Court incorporates all of these opinions by

reference.[1]

      Though pursued under different legal theories, Plaintiff's claims stemmed

from largely the same factual allegations, which the Court summarized in its

---

[1]    The Court recognizes that the naming conventions adopted in this Opinion differ slightly from those adopted in prior decisions.  The Court also recognizes that in certain of its prior orders, it has used the designations "*Murray I*" and "*Murray II*" to refer to Plaintiff's two litigations in this District.  In this Opinion, the Court will distinguish the two litigations by the principal statute under which they were brought, referring to the first as the "DFA Action" and the second as the "SOX Action."

Because of the sheer number of documents to which the Court cites in this Opinion, the Court will reference them using their docket numbers.  Most entries are to the docket in the SOX Action, Case No. 14 Civ. 927 (KPF), and they will be cited using the convention "Dkt. #[ ]."  Docket entries from the DFA Action, Case No. 12 Civ. 5914 (KPF), will be cited using the convention "5914 Dkt. #[ ]."  Pinpoint cites within these references are to the page number provided by the author of the document, even if that differs from the page number assigned by the Court's ECF system.

opinion denying UBS's motion for summary judgment, and which is reprinted

here for convenience:

> Plaintiff had two periods of employment with UBS. The first lasted from in or about May 2007 to September 2009. During this period, Plaintiff was employed as a Strategist within UBS's Mortgage Strategy Group, where he focused on commercial mortgage-backed securities ("CMBS"). According to Defendants, Plaintiff was let go when his group and position were eliminated as part of a reduction in force prompted by the 2008 financial crisis.
>
> By early 2011 business had improved, and UBS looked to rebuild its Mortgage Strategy Group, which was located within the Global Interest Rates Strategy Group headed by Michael Schumacher. The Global Interest Rates Strategy Group, in turn, was a part of Macro Strategy, a division within UBS's Investment Bank (sometimes referred to as the "Bank"). Schumacher reported to Lawrence Hatheway, UBS's Chief Economist, Chief Strategist, and Head of Macro Strategy.
>
> As part of its rebuilding effort, UBS engaged in a series of new hires, including Kenneth Cohen in May 2011 to run the U.S. Real Estate Finance Group, which included the non-research, business side of CMBS dedicated to, *inter alia*, origination, trading, and sales (collectively, the "CMBS Business"). The U.S. Real Estate Finance Group, and thus the CMBS Business, was housed within the Fixed Income, Currency, and Commodities ("FICC") division, also within UBS's Investment Bank; Hatheway oversaw headcount (*i.e.*, the number of UBS personnel) at FICC.
>
> UBS also hired several strategists and analysts, including Plaintiff. Thus, Plaintiff began his second stint with UBS on May 31, 2011, working as a CMBS Strategist within the Mortgage Strategy Group, where he reported directly to Schumacher, and where his responsibilities included writing research articles about the CMBS market and interfacing with clients. Plaintiff was the only such Strategist reporting to Schumacher during this period, and his role in this regard included

supporting the CMBS Business, his "internal client" at the Bank.  Plaintiff did not have responsibilities over any non-CMBS securitized products, such as residential-mortgage-backed securities ("RMBS") or Asset-Backed Securities ("ABS").

\*\*\*

About nine months into Plaintiff's second stint at UBS, on February 6, 2012, UBS terminated his employment. Defendants maintain that Plaintiff was let go as part of another reduction in force.  Plaintiff argues that he was fired for whistleblowing to his supervisors about illegal efforts by CMBS Business personnel to sway his independent research analysis.

*Murray V*, 2017 WL 1498051, at \*2-3 (record citations omitted).

## B.    The DFA Action

Plaintiff brought his first complaint against UBS in August 2012, pursuant to the Securities Whistleblower Incentives and Protection provisions of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6(h) (the "DFA").  (5914 Dkt. #1).  He was represented in that case by attorneys at the firm of Broach & Stulberg, LLP ("B&S"), now known as Stulberg & Walsh LLP.  (5914 Dkt. #1, 9).  The case was initially assigned to the Honorable Jesse M. Furman.  (5914 Dkt. #6).

UBS moved to dismiss the DFA Action, claiming that Plaintiff did not qualify as a whistleblower under the DFA because he had not alleged that he made a report of the putative misconduct to the Securities and Exchange Commission (the "SEC").  (*See* 5914 Dkt. #14).  In *Murray I*, Judge Furman denied UBS's motion to dismiss, citing the decisions of other district courts to have considered the issue and an SEC rule defining who qualified as a

4

whistleblower under the DFA.  *Murray I*, 2013 WL 2190084, at *3-4.  (5914

Dkt. #22).[2]  Shortly after the decision was issued, on June 14, 2013, the case

was reassigned to this Court.  (5914 Dkt. #25).

Coincidentally, on the same day as the reassignment, UBS filed both an

answer and a motion to compel arbitration of the DFA claim.  (5914 Dkt. #26-

29).  Relatedly, UBS requested that if the motion to compel arbitration were

granted, the Court dismiss, rather than stay, the DFA Action.  (5914 Dkt. #31).

On January 27, 2014, this Court granted the motion to compel, *see Murray II*,

2014 WL 285093, but stayed the case pending completion of the arbitration,

*see id.* at *14.  (5914 Dkt. #36).[3]  In relevant part, the Court found that: (i) UBS

had not waived its right to arbitration by filing a motion to dismiss;

(ii) Plaintiff's claim as pleaded arose under the DFA, and not the Sarbanes-

Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 ("SOX"), and accordingly

was not foreclosed from arbitration; and (iii) it was up to the arbitrator, and not

---

[2]     Years after *Murray I* was issued, the Supreme Court held that "[t]o sue under Dodd-Frank's anti-retaliation provision, a person must first "provid[e] … information relating to a violation of the securities laws to the [SEC]."  *See Digital Realty Trust, Inc.* v. *Somers*, 138 S. Ct. 767, 772-72 (2018).  While Murray has provided the Court with information about legislative measures aimed at "overrid[ing]" *Digital Realty Trust* (*see* Dkt. #374-1), neither measure was enacted and the *Digital Realty Trust* decision remains good law as of the date of this Opinion.

[3]     The Court's decision to stay the case pending the completion of arbitration was based on then-current cases, none of which squarely addressed the issue.  *See, e.g.*, *Salim Oleochemicals* v. *M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (instructing that "[d]istrict courts should continue be mindful of this liberal policy favoring arbitration agreements," and that "unnecessary delay of the arbitral process through appellate review is disfavored").  After *Murray II* was issued, the Second Circuit issued a decision "conclud[ing] that the text, structure, and underlying policy of the [Federal Arbitration Act ('FAA')] mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."  *Katz* v. *Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015).

the Court, to determine whether Plaintiff's claims were arbitrable.  *Murray II*, 2014 WL 285093, at *4-14.

Clearly dispreferring arbitration of his claims, Plaintiff responded to the Court's decision with a motion to amend *Murray II* to include language that would permit him to petition the Second Circuit for an immediate interlocutory appeal of the Court's conclusions that: (i) "Plaintiff's claim arose under the Anti-Retaliation Provision [of the DFA], which did not include a prohibition against pre-dispute arbitration agreements"; and (ii) "Plaintiff's claim was not within the exceptions in the parties' arbitration agreements (*i.e.*, the Employment Agreement and Form U-4)."  *Murray III*, 2014 WL 1316472, at *1. The Court denied Plaintiff's motion, finding in relevant part that its prior decision did not involve a controlling question of law; that there was not conflicting authority on the issue; and, most importantly, that resolution of the appeal would not materially advance the ultimate termination of the litigation. *Id.* at *3-7.

The Court's decision denying amendment for interlocutory appeal was issued on April 1, 2014.  (5914 Dkt. #44).  The case has remained stayed since then.  (5914 Dkt. #45).  The Court understands from the parties' briefing that, after trial in the SOX Action, Plaintiff commenced, but ultimately withdrew, an arbitration demand in light of the Supreme Court's decision in *Digital Realty Trust, Inc.* v. *Somers*, 138 S. Ct. 767, 772-72 (2018).  (Dkt. #357 at 3).

C.     **The SOX Action**

1.     **The Motion to Dismiss**

Further telegraphing his desire not to arbitrate his claims, Plaintiff commenced a second lawsuit in this District, alleging violations of 18 U.S.C. § 1514A(a), SOX's anti-retaliation provision, as well as 12 U.S.C. § 5567(a), the anti-retaliation provision of the DFA, commonly known as the Consumer Financial Protection Act (or "CFPA").  The SOX Action was filed on February 13, 2014 (Dkt. #1), one day prior to Plaintiff's motion for amendment to permit interlocutory appeal (5914 Dkt. #37-38).  Again, Plaintiff was represented by lawyers from the B&S firm.  (*See, e.g.*, Dkt. #4, 5).  Plaintiff then filed an amended complaint on April 21, 2014, three weeks after the Court's decision in *Murray III*.  (Dkt. #25).  In his amended complaint, Plaintiff sought relief in the form of, *inter alia*, reinstatement to his position at UBS, back pay, fees and costs incurred in bringing the action, and other compensatory damages.  (*Id.*).

UBS moved to dismiss Plaintiff's SOX complaint, arguing in particular that the second lawsuit amounted to impermissible claim-splitting; in the alternative, it sought a stay of the SOX Action in favor of the prior DFA Action. (Dkt. #32-34).  In an Opinion issued on February 24, 2015, the Court granted in part and denied in part the motion to dismiss and denied the motion to stay. *Murray IV*, 2015 WL 769586.  (Dkt. #42).  While the Court agreed with UBS that the two lawsuits shared a common nucleus of operative fact and sought redress for the same termination of employment, the fact remained that the DFA and SOX retaliation claims accrued at different times:  "[T]he claims

brought here could not have been brought in the earlier action because a procedural bar existed to filing immediately in federal court. Plaintiff's Sarbanes-Oxley claim did not accrue until after the 180-day period had run, and Plaintiff's CFPA claim did not accrue until after the 210-day period had run." *Id.* at *4. Thus, any claim-splitting by Plaintiff was legally permissible.

From there, the Court turned to UBS's challenge to the merits of Plaintiff's CFPA claim, ultimately concluding that the claim failed because the securities at issue did not qualify as "consumer financial products or services" within the meaning of the CFPA. *Murray IV*, 2015 WL 769586, at *5-6. Finally, the Court declined UBS's motion to stay the case pending resolution of the arbitration compelled in the earlier DFA Action. *Id.* at *7-9; *see also id.* at *8 ("This Court heeds the advice of the Second Circuit and the Supreme Court that the parties' statutory federal rights — under Sarbanes-Oxley, Dodd-Frank, and even the Federal Arbitration Act — are best served by careful consideration of the proper scope of claim and issue preclusion after there has been a final decision, rather than preemptive anticipation of the possible effects of the instant litigation or the pending arbitration.").

### 2. Discovery and the Motion for Summary Judgment

UBS filed its answer to the amended SOX complaint on March 13, 2015 (Dkt. #43), and the Court endorsed the parties' proposed case management plan after an initial pretrial conference held on April 7, 2015 (Dkt. #44 (case management plan), 45 (transcript of conference)). Discovery then proceeded from April 2015 through January 2016; the extended period of time was

marked by numerous conflicts between the parties that required Court intervention. (*See, e.g.*, Dkt. #50-51, 56-85, 88, 90).[4]

During expert discovery, UBS sought leave to file a motion for summary judgment. (*See, e.g.*, Dkt. #86 (transcript of November 12, 2015 pretrial conference where summary judgment motion discussed)). Pursuant to a revised schedule set by the Court, UBS's motion was filed on March 2, 2016. (Dkt. #98-99, 102-105). After obtaining several extensions (Dkt. #109-114), Plaintiff filed his opposition submission to the motion on April 26, 2016 (Dkt. #117, 126-129). UBS obtained a brief extension of its deadline, in light of Plaintiff's 666-paragraph Counter-Statement of Material Facts, and filed its reply submission on May 26, 2016. (Dkt. #134-135).

By Opinion and Order dated March 31, 2017, the Court denied UBS's motion for summary judgment. *Murray V*, 2017 WL 1498051. (Dkt. #139). To begin, the Court outlined the evidence that made a triable issue of UBS's argument that Plaintiff could not have had a reasonable belief that the conduct he reported was a violation of any applicable law or regulation. *See id.* at *8-11; *see also id.* at *11 ("The evidence, viewed in the light most favorable to Plaintiff, permits a rational jury to conclude that he was both objectively and subjectively reasonable in believing that Defendants' CMBS Business members 'engaged in wrongdoing' of the sort cognizable under § 806."). The Court similarly identified genuine disputes of material fact in UBS's argument that

---

4       Additional discovery disputes arose during the period immediately prior to trial in this case. (*See, e.g.*, Dkt. #159-167).

Plaintiff's termination was the product of planned reductions in force, or would have happened in any event.  *See id.* at *11 ("Plaintiff and Defendants offer different narratives for why Plaintiff was terminated.  Construing the evidence in the light most favorable to Plaintiff, the record demonstrates that Plaintiff's reporting of efforts by CMBS Business personnel, including Cohen, to skew or chill his independent analysis was a contributing factor to his termination.").

Alternatively, UBS sought to limit Plaintiff's recovery, if any, of back pay damages to February 12, 2014, the date on which Plaintiff began working for a hotel company.  Here, too, the Court found genuine disputes of fact regarding Plaintiff's efforts to mitigate his losses that foreclosed summary judgment.  *See Murray V*, 2017 WL 1498051, at *13-14.  And while UBS subsequently moved the Court to reconsider this portion of its decision (Dkt. #141, 144), the Court denied the request in an oral opinion issued during a pretrial conference held on July 14, 2017 (Dkt. #154 (order), 155 (transcript)).

### 3.    Trial

By Order dated April 26, 2017, the Court scheduled trial in the SOX Action to begin on December 4, 2017.  (Dkt. #148).  Approximately six weeks before the start of trial, attorney Robert L. Herbst of Herbst Law PLLC ("HL") entered a notice of appearance on Plaintiff's behalf (Dkt. #168), and sought leave to appear as principal trial counsel alongside lawyers from the B&S firm (Dkt. #172).  The Court denied the request as violative of the Court's Individual Rules of Practice in Civil Cases, though it allowed Herbst to participate in the trial.  (Dkt. #173).  Most of the parties' pretrial submissions were filed on

November 6, 2017 (Dkt. #174-190), and most of the objections were filed one week later (Dkt. #211-213).  The parties' *in limine* motions were largely decided at the final pretrial conference held on November 21, 2017.  (Dkt. #226 (order), 327 (transcript)).

The parties Joint Pretrial Order included, among other topics, an outline of the damages Plaintiff sought.  They included: (i) back pay in the amount of $3.1 million; (ii) reinstatement with the same seniority status or, in the alternative, front pay for the succeeding 20 years in the amount of $10.839 million plus reasonable continuing increases; (iii) pre- and post-judgment interest; (iv) non-economic compensatory damages; (v) punitive damages; and (vi) attorneys' fees and costs.  (Joint Pretrial Order 11-12).  Among UBS's motions *in limine* were arguments that (i) because front pay, back pay, and reinstatement were equitable remedies, Plaintiff was not entitled to a jury trial on any of them; (ii) UBS would consent only to an advisory jury verdict on the issues of back pay and front pay; (iii) Plaintiff was not entitled to reinstatement as a matter of law; and (iv) punitive damages were not available under SOX. (Dkt. #229, 231).  At the final pretrial conference, the Court advised the parties that they could reference front pay, back pay, and reinstatement during the trial, though the Court was not then committing that the jury would ultimately decide each of those issues; and that punitive damages were not available. (Dkt. #327 at 85-87).

Trial began with jury selection on December 4, 2017, and presentation of evidence from December 5, 2017, through December 19, 2017.  The jury heard

closing arguments and the Court's charge on December 20, 2017, and returned its verdict on December 21, 2017.  (Dkt. #250 (verdict form)).  During the trial, the Court explained to counsel for the parties that, after additional research, it had concluded that reinstatement and front pay were equitable remedies, such that the former would not be presented to the jury and the latter would be presented for an advisory verdict only; and, further, it had tentatively concluded that back pay was also an equitable remedy for which only an advisory opinion could be rendered.  (*See, e.g.*, Trial Transcript ("Tr.") 1984-89, 2197-98).  Additionally, the Court clarified with counsel that, with respect to advocacy of precise damage figures, counsel would only be permitted to suggest a number or a range "[i]f there was a basis in the record, for example, [Plaintiff's] salary."  (Tr. 2198-2200; *see also* Tr. 2200 (Mr. Herbst: "So we can give them a suggested calculation for backpay and front pay because there's a basis on salary and bonus.")).

In her summation, Plaintiff's counsel argued that his salary, with bonus, ranged from $437,000 to $500,000 per year.  (Tr. 2316-17).  From this, counsel argued that the jury should award Plaintiff back pay of lost salary and bonuses in the amount of $2.2 million, which built in an offset of $307,000 for income Plaintiff had realized in the preceding three years.  (*Id.* at 2320).  On the issue of front pay, counsel argued that "[Plaintiff's] earnings were on an upward path.  He planned to work at UBS until retirement, for a very long period of time, and as some of UBS's very own witnesses have.  And, as I said, we're looking at 20 years."  (*Id.* at 2320-21).  Finally, counsel sought substantial non-

economic damages to compensate for the "damages to Mr. Murray's mind and heart and his spirit and his reputation and his loss of enjoyment of life." (*Id.* at 2321).

In its verdict finding for Plaintiff on his SOX anti-retaliation claim, the jury awarded him $653,300 in back pay and $250,000 in non-economic compensatory damages. (Dkt. #250). The jury found that Plaintiff had not established that he was entitled to front pay damages. (*Id.*).

### 4.  The Post-Trial Motions

Both sides filed post-trial motions in February 2018. UBS moved for judgment in its favor as a matter of law pursuant to Federal Rule of Civil Procedure 50; for a new trial pursuant to Federal Rule of Civil Procedure 59; and for a limit on Plaintiff's back pay award. (Dkt. #280-283). For his part, Plaintiff moved for prejudgment interest at the rate of 9%, compounded annually, and for reinstatement; if the Court determined not to reinstate Plaintiff, he sought front pay "at the rate of $468,750 per year, for at least twenty years, through Mr. Murray's reasonable retirement age." (Dkt. #285-286). Additionally, to the extent the Court deemed the jury's back pay award to be advisory, Plaintiff sought "back pay in an amount between $2,549,166.65 and $2,916,666.50." (Dkt. #291 at 50).

The Court resolved the competing motions in an oral decision issued on September 25, 2018. (Dkt. #343 (order), 346 (transcript)). The Court began with a summary of the trial, explaining that:

> I've done it deliberately because I want to make clear
> that I understand and credit the jury's decision, and for

> that reason, I'm largely adhering to it.  As is clear from
> the case law to which I'm about to refer, on the issue of
> liability, my ability to review the verdict is quite
> circumscribed.  And as for damages, I will accept the
> wisdom of the jury in this case in the amounts that they
> found: $653,300 in back pay; $250,000 in noneconomic
> compensatory damages; and no front pay.  And for
> reasons I'll discuss in greater detail later on, I find no
> basis for reinstatement in this case.

(Dkt. #346 at 5).  From there, it proceeded to address the parties' arguments

concerning the sufficiency of Plaintiff's evidence on his SOX anti-retaliation

claim, concluding that "there is evidence to support the jury's finding as to

each of the elements of the Section 1514A offense, principally derived from

Mr. Murray's testimony."  (*Id.* at 8; *see also id.* at 6-21).[5]

The Court then addressed the issue of damages, beginning with the

question it had left open at trial, *viz.*, "whether the back pay component of the

jury's verdict was binding or advisory.  (Dkt. #346 at 23).  After reviewing the

case law, the Court concluded that it was advisory, but that the dispute was

largely an academic one because the Court accepted as reasonable the jury's

back pay award.  (*Id.* at 24-25).  As the Court explained:

> Given the jury's other findings about no failure to
> mitigate damages and no entitlement to front pay, I
> believe that, again, the jury tied Mr. Murray's
> employment to Mr. Cohen's and believes that it was
> appropriate to make Mr. Murray whole by giving him a
> generous back pay for the period of time until Mr.
> Cohen's departure, and no front pay.  And I will adopt
> that number myself.  I see no basis for me to accept
> plaintiff's arguments that the jury's back pay verdict, if
> advisory, should be increased to 2½ to $3 million.

---

[5]     For similar reasons — in particular, the lack of any basis to disturb the jury's credibility
findings — the Court denied UBS's motion for a new trial.  (Dkt. #346 at 33-34).

(*Id.* at 25).  The Court rejected Plaintiff's request for reinstatement, finding the very request to be "surpris[ing]" and the employment relationship to be "irretrievably broken."  (*Id.* at 28).  The Court also accepted the jury's advisory verdict that no front pay was warranted, noting in part that Plaintiff had been able to secure other employment after leaving UBS.  (*Id.* at 29).

On the remaining issue of pre-judgment interest, the Court reviewed the proposals of New York and North Carolina statutory interest rates, the IRS underpayment statute, and the prime interest rate, concluding:

> I've decided that the federal prime rate best balances the factors in [*Wickham Contracting Co.* v. *Local Union No. 3*, 955 F.2d 831 (2d Cir. 1992),] as applied to the evidence in this case, which includes a sudden termination after less than a year into hiring, lengthy periods of unemployment or underemployment, and the length of time over which this litigation has ensued.  The plaintiff's termination occurred more than six years ago. The prime rate has moved around.  So in the interest of fairness to both sides, I've looked at the monthly prime rates for every month from February of 2012 through August of 2018 and I've calculated an average figure of 3.57 percent.  And that is the figure I'm going to use.
>
> It will accrue from the date of the plaintiff's termination until the time that the Court enters judgment in this case, at which point the [28 U.S.C. §] 1961 rate would kick in.

(Dkt. #346 at 33).

## D.     The Instant Fee Petitions

In November 2018, Plaintiff's teams of attorneys at the B&S and HL firms filed separate petitions for the award of attorneys' fees and costs.  (Dkt. #348-354).  UBS filed submissions in opposition in December 2018.  (Dkt. #357).

Plaintiff's counsel filed separate reply submissions in December 2018 and January 2019.  (Dkt. #364-366).

In September 2019, the Court directed Plaintiff's counsel to file supplemental submissions on a variety of topics.  (Dkt. #371).  The supplemental submissions were filed in October and December 2019 (Dkt. #372-374, 376), and counsel for UBS responded in November 2019 (Dkt. #375).

## DISCUSSION

### A.    Overview of the Parties' Arguments

Plaintiff contends that his attorneys brought an important case in a developing area of law against a well-armed opponent; came up victorious after a hard-fought jury trial; and deserve to be compensated to incentivize other lawyers to represent whistleblowers in similar circumstances.  (*See, e.g.*, Dkt. #348, 349, 351, 352, 364, 366).  UBS retorts that Plaintiff's counsel inefficiently approached the task of representing him; wasted countless hours in pursuing losing positions; and achieved only modest results after years of fighting.  (*See, e.g.*, Dkt. #357).  There is merit to both sides' positions, and so the Court begins its analysis with these observations of the two lawsuits at issue.

While it is true that Plaintiff prevailed at trial, his claims of retaliation in violation of SOX and the DFA were far from a slam dunk.  The relevant timeline — which showed UBS coaxing Plaintiff back to a second stint at the company, and then firing him within a year contemporaneously with

16

substantial reductions in force — made the case one of the closest the Court has ever observed.  The comparative marginality of Plaintiff's case, coupled with the tenacity of counsel on both sides, also had consequences for the manner in which the parties and their counsel conducted these actions.  Put simply, the parties quickly devolved to scorched-earth litigation tactics. Discovery was more protracted, and more contentious, then it needed to be. And UBS took every opportunity to bring motions to reduce and/or eliminate Plaintiff's claims, even as such motions proved only partially effective.  To be clear, the Court does not fault the parties for advancing positions justified under the relevant law, but the fact remains that the litigation strategy on which all counsel settled contributed, to a degree, to the outsized hours billed by Plaintiff's counsel.

The Court also notes the circumstances that resulted in Plaintiff having two separate teams of attorneys for a substantial portion of this litigation. Robert Stulberg, on behalf of the B&S firm, has averred that at all relevant times, the firm had no more than three partners and no more than three associates.  (Dkt. #365 at ¶ 2).  In consequence, the case was frequently staffed in a "top-heavy" manner, in which one or more B&S partners acted in an associate capacity while billing in a partner capacity.  As described later in this Opinion, those staffing decisions impact the Court's findings concerning the

reasonable hourly rates of Plaintiff's legal professionals and the number of hours reasonably spent in this matter.[6]

The biggest issue for the Court concerns the manner in which Plaintiff's counsel staffed the case for trial and for post-trial proceedings. Since June 2013, the undersigned has consistently had an individual rule of practice requiring the presence of principal trial counsel at all conferences. *See* Individual Rules of Practice in Civil Cases 3.A ("The attorney who will serve as principal trial counsel must appear at all conferences with the Court.").[7] That provision, which is shared by several other judges in this District, exists to ensure that trial counsel has the requisite institutional knowledge of the case and of the Court's prior rulings in the case because counsel has been involved at its outset, rather than parachuting into the case a few weeks prior to trial. It also minimizes opportunities for wastefulness and duplication of efforts, both

---

[6]     On this issue, the Court recognizes that (i) UBS was a well-heeled adversary and (ii) Murray's counsel battled throughout the two litigations with several partners and associates from the Gibson, Dunn & Crutcher LLP firm ("GDC"). The Court rejects Murray's counsel's requests that it obtain GDC's billing records for purposes of determining reasonable attorneys' fees (*see, e.g.*, Dkt. #329 at 17-21; Dkt. #366 at 1), finding such apples-to-oranges comparisons of the various firms involved to be unhelpful in this case. *See generally Ravina* v. *Columbia Univ.*, No. 16 Civ. 2137 (RA), 2020 WL 1080780, at *5 (S.D.N.Y. Mar. 6, 2020) (discussing plaintiff's counsel, Sanford Heisler Sharp: "It would therefore be unfair for this Court to rely only on the fees awarded to solo practitioners or practitioners from smaller, less well-known firms that commonly represent plaintiffs in employment discrimination actions in this district. *Nonetheless, SHS is not akin to a commercial 'big law' firm in terms of its fee model, clients, overhead, or substantive areas of practice.* Therefore, the Court looks to rates awarded to other well-known and well-regarded civil rights firms." (emphasis added)). That said, at various points in its analysis *infra*, the Court has been more forgiving of B&S's and HL's staffing issues, given the size and quality of the defense team.

[7]     This language appears in all versions of the Court's Individual Rules of Practice in Civil Cases from 2013 through the present. The Court understands that Judge Furman's individual rule regarding appearances of counsel is slightly different, in that it contains an exception for situations in which leave of court is obtained. However, at the time the SOX Action was filed, both cases were before this Court, and Murray's counsel could have had no confusion about which court's rules would apply.

of which occur when a new group of attorneys is brought on at a late stage in the proceedings solely to handle the trial.

The B&S firm touts itself as "one of the few firms in the U.S. capable of litigating" "cross-border, multinational whistleblower litigation." (Dkt. #351 at ¶ 7). However, as the Court learned, these capabilities do not include taking whistleblower cases to trial. (Dkt. #365 at ¶ 2 (Mr. Stulberg: "[A]t no point did B&S employ trial counsel.")). In particular, the Court was not made aware until a few weeks prior to trial that the B&S firm did not consider itself equipped to handle a trial; that Plaintiff had retained a previous trial attorney whose personal circumstances no longer permitted the attorney to participate at the trial; and that they had very recently retained HL to assist them at trial. (Dkt. #172-173).[8]

The consequences for the trial and post-trial segments of the DFA Action were considerable. To comply with the letter of the Court's rules, Mr. Stulberg assumed the role of principal trial counsel, but as a practical matter, Mr. Herbst took the lead at trial, handling the vast majority of the witnesses and one of two jury addresses. (*See* Dkt. #357 at 4-5). In essence, Plaintiff had two separate teams of attorneys at trial, with three partners at the front table and various supporting professionals in the courtroom or otherwise accessible.

---

[8]    Mr. Herbst leans into this issue, asserting that HL's "work was performed on an expedited basis as plaintiff had a desperate and immediate need for experienced trial counsel who could prepare and try the case as scheduled after prior counsel had bowed out." (Dkt. #349 at 3). While this urgency may have been true, it is of no fault of UBS's. And it remains the case that the prior trial counsel retained by B&S, who appeared at no court conferences, also would not have been permitted by the Court to serve as principal trial counsel.

And while Mr. Herbst was a competent trial attorney, his lack of involvement at previous stages of the litigation, as well as his desire to sidestep the Court's decision, were made plain.  (*See, e.g.*, Tr. 1085-86 (The Court: "Do you not realize, I think you don't want to realize, that I actually issued a decision saying that you were not principal trial counsel.  I realize that you're trying to get in as much as of this as possible, but the point was that Mr. Stulberg was principal trial counsel and he had to do some witnesses and he had to do a jury examination."), 1095-1101 (Mr. Herbst's request for reconsideration of the Court's decision regarding principal trial counsel), 1734-42 (Mr. Herbst's request for reconsideration of the Court's decision regarding principal trial counsel), 2075 (The Court: "You don't like my decisions so you try to evade them.  If you try to evade them and if I catch you, I will tell you that I don't wish you to evade them.  That's been the issue."); *see also id.* at 1739 (The Court: "The issue is I don't like what happened in this case, which is that at the last minute someone else comes in who does not have the same familiarity with all of the conferences that preceded it.")).  UBS may be liable for reasonable attorneys' fees, but the Court will not make it bear the brunt of these staffing inefficiencies caused by information of which Plaintiff and his counsel were aware from the start.

Finally, there is the issue of the degree of success.  According to Plaintiff's counsel, he achieved "'excellent results' — a seven-figure judgment (with prejudgment interest) intended by the jury to fully compensate him for all of his economic and psychiatric loss."  (Dkt. #349 at 5; *see also* Dkt. #352 at 8

(observing that Plaintiff may be the first counseled SOX plaintiff to have won a jury verdict and had it upheld in post-trial motion practice)).  UBS begs to differ, noting that the jury rejected Plaintiff's claims for front pay and awarded him a small part of the back pay he sought, while the Court rejected Plaintiff's claims for punitive damages and reinstatement.  (Dkt. #357 at 13).  The Court recognizes the public policy interest in encouraging attorneys to bring whistleblower cases under SOX, an interest that was vindicated to some degree by the jury's verdict in this case.  The Court also notes that there was no offer of judgment from UBS, and that the Court has been appropriately shielded from the specifics of any settlement discussions, so that it cannot determine the degree to which the valuation of his case by Plaintiff and his counsel may have prevented a pretrial resolution of the matter.  Irrespective of the gloss now imparted by his counsel, the fact remains that Plaintiff obtained only a fraction of the relief he sought.

## B.    Applicable Law

The Sarbanes-Oxley Act provides that a prevailing employee "shall be entitled to all relief necessary to make the employee whole."  18 U.S.C. § 1514A(c)(1).  Available compensatory damages include, *inter alia*, "compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees."  *Id.* § 1514A(c)(2)(C).  As the fee applicant under a prevailing party fee statute, Plaintiff has the burden of demonstrating the reasonableness of the fee requested.  *Hensley* v. *Eckerhart*, 461 U.S. 424, 437 (1983).  And in

resolving the instant fee petitions, the Court strives to arrive at an attorneys'

fees award that is "adequate to attract competent counsel, but not produce

windfalls to attorneys." *City of Riverside* v. *Rivera*, 477 U.S. 561, 580 (1986)

(internal quotations and citations omitted).

Attorneys' fees are awarded by determining the "'presumptively

reasonable fee,'" often (if imprecisely) referred to as the "lodestar." *Millea* v.

*Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill*

*Concerned Citizens Neighborhood Ass'n* v. *Cnty. of Albany*, 522 F.3d 182, 183

(2d Cir. 2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53

(2010).  This fee is calculated by multiplying the "reasonable hourly rate and

the reasonable number of hours required by the case." *Millea*, 658 F.3d at 166.

Courts may, only after the initial calculation of the presumptively reasonable

fee, adjust the total when it "does not adequately take into account a factor

that may properly be considered in determining a reasonable fee." *Lilly* v. *City*

*of New York*, 934 F.3d 222, 230 (2d Cir. 2019) (citing *Millea*, 658 F.3d at 167).

The Second Circuit has recognized that a district court exercises considerable

discretion in awarding attorneys' fees.  *See Millea*, 658 F.3d at 166; *see also*

*Arbor Hill*, 522 F.3d at 190.

The Second Circuit clarified the process by which a district court

determines the reasonable hourly rate in *Lilly* v. *City of New York*.  After

reviewing the history of fee-shifting jurisprudence of the Supreme Court, the

Court reaffirmed the guidance it had provided a decade earlier in *Arbor Hill*:

> [T]he district court, in exercising its considerable
> discretion, [should] bear in mind all of the case-specific

> variables that we and other courts have identified as
> relevant to the reasonableness of attorney's fees in
> setting a reasonable hourly rate. The reasonable hourly
> rate is the rate a paying client would be willing to pay.
> In determining what rate a paying client would be
> willing to pay, the district court should consider, among
> others, the *Johnson* factors; it should also bear in mind
> that a reasonable, paying client wishes to spend the
> minimum necessary to litigate the case effectively. The
> district court should also consider that such an
> individual might be able to negotiate with his or her
> attorneys, using their desire to obtain the reputational
> benefits that might accrue from being associated with
> the case. The district court should then use that
> reasonable hourly rate to calculate what can properly
> be termed the "presumptively reasonable fee."

*Lilly*, 934 F.3d at 230 (quoting *Arbor Hill*, 522 F.3d at 190).[9]  In this setting,

"the district court does not play the role of an uninformed arbiter but may look

to its own familiarity with the case and its experience generally as well as to the

evidentiary submissions and arguments of the parties."  *Bliven* v. *Hunt*, 579

F.3d 204, 213 (2d Cir. 2009) (quoting *DiFilippo* v. *Morizio*, 759 F.2d 231, 236

(2d Cir. 1985)).

"To determine the reasonable hourly rate for each attorney, courts must

look to the market rates 'prevailing in the community for similar services by

---

[9]     The twelve factors enumerated in *Johnson* are (i) the time and labor required; (ii) the
novelty and difficulty of the questions; (iii) the level of skill required to perform the legal
service properly; (iv) the preclusion of employment by the attorney due to acceptance of
the case; (v) the attorney's customary hourly rate; (vi) whether the fee is fixed or
contingent; (vii) the time limitations imposed by the client or the circumstances;
(viii) the amount involved in the case and results obtained; (ix) the experience,
reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the
nature and length of the professional relationship with the client; and (xii) awards in
similar cases.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cnty. of Albany*,
522 F.3d 182, 186 n.3 (2d Cir. 2008) (citing *Johnson* v. *Ga. Highway Express, Inc.*, 488
F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard* v. *Bergeron*, 489
U.S. 87 (1989)).

lawyers of reasonably comparable skill, experience, and reputation.'" *Heng Chan* v. *Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 1373118, at *2 (S.D.N.Y. 2007) (quoting *Gierlinger* v. *Gleason*, 160 F.3d 858, 882 (2d Cir. 1998)).  The Second Circuit's "forum rule" requires courts to "generally use 'the hourly rates employed in the district in which the reviewing court sits' in calculating the presumptively reasonable fee."  *Simmons* v. *N.Y.C. Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill,* 493 F.3d at 119).  Moreover, courts in this District have recognized that an "attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of" a reasonable hourly rate.  *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 962 (RCC), 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006).

When evaluating the number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended."  *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks and citation omitted).  In addition, a court should examine the hours expended by counsel with a view to the value of the work product to the client's case.  *See Lunday* v. *City of Albany*, 42 F.3d 131, 133 (2d Cir. 1994) (per curiam).  The Court is to exclude "excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims."  *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would

have engaged in similar time expenditures.'" *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).  And where "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent."  *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks and citation omitted).  A court also retains the discretion to make across-the-board percentage reductions to exclude unreasonable hours, colloquially referred to as "trimming the fat."  *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *E.S.* v. *Katonah-Lewisboro Sch. Dist.*, 796 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), *aff'd sub nom. E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.*, 487 F. App'x 619 (2d Cir. 2012) (summary order).

"'[T]he most critical factor' in a district court's determination of what constitutes reasonable attorney[s]' fees in a given case 'is the degree of success obtained' by the plaintiff."  *Barfield* v. *N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar* v. *Hobby*, 506 U.S. 103, 114 (1992)) (citing *Kassim* v. *City of Schenectady*, 415 F.3d 246, 254 (2d Cir. 2005); *Pino* v. *Locascio,* 101 F.3d 235, 237-38 (2d Cir. 1996)).  "Where 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount,' even if plaintiff's 'claims were interrelated, nonfrivolous, and

raised in good faith.'"  *Williams* v. *Epic Sec. Corp.*, 368 F. Supp. 3d 651, 656

(S.D.N.Y. 2019) (quoting *Hensley*, 461 U.S. at 436).

## C.   Calculating Reasonable Attorneys' Fees

### 1.   Determining the Reasonable Hourly Rate

#### a.   Mishcon de Reya

The Court understands that, shortly after his 2012 termination, Plaintiff

retained the law firm of Mishcon de Reya ("MDR"), with which he consulted for

approximately one month before that firm referred his case to B&S.  (Dkt. #351

at ¶¶ 33, 44 and Ex. E; Dkt. #352 at 1-2 (including request for MDR fees in the

amount of $13,355 in B&S fee petition)).  The Court further understands that

Plaintiff was billed at MDR's 2012 hourly rates of $675 per partner and $465

per associate and that he paid these fees in full.  (Dkt. #351 at ¶ 44 & Ex. E).

However, while the Court has been provided with MDR billing records for

February and March of 2012, it has been provided no information regarding

the three individuals whose names appear in those records, and the Court has

been unable to locate those individuals on the firm's website.  *See*

https://www.mishcon.com/people (last accessed December 15, 2020).

The Court therefore cannot make a determination regarding the

reasonableness of any of the rates sought.

#### b.   Broach & Stulberg, LLP

In its submissions, which comprise attorney affidavits from Mr. Stulberg

and several legal memoranda and letter briefs, the B&S firm seeks hourly rates

of $700 for senior partner Robert Stulberg, who has 42 years of experience;

$600 for partner Amy F. Shulman, who has 24 years of experience; $550 for senior associate Patrick J. Walsh, who has 25 years of experience; $475 for associate Michael H. Isaac, who has 13 years of experience; $500 for associate Vincent L. Torregiano, who has 14 years of experience; $450 for associate Zachary R. Bergman, who has five years of experience; $450 for associate Julie Dabrowski, who has six years of experience; and $175 for paralegals Amelia Follett, Jacqueline Nishi, Frederico De Paoli, Jeremy Gallion, Allison Paller, Sun Park, and Ben Vanden Heuvel, all of whom have undergraduate degrees. (*See, e.g.*, Dkt. #351, 352, 365, 366, 373, 374, 376).[10]  In addition to detailing the relevant experience of the attorneys involved (particularly Mr. Stulberg and Ms. Shulman), the B&S submissions include explanations of its historical billing practices, of the rates it has sought in other deferred-fee and fee-shifting cases, and of its evolving fee arrangement with Plaintiff.  (*See* Dkt. #351 at ¶¶ 50-57).  B&S has also included declarations from attorneys Franklin Siegel, opining in relevant part on the issue of appropriate fee scales in fee-shifting litigation (Dkt. #351-1), and Jason Zukerman, opining on issues of litigating under SOX (Dkt. #351-6).  Both declarants conclude that the rates sought by B&S legal professionals are at or below market rates, and thus reasonable.

One fact that distinguishes this case from many fee-shifting cases is that Plaintiff had a fee arrangement with B&S that began with a discounted-rate structure, pursuant to which Plaintiff was billed at "$500.00 per hour for

---

[10]    The years of experience are approximate as of the date of this Opinion.  In a supplemental submission, B&S increased the hourly rate sought by Mr. Walsh to $600, to reflect his promotion to partner in November 2019.  (Dkt. #374-1 at ¶ 2).

partners' time, $300 per hour for associates' time, and $125 per hour for legal assistants' time." (Dkt. #351 at ¶ 54 & Ex. G). Plaintiff paid his legal fees under this agreement on an ongoing basis until early 2014. (Dkt. #351 at ¶ 54). In 2014, the parties entered into a superseding retainer agreement that included a partial contingency fee arrangement and substantially reduced billing rates; were Plaintiff to succeed in his claims, the agreement permitted recalculation of billing rates to the "presumptively reasonable top rates" used by B&S from 2011 through 2018: "$600/hour for senior partners [Robert B. Stulberg ... ]; $500/hour for other partners [Amy F. Shulman]; $350/hour for associates; $150/hour for legal assistants." (Id. at ¶ 55 & Ex. H). Plaintiff was able to pay his subsequent legal bills until approximately September 2015; he then fell behind, and ceased paying his bills altogether beginning in July 2016. (Id. at ¶ 56). Shortly before trial, in October 2017, the parties entered into a second superseding retainer agreement that provided for full contingency in the event of Plaintiff's recovery at trial in the amount of "the greater of 'our time charges at our customary hourly rates (currently, $600 for senior partners' time, $500 for other partners' time, [$]350-400 for associates' time and $150 for paralegals' time,' or 17.5% of any recovery." (Id. at ¶ 57 & Ex. J).

Recognizing the difference between the rates specified in the 2017 retainer agreement and the rates now sought, B&S contends that it offered Plaintiff "discounted rates as a courtesy in light of their longstanding attorney-client relationship, and because Mr. Murray had been financially devastated as a consequence of his unlawful termination by UBS." (Dkt. #351 at ¶ 57). And

as further support for the rates they now seek, B&S has submitted redacted copies of several 2019 retainer agreements in which the higher fee scale is now specified.  (Dkt. #374).

On the precise issue of the rates sought by B&S legal professionals, UBS advances two arguments.  *First*, it notes B&S's inconsistency in defining the rates specified in the 2017 retainer as its "customary hourly rates," while now claiming that those rates were discounted for Plaintiff.  (Dkt. #357 at 26-27).  UBS identifies an additional inconsistency in referring to these rates as "discounted" in light of the fact that the rates only kicked in if Plaintiff prevailed on his claim at trial, which claim arose under a statute that mandated recovery of attorneys' fees.  (*Id.* at 27).  *Second*, in response to B&S's supplemental submission of 2019 retainer agreements, UBS argues that it would be "improper[]" for the Court to apply 2019 hourly rates to litigation conducted between 2012 and 2017.  (Dkt. #375 at 1).

The Court rejects UBS's second challenge.  In prior opinions on fee petitions, the Court has concluded that the proper rates to be used are current, rather than historic, rates.  *See, e.g.*, *Balu* v. *City of New York*, No. 12 Civ. 1071 (KPF), 2016 WL 884666, at *4 (S.D.N.Y. Mar. 8, 2016) (citing *Reiter* v. *MTA N.Y.C. Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006); *LeBlanc-Sternberg* v. *Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998); *Mugavero* v. *Arms Acres, Inc.*, No. 03 Civ. 5724 (PGG), 2010 WL 451045, at *5 (S.D.N.Y. Feb. 9, 2010)); *accord Ravina* v. *Columbia Univ.*, No. 16 Civ. 2137 (RA), 2020 WL 1080780, at *7 (S.D.N.Y. Mar. 6, 2020); *see also Pig Newton, Inc.* v. *The Boards of Directors of*

*The Motion Picture Indus. Pension Plan*, No. 13 Civ. 7312 (KPF), 2016 WL 796840, at *5 (S.D.N.Y. Feb. 24, 2016) (discussing "Supreme Court and Second Circuit cases expressing a preference for current rather than historical rates").

UBS has more traction with their first argument. The 2014 retainer agreement explicitly recites that the rates specified therein "represent[ed] a significant reduction from the rates set forth in the March 22, 2012 retainer agreement and from the prevailing rates for legal services provided in comparable cases in the Southern District of New York ('prevailing rates')." (Dkt. #351-8 at 1). In contrast, the 2017 retainer agreement recites that the rates specified therein are the B&S firm's "customary hourly rates" (Dkt. #351-10 at 2), and even Mr. Stulberg acknowledges these rates to have been the firm's "presumptively reasonable rates" from 2011 through 2018 (Dkt. #351 at ¶ 52). This is not, therefore, a situation in which adoption of those rates would cause the Court unwittingly to "punish an 'under-charging' civil rights attorney." *Reiter*, 457 F.3d at 233 (quoted in Dkt. #352 at 14).

The fee schedule to which B&S and Plaintiff agreed, however, is only one of the *Johnson* factors the Court must consider in determining reasonable hourly rates. Another is the "market rates 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Heng Chan*, 2007 WL 1373118, at *2. In the absence of any decisions under the SOX anti-retaliation provision, the Court has reviewed recent attorneys' fees decisions in this District in search of analogues.

In a different factual context, the Court previously observed "that there has not been perfect consistency in assessing the reasonableness of attorneys' rates." *Carrington* v. *Graden*, No. 18 Civ. 4609 (KPF), 2020 WL 5758916, at *12 (S.D.N.Y. Sept. 28, 2020).  The same observation holds true with respect to the proffered comparator contexts of False Claims Act and civil rights cases.  *See United States ex rel. Nichols* v. *Computer Scis. Corp.*, No. 12 Civ. 1750 (JSR), 2020 WL 6559194, at *5 (S.D.N.Y. Nov. 9, 2020) (approving rates in False Claims Act case of $850 for partners, $425 to $500 for associates, and $125 to $225 for paralegals); *United States ex rel. Wood* v. *Avalign Technologies, Inc.*, No. 14 Civ. 4958 (ER), 2020 WL 2555115 (S.D.N.Y. May 20, 2020) (approving rates in False Claims Act case of $800 for partners, $400 for associates, and $100 to $150 for paralegals); *Greenburger* v. *Roundtree*, No. 17 Civ. 3295 (PGG) (SLC), 2020 WL 4746460, at *6 (S.D.N.Y. Aug. 16, 2020) (upholding report and recommendation in civil rights action that found to be reasonable rates of $600 for senior partner, $500 and $425 for partners, and $150 for paralegal); *Ravina*, 2020 WL 1080870, at *16 (approving, *inter alia*, rates for partners from $552.50 to $780, for senior litigation counsel from $487.50 to $552.50, and for associates from $276.25 to $308.75); *Indep. Project, Inc.* v. *Ventresca Bros. Constr. Co.*, 397 F. Supp. 3d 482, 496 (S.D.N.Y. 2019) ("Other judges within this District have found the customary rate for experienced litigators ranges from about $400 to $600 per hour in civil rights and ADA cases." (collecting cases)); *Lewis* v. *Am. Sugar Ref., Inc.*, No. 14 Civ.  2302 (CRK), 2019 WL 116420, at *4 (S.D.N.Y. Jan. 2, 2019) ("Courts in this district have approved

hourly rates of $250 to $600 for civil rights attorneys with over ten years of experience and of $200 to $350 for associates." (citing cases)); *Williams* v. *Metro-N. R.R. Co.*, No. 17 Civ. 3847 (JGK) (KHP), 2018 WL 3370678, at *6-7 (S.D.N.Y. June 28, 2018) (noting wide variety of hourly fees awarded in civil rights actions in this District; awarding $800 hourly rates to lead partners in novel case involving discrimination and retaliation against transgendered plaintiff, "in light of hourly rates approved for similarly experienced and qualified employment counsel in this District, rates previously approved for [counsel and others at her firm], and in light of the specific features of this case discussed at length herein," but reducing rates of other legal professionals involved), *report and recommendation adopted*, No. 17 Civ. 3847 (JGK), 2018 WL 3368713 (S.D.N.Y. July 10, 2018).

In considering other of the *Johnson* factors, this Court acknowledges that Plaintiff's lawsuits against UBS involved novel issues under the DFA and SOX. Plaintiff believes himself to be "the first SOX plaintiff in this Circuit represented by counsel to have won a jury verdict and had it upheld after post-trial motion practice." (Dkt. #352 at 8-9).[11]  Awarding appropriate fees to attorneys who take on claims under less-established statutes, such as SOX, would certainly clarify the law and vindicate Congress' policy goals in enacting such legislation. The Court also observes that the litigation was long, and hard-fought on both

---

[11]    In point of fact, the other successful SOX plaintiff in this District was a *pro se* litigant who achieved a substantially higher compensatory damages award from the jury in the amount of $1,662,951, which award was then supplemented by a district court order of front pay damages in the amount of $2,706,585.  *See Perez* v. *Progenics Pharm., Inc.*, 204 F. Supp. 3d 528, 546, 552 (S.D.N.Y. 2016).

sides, and that B&S provided competent representation to its client at the pretrial stages of both the DFA and SOX Actions.  And by devoting significant time to Plaintiff's case over a period of years, to the point of twice revising its retainer agreement to address Plaintiff's changing economic circumstances, B&S necessarily forewent other representations.

Two countervailing considerations warrant discussion.  *First*, while continuing to tout itself as "one of the few firms in the U.S. capable of litigating [whistleblower] cases" (Dkt. #351 at ¶ 7), B&S omits the material fact that, by design, it is not equipped to take such cases to trial.  The Court wonders whether Plaintiff was advised of that fact at the commencement of the representation, or of his concomitant obligation to retain separate trial counsel if the case progressed that far.  This fact distinguishes B&S from the firms involved in the comparator decisions discussed above; it is a fact that the Court considers more heavily in determining the hours reasonably expended, though it has some impact on the determination of the reasonable hourly rate. Relatedly, the top-heavy structure of the B&S firm, particularly after the addition of the HL firm for trial and post-trial work, resulted in situations in which partners performed associate-level work at partner-level rates.  On this point, as suggested by its prior footnote, *see* n.6 *supra*, rather than reduce rates across-the-board, the Court will instead consider reductions, either as an absolute number or as a percentage, in determining the reasonable number of hours expended.  *See generally Pig Newton, Inc.*, 2016 WL 796840, at *7 (reducing the number of hours billed where "the division of labor was at times

33

unreasonable, with multiple partners involved in the same task and, perhaps more troubling, partners performing work better assigned to associates or paralegals"); *Tlacoapa* v. *Carregal*, 386 F. Supp. 2d 362, 372 (S.D.N.Y. 2005) (reducing hours where "tasks were performed by individuals more qualified, and therefore more highly compensated, than necessary").

*Second*, putting to the side the policy goals ostensibly vindicated by the jury's verdict, the fact remains that Plaintiff obtained significantly less relief, quantitatively and qualitatively, than he sought.  The *Lilly* Court admonished district courts to consider the *Johnson* factors in determining a reasonable hourly rate, and one of those factors is "the amount involved in the case and the results obtained."  *See Lilly*, 934 F.3d at 228, 230.  To that end, several courts have factored the degree of success into the reasonable hourly rate. *See, e.g.*, *Ravina*, 2020 WL 1080780, at *4 ("Accordingly, Ravina's relief — while significant — was just a fraction of what she initially sought.  Ravina's limited relief counsels in favor of a significant reduction in her proposed rates.").  More often than not, however, courts reflect that factor when or after determining the reasonable number of hours expended.  *See, e.g.*, *Smith ex rel. 50 E. 69th St. Corp.* v. *Smith*, No. 17 Civ. 6648 (PAE), 2020 WL 1934984, at *2-3 (S.D.N.Y. Apr. 22, 2020) (collecting cases).  This Court will do that here.

In sum, the Court has considered the *Johnson* factors.  It has also considered the opinions of the two attorney declarants; the retainer agreements with Plaintiff; the time that has passed since the execution of each of Plaintiff's retainer agreements; and the 2019 retainer agreements with other B&S

clients.[12]  Ultimately, it concludes that the following hourly rates are reasonable on the specific facts of this case: **$650** for Mr. Stulberg, **$600** for Ms. Shulman, **$500** for Mr. Walsh, **$400** for Mr. Torregiano and Mr. Isaac, and **$350** for Mr. Bergman and Ms. Dabrowski.  As for the legal assistants, the Court understands that each has an undergraduate degree, but it has received no information about their employment backgrounds or the length of time that any of them worked at B&S.  Accordingly, the Court reduces the hourly rates for Ms. Follett, Mr. De Paoli, Ms. Nishi, Ms. Paller, Mr. Gallion, Ms. Park, and Mr. Vanden Heuvel to **$150**.  *See Williams*, 2018 WL 3370678, at *8 ("Courts in this district typically award paralegal rates in the range of $100-150 per hour." (collecting cases)).

### c.    Herbst Law PLLC

Two professionals at Herbst Law PLLC seek reimbursement for their work on the trial and post-trial proceedings in the SOX Action.  Founder and principal Robert L. Herbst seeks fees at an hourly rate of $800, and then-paralegal (and now-attorney) Benjamin J. Ashmore Sr. seeks fees at an hourly rate of $175.  (Dkt. #348, 349).  Most of HL's submission is devoted to substantiating Mr. Herbst's request.  Mr. Herbst outlines his 48 years of legal experience (Dkt. #348-1 at ¶¶ 8-16 and Ex. 3), and his decades-long practice focusing on "civil and constitutional rights cases involving police and other

---

[12]    UBS opposed Murray's request that the Court consider a supplemental submission that included the 2019 retainer agreements.  (Dkt. #375).  UBS is correct that the Court's request for a supplemental tabulation of fees did not seek additional support for those fees.  However, in recognition of the length of time over which these fee petitions have been on the Court's docket, the Court has considered the later retainer agreements.

official and municipal misconduct, and unlawful discrimination and retaliation by both private and public employers" (*id.* at ¶ 14).  He has submitted redacted versions of HL's retainer agreement with Plaintiff (Dkt. #348-2) and with several other unidentified clients (Dkt. #348-5), each of which recites a "customary hourly rate[]" of $800.  Mr. Herbst has also submitted declarations from noted civil rights and employment law attorneys Richard Emery (Dkt. #348-6) and Wayne Outten (Dkt. #348-7).  Each declarant opines that the rates sought by Mr. Herbst and Mr. Ashmore are "eminently reasonable," if not below prevailing market rates.

Mr. Herbst has identified three cases from this District, albeit of some vintage, where Judges Rakoff, Peck, and Berman have awarded him fees at his then-current hourly rate.  (Dkt. #348-1 at ¶¶ 43-44).  The Court's research discloses one additional case.  In 2019, Judge Sarah Netburn awarded Mr. Herbst an hourly rate of $650 in a police misconduct case that was resolved by an offer of judgment under Federal Rule of Criminal Procedure 68.  *See Elkhouly* v. *City of New York*, No. 17 Civ. 2318 (AT) (SN), Dkt. #138 (transcript) (S.D.N.Y. Aug. 6, 2019), *report and recommendation adopted*, No. 17 Civ. 2318 (AT) (SN), 2019 WL 4141866 (S.D.N.Y. Aug. 30, 2019).[13]

---

[13]     Judge Netburn's decision also explained why certain facts about the three cases cited by Mr. Herbst, facts acknowledged by Mr. Herbst, have only limited relevance to the Court's reasonableness inquiry here.  (Dkt. #138 at 4-5).  Judge Rakoff's award was for work performed between 1998 and 2000.  Judge Peck's award was for a discovery sanction.  And Judge Berman's award arose in the context of approving an on-consent fee application for a percentage-of-the-fund award in a class action settlement.  Judge Netburn was also presented with similar declarations from Messrs. Emery and Outten, and these were factored into her rate assessment.  (*Id.* at 5).

The Court's discussion of the *Johnson* factors in the preceding section applies equally to the HL legal professionals.  While the Court understands the circumstances that resulted in HL's last-minute addition to Plaintiff's trial team, those circumstances arose through no fault of UBS's, and they do not warrant a premium on Mr. Herbst's hourly rate.  More fundamentally, given the timeline of the trial in the SOX Action, neither firm on its own could adequately have represented Plaintiff at trial — B&S because of its professed deficiencies in conducting trials and HL because of its comparative lack of institutional knowledge of the DFA and SOX Actions, despite considerable efforts to get up to speed.  For this reason, the Court will award Mr. Herbst the same **$650** rate awarded to Mr. Stulberg by this Court and previously found reasonable by Judge Netburn.  The Court awards Mr. Ashmore his **$175** hourly rate with no difficulty.  As with the B&S firm, the Court will consider staffing issues more explicitly in its determination of the reasonable number of hours expended.

## 2.    Determining the Number of Hours Reasonably Expended

"On a fee-shifting application … the governing test of reasonableness is objective; it is not dictated by a particular client's subjective desires or tolerance for spending.  The test is whether the plaintiff 'spen[t] the minimum necessary to litigate the case effectively.'"  *Beastie Boys* v. *Monster Energy Co.*, 112 F. Supp. 3d 31, 52 (S.D.N.Y. 2015) (quoting *Simmons*, 575 F.3d at 174). "In determining what fee is reasonable, the court takes account of claimed hours that it views as excessive, redundant, or otherwise unnecessary."  *Bliven*, 579 F.3d at 213 (internal quotation marks omitted).  The court may consider

whether billing entries are sufficiently precise, or whether they instead reflect vague descriptions of tasks or "block-billing." *See LV* v. *N.Y.C. Dep't of Educ.*, 700 F. Supp. 2d 510, 525 (S.D.N.Y. 2010) ("Block-billing, the practice of aggregating multiple tasks into one billing entry, is not prohibited," but it "can make it exceedingly difficult for courts to assess the reasonableness of the hours billed." (internal quotation marks omitted)).

In determining whether the hours expended were reasonable, a court may properly draw on its "first-hand knowledge of [the] litigation and its extensive contact with the parties." *Luciano* v. *Olsten Corp.*, 109 F.3d 111, 117 (2d Cir. 1997). Where the court finds the number of hours stated to be disproportionate to the work performed, the court should reduce the stated hours accordingly. *See Hensley*, 461 U.S. at 434; *Seitzman* v. *Sun Life Assurance Co. of Can.*, 311 F.3d 477, 487 (2d Cir. 2002).

### a.   Mishcon de Reya

The B&S fee petition includes MDR billing records detailing 6.5 hours of partner time and 19.5 hours of associate time. (Dkt. #351-5). As in the earlier discussion of reasonable rates, the Court lacks sufficient information to determine whether these hours are reasonable, particularly since much of the work described in the billing statements appears to have been duplicated by B&S after the file was transferred. The Court is mindful of the fact that these fees were paid out of pocket by Plaintiff. (Dkt. #351 at ¶ 44). However, on this record, it cannot find that they are reasonable and it will not award them.

### b.    Broach & Stulberg, LLP / Herbst Law PLLC

In calculating the hours expended, the B&S firm has excluded, *inter alia*, time spent by its attorneys on publicity, attorney-client financial matters, internal firm administration involving the case, updating new attorneys and paralegals on case history, and certain administrative tasks.  (Dkt. #351 at ¶ 59; Dkt. #352 at 24-25).  It has also billed travel time at 50%, as is customary in this District.  (*Id.* at 24).  *See generally Vicente* v. *Ljubica Contractors LLC*, No. 18 Civ. 419 (VSB) (OTW), 2019 WL 2137001, at *5 (S.D.N.Y. May 16, 2019) ("In this District, attorney travel time is generally compensated at 50% of the attorney's reasonable billing rate.").  The HL firm has similarly reduced Mr. Herbst's travel time by 50%.  Additionally, HL has not submitted time spent by Mr. Ashmore (i) in travel, (ii) performing clerical tasks, and (iii) for certain internal communications; as a practical matter, these reductions amount to 17% of the total time billed by Mr. Ashmore in this matter.  (Dkt. #348-1 at ¶ 40).  The Court recognizes and appreciates the firms' proactive exercises of billing judgment.

Despite these reductions, UBS proffers several reasons why, in its estimation, the hours submitted by the two firms are still not reasonable. Throughout, UBS emphasizes Plaintiff's limited success at trial, noting that what Plaintiff obtained at trial and in post-trial motion practice amounted to "less than seven percent of his pre-trial demand."  (Dkt. #357 at 8 (italicization omitted)).  In a variation on this theme, UBS argues in the alternative that Plaintiff's attorneys should not recover time spent in pursuit of "extreme

demands that were not supported by the law or facts, including punitive damages and an award of back pay and front pay for a period of over 25 years." (*Id.* at 11-12 (italicization omitted)). And with specific reference to Plaintiff's DFA claim, UBS maintains that his attorneys are entitled to recover no fees at all expended in this ultimately unavailing effort. (*Id.* at 15-16).

UBS also focuses on the staffing of Plaintiff's case — in particular, time billed by Messrs. Herbst and Stulberg to trial preparation and trial attendance. (Dkt. #357 at 13). It makes much of what it perceives to be impermissibly vague entries. (*Id.* at 25-26). And it devotes an entire section of its submission to cataloging putatively "excessive, redundant, or otherwise unnecessary tasks (*id.* at 17-23 (capitalization omitted)), including a section detailing "work necessitated by the conduct of [Plaintiff's] counsel" (*id.* at 21).

In reviewing the parties' original fee submissions, the Court encountered difficulty in categorizing time entries made over a six-year period of litigation. To aid it in analyzing the reasonableness of the hours billed, the Court issued a supplemental order dividing the two lawsuits into 20 discrete time periods, and directing Plaintiff's attorneys to allocate their time among those periods. (Dkt. #371). Having received counsel's time allocations, the Court now proceeds to evaluate the reasonableness of the hours billed in each category.

In assessing the reasonableness of hours billed in prior fee petitions, this Court has alternated between the use of an across-the-board percentage reduction and the disallowance of certain hours billed. *Compare Gamero* v. *Koodo Sushi Corp.*, 328 F. Supp. 3d 165, 175 (S.D.N.Y. 2018) (disallowing

certain time entries billed), *with Marzullo* v. *Karmic Release Ltd.*, No. 17 Civ. 7482 (KPF), 2018 WL 10741649, at *3 (S.D.N.Y. Apr. 24, 2018) (imposing across-the-board reduction of 15%).  Both are acceptable methods of arriving at a reasonable number of hours.  Having carefully considered the hours billed in the DFA and SOX Actions, the Court has determined to analyze reasonableness in two stages.  *First*, the Court will consider the hours billed for each of the time periods, and will use a percentage basis to reduce as appropriate hours that are "excessive, redundant, or otherwise unnecessary." *Second*, the Court will undertake a more holistic analysis of the billings to consider whether they should be adjusted to account for the degree of Plaintiff's success or any other appropriate factor.

### i. The Intake of the Case, Initial Meetings with Plaintiff, and Investigation of His Claims[14]

B&S allocates a total of 34.9 hours to this category from three legal professionals, two partners and one associate.  In reviewing the relevant time records, the Court observes several instances in which Mr. Stulberg performed tasks more properly done (and, in fact, done by) his associate, including legal research.  There are as well certain imprecise entries, including "Review file." And there are instances in which one attorney cites a communication with another B&S professional that is not reflected in the other professional's billing records; both Mr. Stulberg and Mr. Isaac refer to communications with Ms.

---

[14]    The information on hours billed in these sections is drawn from the submissions of Plaintiff's counsel.  (*See, e.g.*, Dkt. #372, 373).

Shulman for which she has no corresponding entry.  Given these findings, the Court will make a modest reduction of 10% in the hours sought as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 12.3 | $7,995.00 |
| Shulman | $600.00 | 0.9 | $540.00 |
| Isaac | $400.00 | 21.7 | $8,680.00 |
| | | **Interim Total** | $17,215.00 |
| | | **Less 10%** | **$15,493.50** |

### ii.   The Submissions and Presentations Made on Plaintiff's Behalf to the U.S. Department of Labor, the U.S. Securities and Exchange Commission, and the Occupational Safety and Health Administration

B&S allocates a total of 144 hours to this category from the same three legal professionals.  Though there are many entries in this category, the vast majority are for small increments of time and are sufficiently precise to permit this Court's review of their reasonableness.  The Court will not reduce the number of hours at this stage of its analysis.

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 79.0 | $51,350.00 |
| Shulman | $600.00 | 0.1 | $60.00 |
| Isaac | $400.00 | 64.9 | $25,960.00 |
| | | **Total** | **$77,370.00** |

### iii. The Preparation of the Complaint Filed in *Murray* v. *UBS Securities, LLC*, No. 12 Civ. 5914 (KPF) (the "DFA Action")

B&S allocates a total of 11.7 hours to this category from one partner and one associate. The entries themselves are sufficiently precise, and the Court will not reduce the hours at this stage of its analysis.

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 3.5 | $2,275.00 |
| Isaac | $400.00 | 8.2 | $3,280.00 |
| | | **Total** | **$5,555.00** |

### iv. The Preparation of Plaintiff's Opposition to Defendants' Motion to Dismiss in the DFA Action, As Well As the Review of the Court's May 21, 2013 Opinion and Order Resolving That Motion

B&S allocates 87.7 hours to this category from two partners and one associate. The Court's review of these entries discloses reasonable amounts of time billed for reviewing the opening and reply submissions for UBS's motion to dismiss; for reviewing submissions to and from Judge Furman; and for preparing a discovery plan. However, the Court believes that B&S spent more time than necessary in researching, drafting, and preparing their opposition to UBS's motion to dismiss, particularly given the firm's professed expertise in whistleblower litigation.

There are also several entries that do not appear to have been properly allocated to this category. Judge Furman's decision was issued on May 21, 2013 (5914 Dkt. #22); there are billing entries concerning that decision in the days that followed and some billing entries one month later concerning a

43

possible interlocutory appeal.  But there are also entries in mid-July and in October that do not appear to pertain to this category, although they are for small increments of time.  Giving B&S the benefit of the doubt as to these entries, the Court will deduct only 10% from the fees allocated to this section as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 32.9 | $21,385.00 |
| Shulman | $600.00 | 5.1 | $3,060.00 |
| Isaac | $400.00 | 49.7 | $19,880.00 |
| | | **Interim Total** | $44,325.00 |
| | | **Less 10%** | **$39,892.50** |

### v. The Preparation of Plaintiff's Opposition to Defendants' Motion to Compel Arbitration in the DFA Action, As Well As the Review of the Court's January 27, 2014 Opinion and Order Resolving That Motion

B&S allocates 155 hours to this category from two partners and one associate.  In reviewing these entries, the Court identified "fat" to be trimmed.  There were several instances of partners performing associate tasks; these included instances in which Ms. Shulman conducted legal research — on one day, 5.5 hours of legal research.  In addition, Mr. Isaac spent the better part of 100 hours researching and drafting a 25-page opposition to a motion to compel arbitration.  As with the motion to dismiss, the Court understands that the work was necessitated by UBS's decision to file a motion to compel arbitration.

Even so, the hours spent were excessive, and the Court will reduce them by 15% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 38.6 | $25,090.00 |
| Shulman | $600.00 | 12.0 | $7,200.00 |
| Isaac | $400.00 | 104.4 | $41,760.00 |
| | | **Interim Total** | $74,050.00 |
| | | **Less 15%** | **$62,942.50** |

  **vi.** **The Preparation of Plaintiff's Motion for Amendment of the Court's January 27, 2014 Opinion and Order in the DFA Action, As Well As the Review of the Court's April 1, 2014 Opinion and Order Resolving That Motion**

B&S allocates 78.7 hours to this category from two partners and one associate.  The Court's review discloses that the entries billed are sufficiently precise to permit review and are reasonable for the tasks described, and it will not reduce the number of hours in this category at this stage of its analysis.

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 22.1 | $14,365.00 |
| Shulman | $600.00 | 0.3 | $180.00 |
| Isaac | $400.00 | 56.3 | $22,520.00 |
| | | **Total** | **$37,065.00** |

### vii.    Any Miscellaneous Entries for Time Billed in the DFA Action

In the category of miscellaneous billings in the DFA Action, B&S allocates 15.5 hours among two partners and two associates.[15]   Generally speaking, these entries concern miscellaneous communications with the client and research and preparation of materials for an abortive 2018 arbitration. The Court believes the entries to be appropriately specific and reasonable in length.  It will reduce the number of hours billed by 10% to account for Ms. Shulman performing arbitration-related tasks in 2018 that were appropriately done by an associate.  The Court will address the success of the arbitration later in this Opinion.

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
| --- | --- | --- | --- |
| Stulberg | $650.00 | 6.5 | $4,225.00 |
| Shulman | $600.00 | 8.7 | $5,220.00 |
| Walsh | $500.00 | 0.2 | $100.00 |
| Isaac | $400.00 | 0.1 | $40.00 |
| | | **Interim Total** | $9,585.00 |
| | | **Less 10%** | **$8,626.50** |

### viii.    The Preparation of the Initial and Amended Complaints Filed in *Murray* v. *UBS Securities, LLC*, No. 14 Civ. 927 (KPF) (the "SOX Action")

B&S allocates 47.1 hours to this category from two partners, one associate, and one paralegal.  The Court was struck by the amount of time

---

[15]    Other miscellaneous entries have not been included among the hours for which recovery is sought, in the exercise of B&S's billing judgment.  (*See* Dkt. #373-4 at 3).

billed to commence a second lawsuit, particularly since B&S has always maintained that the core factual allegations were the same across both actions. A review of the entries and of the docket offered an explanation: The associate on the team, Mr. Isaac, took the laboring oar in drafting the initial complaint. However, by the time of the amended complaint, Mr. Isaac had left the firm (*see* Dkt. #19-20), and Ms. Shulman, a partner, had taken over his role.

As noted earlier, the Court understands that UBS was a well-funded adversary defended by a large firm. And for this reason, the Court has extended a measure of latitude to B&S in its analysis — for example, in allowing two partners to bill for at-times-overlapping work on the DFA litigation. Allowing full recovery by Ms. Shulman for hours spent on legal research or drafting, or by Ms. Shulman and Mr. Stulberg for hours spent editing a complaint that began at 12 pages (Dkt. #2) and ended at 14 pages (Dkt. #25), is a bridge too far. Accordingly, the Court will reduce the hours sought by 25% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 16.1 | $10,465.00 |
| Shulman | $600.00 | 23.5 | $14,100.00 |
| Isaac | $400.00 | 7.1 | $2,840.00 |
| Paller | $150.00 | 0.4 | $60.00 |
| | | **Interim Total** | $27,465.00 |
| | | **Less 25%** | **$20,598.75** |

ix. **Preparation for and Attendance at the Pre-Motion Conference Held on May 15, 2014; the Preparation of Plaintiff's Opposition to Defendants' Motion to Dismiss and/or to Stay the Litigation in the SOX Action; and the Review of the Court's February 24, 2015 Opinion and Order Resolving That Motion**

B&S allocates 197.7 hours to this category from two partners, one associate, and two paralegals.  Again, the amount of hours billed is striking, and again, the figures are largely a product of staffing issues at the firm.  Until Mr. Torregiano began working on the matter in late July 2014, Ms. Shulman handled the lion's share of researching and drafting obligations, which is inappropriate for someone of her experience, seniority, and billing rate.[16]  The Court will again reduce the hours sought by 25%, principally because of the sheer number of associate hours billed by Ms. Shulman, as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 42.9 | $27,885.00 |
| Shulman | $600.00 | 134.8 | $80,880.00 |
| Torregiano | $400.00 | 13.6 | $5,440.00 |
| Gallion | $150.00 | 5.4 | $810.00 |
| Paller | $150.00 | 1.0 | $150.00 |
|  |  | **Interim Total** | $115,165.00 |
|  |  | **Less 25%** | **$86,373.75** |

---

[16]     Mr. Isaac had entered notices of appearance in each of the DFA and SOX Actions.  Mr. Torregiano and other B&S associates working on the SOX Action did not.

**x.**     **Preparation for and Attendance at the Pretrial Conference in the SOX Action Held on April 7, 2015, Including the Review of Defendants' Answer in That Case and the Preparation of the Joint Letter and Proposed Case Management Plan Requested by the Court**

B&S allocates 34.9 hours to this category from two partners.  The time entries are sufficiently precise to permit review.  In another grant of latitude, the Court will reduce these numbers slightly, by 10%, to account for time engaged by Ms. Shulman in legal research and for excessive time spent by both attorneys in drafting and editing pre-conference submissions to the Court as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
| --- | --- | --- | --- |
| Stulberg | $650.00 | 10.6 | $6,890.00 |
| Shulman | $600.00 | 24.3 | $14,580.00 |
|  |  | **Interim Total** | $21,470.00 |
|  |  | **Less 10%** | **$19,323.00** |

**xi.**     **Fact and Expert Discovery in the SOX Action, Which Category Includes Time Spent (a) Negotiating and Preparing Discovery Protocols and Protective Orders, and (b) Identifying, Articulating, Discussing, and Resolving Discovery Issues and Disputes with Adversary Counsel and with the Court**

B&S allocates 1,061.8 hours to this category among two partners, one associate, and two paralegals, with more than half of the time (571.1 hours) billed by Ms. Shulman.  The Court recalls that the course of discovery in this case was not a smooth one, but rather was marked by numerous disputes and at least two requests for extensions.  (*See* Dkt. #55, 90).  In several of the

parties' disputes, the Court ultimately adopted Plaintiff's position.  (*See, e.g.*, Dkt. #58, 61, 64).  And to a certain degree, the scope of discovery was necessitated by UBS's defense that the termination of Plaintiff's employment was in fact the product of large-scale reductions in force.

Even with those provisos, there is much to criticize in this category of B&S's billings.  Mr. Stulberg and Ms. Shulman had Mr. Torregiano working on the case (and doubtless had access to other associates as needed), and yet the associate billed just a few hours in October 2015, many of which were spent "preparing" documents for deposition.[17]  Ms. Shulman again assumed the associate role, drafting discovery requests for Mr. Stulberg's review, and reviewing and preparing documents for production with the assistance of B&S paralegals.

Of greater concern to the Court are a host of billing entries by Ms. Shulman with vague descriptions and suspiciously full-hour entries.  Many of these entries include the description, "Correspondence with court," but not all of those billing entries have corresponding docket entries.  (*See, e.g.*, AFS entries for August 4, 2015 (four hours billed to "Correspondence with Court"); August 6, 2015 (four hours billed to "Correspondence with Court; legal research re same"); August 7, 2015 (two hours billed to "Correspondence with Court"); August 28, 2015 (five hours billed to "Correspondence with court"); August 31, 2015 (ten hours billed to "Correspondence with Court (2); legal

---

[17]     Mr. Torregiano returned to the case briefly in January 2016 to conduct limited legal research.

research re extraterritorial depositions"); September 9, 2015 (three hours billed to "Correspondence with court"); September 10, 2015 (two hours billed to "Correspondence with Court"); September 15, 2015 (two hours billed to "Correspondence with Court"); September 18, 2015 (five hours billed to "Letter motion to Court"); September 24, 2015 (one hour billed to "Correspondence with Court"); *see also, e.g.*, AFS entries for September 25, 2015 (five hours billed to "Review documents for production"); September 28, 2015 (ten hours block-billed to various entries)).  And there are numerous entries in which Mr. Stulberg and Ms. Shulman bill for overlapping, if not duplicative, work.

In the preceding two sections, the Court was more accommodating of the top-heavy staffing because of the departure of Mr. Isaac.  For this period, however, Mr. Stulberg and Ms. Shulman had, but disclaimed use of, associate assistance.  That is a choice that B&S made, but it is not a choice for which UBS should receive the bill.  *Cf. Beastie Boys*, 112 F. Supp. 3d at 53 ("It was [plaintiffs'] prerogative to commission or approve such staffing.  But the issue for this Court is whether it is reasonable to shift the resulting fees to [defendant], their adversary.  And there is ample authority in this District, applying the standard of objective reasonableness, for reducing a fee award where the legal hours recorded by plaintiffs' counsel fell unusually heavily on partners with high hourly rates.").  For that, and for the noteworthy imprecision identified by the Court, the Court will reduce the hours in this section by 35% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 151.8 | $98,670.00 |
| Shulman | $600.00 | 571.1 | $342,660.00 |
| Torregiano | $400.00 | 29.6 | $11,840.00 |
| Paller | $150.00 | 22.1 | $3,315.00 |
| Nishi | $150.00 | 287.2 | $43,080.00 |
| | | **Interim Total** | $499,565.00 |
| | | **Less 35%** | **$324,717.25** |

      **xii.**    **Preparation for and Attendance at the Pretrial Conference Held on November 12, 2015, at Which the Parties Discussed Discovery Issues and Defendants' Contemplated Summary Judgment Motion**

B&S allocates 24.7 hours to this category from Mr. Stulberg and Ms. Shulman.  The Court has reviewed the entries and will reduce them by 5%, to account for Ms. Shulman's one hour of legal research and her (in the Court's estimation, excessive) seven hours preparing for the court conference, as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 7.0 | $4,550.00 |
| Shulman | $600.00 | 17.7 | $10,620.00 |
| | | **Interim Total** | $15,170.00 |
| | | **Less 5%** | **$14,411.50** |

### xiii. The Preparation of Plaintiff's Opposition to Defendants' Motion for Summary Judgment in the SOX Action, As Well As the Review of the Court's March 31, 2017 Opinion and Order Resolving That Motion and the Proposal of Redactions to That Opinion

B&S allocates 609.2 hours to this category, including hours billed by two partners, one associate, and two paralegals.  Counsel for UBS will recall that the Court cautioned against bringing such a motion at the pre-motion conference that preceded its filing; these fees arose because Plaintiff was obligated to respond to the comprehensive motion that UBS filed.  Yet again, however, B&S's idiosyncratic staffing issues warrant a substantial reduction in hours.

Mr. Torregiano is again underused, billing a mere 18.2 hours to the project.  However, in contrast to other matters, paralegals appear to have assisted Mr. Stulberg and Ms. Shulman in developing factual arguments.  Even with that assistance, Mr. Stulberg spent 32 hours drafting Plaintiff's opposition papers, and Ms. Shulman spent nearly 200 hours doing the same.[18]  The Court recognizes that the submission — in particular, the Counter-Statement of Material Facts — was quite lengthy.  And the Court does not quibble that these lengthy submissions played a part in the Court's decision to deny UBS's motion.  But the fact remains that Ms. Shulman and, to a lesser extent, Mr.

---

[18]     In this section as well, Ms. Shulman's and Mr. Stulberg's billings have a surprising number of entries for which time is billed in full-hour amounts.  (*See, e.g.*, AFS entries for April 8, 2016, April 10, 2016, April 12, 2016, April 16, 2016, April 19, 2016, April 21, 2016, April 22, 2016, April 25, 2016, May 3, 2016, and May 6, 2016; RBS entries for April 21, 2016, April 22, 2016, and April 25, 2016).

Stulberg, billed far too much for work that was a waste of their talents, and for this reason the Court will reduce the fees sought by 25% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 54.7 | $35,555.00 |
| Shulman | $600.00 | 287.6 | $172,560.00 |
| Torregiano | $400.00 | 18.2 | $7,280.00 |
| De Paoli | $150.00 | 190.1 | $28,515.00 |
| Nishi | $150.00 | 58.6 | $8,790.00 |
| | | **Interim Total** | $252,700.00 |
| | | **Less 25%** | **$189,525.00** |

> **xiv.** **The Preparation of Plaintiff's Opposition to Defendants' Motion for Reconsideration of the March 31, 2017 Opinion in the SOX Action, As Well As the Review of the Court's July 17, 2017 Opinion and Order Resolving That Motion**

B&S allocates 60.8 hours to this category, all but 0.3 of which are divided between Mr. Stulberg and Ms. Shulman.  Several of these entries appear to be mischaracterized, as they reference efforts to investigate unnamed "trial attorney[s]."  Even were the Court to include these as legitimate, but simply misclassified, billings, Ms. Shulman bills approximately 26 hours for drafting a ten-page opposition to the reconsideration motion, and Mr. Stulberg bills four hours for editing that same opposition.  Their efforts may have been successful, but their staffing and time expenditures were not reasonable.  The Court believes that a deduction of 20% is warranted as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 11.0 | $7,150.00 |
| Shulman | $600.00 | 49.5 | $29,700.00 |
| Follett | $150.00 | 0.3 | $45.00 |
| | | **Interim Total** | $36,895.00 |
| | | **Less 20%** | **$29,516.00** |

> **xv.** **Preparation for Trial Prior to Plaintiff's Retention of Herbst Law PLLC, Including Discussions with Defense Counsel Regarding Trial Scheduling; Review of the Court's Orders Regarding the Conduct of Trial; and, If and As Applicable, Preparation of Pretrial Materials, Including the Joint Pretrial Order, Motions *In Limine*, and Proposed *Voir Dire* Questions**

B&S allocates 256.8 hours to this category, reflecting the efforts of two partners, one senior associate, and one paralegal. Certain billing entries are to be expected — discussions regarding the scheduling of trial, conversations with the client regarding trial strategy, and extensive, good-faith efforts to mediate the case and avoid trial. There remain, however, certain staffing issues that continue to confound reason, including Ms. Shulman spending nearly 35 hours drafting a mediation statement, and several hours conducting legal research. The Court also believes it inappropriate to allow Mr. Walsh to bill at his senior associate rate for what amounted to basic legal research, and will therefore reduce his hours, though not his rate.

What is more, beginning in or about October 2017, a substantial amount of time was devoted by the B&S firm to securing counsel to assist them at trial. For all of the reasons discussed earlier, UBS should not pay for Plaintiff's

decision to retain a firm that could not take his case to trial.  The Court will therefore implement a 20% reduction in hours as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 46.3 | $30,095.00 |
| Shulman | $600.00 | 135.9 | $81,540.00 |
| Walsh | $500.00 | 6.4 | $3,200.00 |
| Follett | $150.00 | 68.2 | $10,230.00 |
| | | **Interim Total** | $125,065.00 |
| | | **Less 20%** | **$100,052.00** |

> **xvi.** **Preparation for Trial After Plaintiff's Retention of the Herbst Law Firm, Including Discussions with Defense Counsel Regarding Trial Scheduling; Preparation of Pretrial Materials, Including the Joint Pretrial Order, Motions *In Limine*, and Proposed *Voir Dire* Questions; Preparation for and Attendance at the Court's Final Pretrial Conference Held on November 21, 2017; and Review of the Court's November 27, 2017 Order Resolving Certain Pretrial Motions**

The Court's reasonableness analysis is complicated by the addition of the HL firm to the SOX Action six weeks prior to trial.  The Court recognizes, again, that UBS had a number of attorneys, including several "big law" partners, defending it throughout the two litigations, including at trial.  And it believes that Plaintiff was also entitled to be well-represented at trial.  Plaintiff chose B&S to represent him in the SOX Action; the complaint in that action was filed by B&S with full knowledge that it would be assigned to this Court as a related action; and this Court has always had an individual rule of practice mandating principal trial counsel to be present at all court conferences, for reasons

discussed *supra*.  At no time between February 2014, when the case was filed,
and October 2017, when Mr. Herbst entered his notice of appearance —
including in April 2017, when the trial scheduling order was issued — did B&S
advise the Court that it was not staffed to handle trials.  Indeed, had such
information been disclosed, the Court would have assumed an earlier, and
greater, role in ensuring the efficient incorporation of trial counsel onto the
team.  Instead, the Court witnessed the formation of two discrete but
overlapping teams of attorneys that, while effective to a degree at trial, were not
symbiotic.

The Court has reviewed the billings of the B&S firm for this category,
which includes 1,007.3 hours spread out among two partners, one senior
associate, and one paralegal.  After reviewing the specific billing entries, the
Court makes substantial reductions to account for trial team inefficiencies
(including descriptions as imprecise as "Trial preparation"); allocation of
partner time to associate tasks (including legal research, exhibit designations,
and drafting of pretrial submissions); and duplication of efforts between the
B&S and HL teams.  The Court also reduces B&S's hours to account for the
time that the HL professionals spent acclimating themselves to the case; it was
B&S who recruited Mr. Herbst and Mr. Ashmore to provide a last-minute assist
at trial, and it is therefore B&S (as opposed to UBS) that will be charged with
the time spent getting Mr. Herbst up to speed for trial.  In total, the Court
reduces B&S's hours in this category by 45% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 256.2 | $166,530.00 |
| Shulman | $600.00 | 375.5 | $225,300.00 |
| Walsh | $500.00 | 162.0 | $81,000.00 |
| Follett | $150 | 283.6 | $42,540.00 |
| | | **Interim Total** | $515,370.00 |
| | | **Less 45%** | **$283,453.50** |

The Court has reviewed the HL records with similar care.  Many of the same problems befall these records, including duplication of efforts by Mr. Herbst with the B&S team and with Mr. Ashmore, as well as tasks billed by Mr. Herbst but more appropriately performed by a more junior attorney.  However, pursuant to the Court's discussion in the preceding paragraph, and recognizing that Mr. Herbst was receiving quasi-associate assistance from Mr. Ashmore at a reduced rate, the Court will reduce HL's hours by only 30% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Herbst | $650.00 | 293.6 | $190,840.00 |
| Ashmore | $175.00 | 362.0 | $63,350.00 |
| | | **Interim Total** | $254,190.00 |
| | | **Less 30%** | **$177,933.00** |

xvii. **Work Undertaken During the Trial Held from December 4-21, 2017, Including Preparation for and Participation in Jury Selection; Preparation of Jury Addresses and Witness Examinations; Attendance at Trial; Work on Motions and Applications During Trial; and Work on Proposed Responses to Jury Notes**

The disharmony between the two trial teams was evident throughout the thirteen-day trial. Three partners from two firms flanked Plaintiff at trial; more often than not, two of the partners did little but take notes while the third conducted examinations or participated in oral argument. Pursuant to the Court's individual rules of practice requiring attendance by principal trial counsel, either of Mr. Stulberg or Ms. Shulman could have served as principal trial counsel, and Mr. Stulberg assumed that role. Given the way in which the three attorneys allocated the witnesses and the speaking opportunities at trial, however, it may have made more sense for Ms. Shulman to have assumed the role, as she appeared (at least to the Court) to have more knowledge about the facts and procedural history in this case, and she in fact had more work to do at trial. In any event, it was incumbent on counsel to divide up the trial so that all of them were responsible for some portion of it, rather than having one or more experienced partners playing the role of potted plants for days on end. *See IRAN-CONTRA HEARINGS; Note of Braggadocio Resounds at Hearing*, N.Y. Times, July 10, 1987, at A7 (noting retort of attorney Brendan V. Sullivan to Senator Daniel Inouye: "Well, sir, I'm not a potted plant. I'm here as the lawyer. That's my job.").

Mr. Herbst suggests that part of the inefficiencies observed during trial were attributable to the Court's individual rule of practice and counsel's efforts to understand and abide by it.  (*See* Dkt. #348-1 at ¶ 6 ("Because of the critical importance of both the opening statement and closing argument to the trial of this case (and most others), this unexpected ruling created a significant challenge to Mr. Murray's choice of counsel to make those jury statements and, depending upon how the Court actually enforced its rule at trial, to my ability to supervise and try the case as I saw fit, which is what I was engaged to do.")).  Mr. Herbst is mistaken:  The decision could not have been "unexpected," given the publication of the written rule and the Court's discussion of it with the parties once Mr. Herbst had filed his notice of appearance.  As it happened, Mr. Herbst did all he could to circumvent the Court's decision and make himself *de facto* principal trial counsel.  That he largely succeeded does not mean that UBS should pay for the services of two underutilized partners at the trial table.  (*See* Dkt. #357 at 14 ("UBS should not be forced to pay fees because, eight days into a 13-day trial, Murray's counsel had not decided who would present the closing address.")).

After reviewing the trial-related billing entries closely, the Court will reduce B&S's hours by 50%, to account for the firm's comparative inactivity during the actual trial day, which inactivity, as suggested by Mr. Herbst's contemporaneous oral statements and his more recent written submissions, was precisely what he sought to achieve.  The reductions are implemented as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 201.6 | $131,040.00 |
| Shulman | $600.00 | 238.0 | $142,800.00 |
| Walsh | $500.00 | 84.1 | $42,050.00 |
| Follett | $150.00 | 183.3 | $27,495.00 |
| | | **Interim Total** | $343,385.00 |
| | | **Less 50%** | **$171,692.50** |

The HL Firm's billings are also reduced to account for the aforementioned duplication of efforts among the two teams and certain minor imprecisions in billing, but only in the amount of 25% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Herbst | $650.00 | 212.1 | $137,865.00 |
| Ashmore | $175.00 | 214.5 | $37,537.50 |
| | | **Interim Total** | $175,402.50 |
| | | **Less 25%** | **$131,551.88** |

### xviii. The Preparation of Plaintiff's Post-Trial Motions and His Opposition to Defendants' Post-Trial Motions, Including Participation in the September 25, 2018 Telephone Conference with the Court During Which Those Motions Were Resolved

B&S allocates 566.7 hours to these category, spread out among two partners, two associates, and one paralegal.  HL, perhaps recognizing the reversal of roles among Plaintiff's attorneys once trial had concluded, allocates 53 hours to Mr. Herbst and 89.2 hours to Mr. Ashmore.

The Court's review of B&S's billing entries in this category reveals the same problems identified, repeatedly, in this Opinion — Ms. Shulman performed the work of a junior-to-mid-level associate, with insufficient assistance from the actual associate on the matter, Mr. Walsh.[19]  She handled substantial legal research and principal drafting responsibilities.  Again, Ms. Shulman employed whole-hour billing practices that the Court finds unlikely to have occurred in real life.  (*See, e.g.*, AFS entries for February 11, 2018 (two entries reflecting three hours and eight hours, respectively, for drafting and editing); February 11, 2018 (eight hours); February 12, 2018 (twelve hours); March 5, 2018 (three hours); March 6, 2018 (four hours); March 11, 2018 (twelve hours); March 13, 2018 (fifteen hours); March 14, 2018 (fourteen hours); March 15, 2018 (fifteen hours); March 26, 2018 (ten hours drafting reply brief); March 27, 2018 (thirteen hours); March 28, 2018 (sixteen hours); March 29, 2018 (ten hours)).  Given the misallocation of tasks, the imprecision of billing, and the partial duplication of efforts with the HL firm, the Court will reduce B&S's hours by 30% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 47.8 | $31,070.00 |
| Shulman | $600.00 | 198.4 | $119,040.00 |
| Walsh | $500.00 | 84.4 | $42,200.00 |
| Bergman | $350.00 | 5.5 | $1,925.00 |

---

[19]   The Court notes the appearance of a second associate, Mr. Bergman, in September 2018, and understands that he did not join B&S until 2018.  (*See* Dkt. #351 at ¶¶ 26-27).

| Follett | $150.00 | 230.6 | $34,590.00 |
| | | **Interim Total** | $228,825.00 |
| | | **Less 30%** | **$160,177.50** |

The HL firm does not have the same intra-firm staffing issues, given the allocation of tasks between Mr. Herbst and Mr. Ashmore, nor does it have comparable billing entry issues. Instead, the question is one of superfluity: The record indicates that HL was needed for trial, but does not indicate that it was needed for post-trial motion practice. B&S had handled all of the pretrial motion practice without issue, and inasmuch as B&S attorneys were present for the entirety of the trial, it is difficult to argue that HL had information concerning the trial of which B&S was not aware. Nor is there any indication in the billing records of a division of labor between the B&S and HL firms for these motions. Rather, the HL firm appears to have acted as a second level of review of the briefing, and for this reason will not recover fully for its submissions in this category. Instead, recognizing the primacy of B&S in the research and preparation of post-trial motions, the Court will reduce the HL firm's hours by 35% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
| --- | --- | --- | --- |
| Herbst | $650.00 | 53.0 | $34,450.00 |
| Ashmore | $175.00 | 89.2 | $15,610.00 |
| | | **Interim Total** | $50,060.00 |
| | | **Less 35%** | **$32,539.00** |

### xix. Any Miscellaneous Entries for Time Billed in the SOX Action[20]

The B&S Firm lists entries totaling 0.5 hour in miscellaneous time charges; the HL Firm has no such entries. The Court has reviewed the B&S entries and accepts them without reduction as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 0.4 | $260.00 |
| Shulman | $600.00 | 0.1 | $60.00 |
| | | **Total** | **$320.00** |

## 3. Determining Whether a Success-Based Adjustment Is Warranted

After reviewing the billing records for "excessive, redundant[,] or otherwise unnecessary hours," the Court has arrived at interim aggregate fee awards of $1,647,105.75 for the B&S Firm and $342,023.88 for the HL Firm. UBS argues additionally that these fees should be reduced significantly because of Plaintiff's comparative lack of success at trial.

The Supreme Court and the Second Circuit have made clear that a court retains discretion to reduce a fees award to account for limited success. *See Barfield,* 537 F.3d at 152 ("Both 'the quantity and quality of relief obtained,' as compared to what the plaintiff sought to achieve as evidenced in [his] complaint, are key factors in determining the degree of success achieved." (citing *Carroll,* 105 F.3d at 81)); *see also Hensley,* 461 U.S. at 436 (observing

---

[20] The Court has deliberately skipped over the nineteenth category of billings, which concern the preparation of the respective fee applications, and will address that category separately *infra.*

that in awarding attorneys' fees, "the most critical factor is the degree of success obtained," and, further, that "[i]f ... a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount"); *Chabad Lubavitch of Litchfield Cnty., Inc.* v. *Litchfield Historic Dist. Comm'n*, 934 F.3d 238, 245 (2d Cir. 2019) (upholding district court reduction in fees of 50% based on partial success, where district court considered litigation as a whole rather than on claim-by-claim basis). That said, both Courts have also concluded that a statutory fee award need not be proportional to the amount of damages recovered. *See City of Riverside*, 477 U.S. at 564-65, 574 (affirming attorneys' fee award under 42 U.S.C. § 1988 that was approximately seven times greater than the amount of damages the plaintiffs were awarded); *Kassim* v. *City of Schenectady*, 415 F.3d 246, 252 (2d Cir. 2005) ("[W]e have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation."). Courts have similarly declined to reduce attorneys' fees where a plaintiff's successful and unsuccessful claims are inextricably intertwined. *See, e.g.*, *Wilson* v. *Nomura Sec. Int'l, Inc.*, 361 F.3d 86, 90-91 (2d Cir. 2004) ("[W]hen a plaintiff fails to prove one of two overlapping claims — e.g. a discriminat[ion claim] — but prevails on the other — e.g. retaliation for complaining of discrimination — the plaintiff may recover fees for all the legal work.").[21]

---

[21]     *See generally LeBlanc-Sternberg* v. *Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998):

> When a plaintiff has achieved substantial success in the litigation but has prevailed on fewer than all of his claims, the most

UBS's arguments about success have considerable force.  What Plaintiff achieved in this litigation was far less, qualitatively and quantitatively, than what he sought.  Plaintiff requested approximately five years of back pay (including bonuses) and twenty years of front pay, totaling nearly $14 million; the jury awarded him approximately thirteen months of back pay, $653,600, while offering an advisory verdict that Plaintiff was entitled to no front pay, a determination with which this Court ultimately agreed.  The Court is confident that Plaintiff was made whole, as SOX required.  However, the Court cannot blind itself to the enormous disparities between and among what was sought by Plaintiff, what was obtained by Plaintiff, and what is now being sought by his counsel.

Were this merely a question of proportionality, the Court would not consider a reduction for Plaintiff's limited success.  After all, Plaintiff's DFA and SOX claims, as well as his varying claims for relief, proceeded from a common nucleus of facts.  And this Court does not want to penalize counsel for, or disincentivize counsel from, bringing difficult or novel cases, particularly given

---

important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded.  *See Hensley* v. *Eckerhart*, 461 U.S. [424, 433-37 (1983)]; *Reed* v. *A.W. Lawrence & Co.*, 95 F.3d 1170, 1183 (2d Cir. 1996).  No fees should be awarded for time spent pursuing a failed claim if it was "unrelated" to the plaintiff's successful claims in the sense that it was "based on different facts and legal theories." *Hensley*[, 461 U.S. at 434-35].  On the other hand, if the plaintiff won substantial relief, and all of his claims for relief "involve[d] a common core of facts" or were "based on related legal theories," so that "[m]uch of counsel's time w[as] devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis," there should be a fee award for all time reasonably expended.  *Id.* at 435[.]

the fact that the SOX statute under which Plaintiff prevailed at trial specifies the award of attorneys' fees where necessary to make a prevailing employee whole. But there is more than just disproportionality, and it concerns the first eighteen months of Plaintiff's litigation against UBS.

To review, Plaintiff filed the DFA Action in August 2012. During that time, he prevailed on a motion to dismiss brought by UBS. The fact remained, however, that Plaintiff's DFA claim was subject to arbitration, a fact confirmed by the Court in January 2014 when it issued *Murray II*. Plaintiff could simply have proceeded with the arbitration. The Supreme Court would not issue *Digital Realty Trust*, which would ultimately vitiate Plaintiff's DFA claim, for another four years. Instead, Plaintiff made a strategic decision to mothball the DFA Action and its related arbitration for years and commence a second lawsuit, the SOX Action. (Dkt. #366 at 6 ("After this Court referred the Dodd-Frank claim to arbitration, B&S made the strategic decision to file the SOX claim here, and prosecute that claim first, preserving Mr. Murray's right to seek double recovery for back pay on his Dodd-Frank claim if he prevailed on his SOX claim.")).

To be clear, the Court adheres to its decision in *Murray IV* that Plaintiff was legally permitted to split his claims in this matter. But Plaintiff's decision had consequences, and several of those consequences are reflected in his counsel's billings. There are substantial billings for wasted motion practice in the DFA Action, such as Plaintiff's opposition to UBS's successful motion to compel arbitration and his groundless motion to amend for interlocutory

appeal.  Plaintiff's counsel also billed many hours to researching and preparing for an arbitration that, when it was brought in late January 2018 — one month after the trial in the SOX Action and three weeks before *Digital Realty Trust* was issued — was effectively dead on arrival.  Separate and apart from the wasted work, the filing of the SOX Action also necessitated extra work by both sides' attorneys.  Plaintiff's counsel amassed substantial billings preparing initial and amended complaints, and in responding to a second round of Rule 12(b)(6) motion practice from UBS.

The Court does not fault Plaintiff or his counsel for not being prescient. That said, Plaintiff and his counsel made strategic litigation decisions that had dramatic impact on his legal bills.  Considering the bills in light of those decisions, and in light of the ultimate recovery Plaintiff received, the Court must answer in the negative the question of whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." *Hensley*, 461 U.S. at 434.  Accordingly, it will reduce the interim aggregate fee award  to B&S by 30%, resulting in an award, exclusive of fees incurred in drafting the fee petitions, of **$1,152,974.02**.  The reduction in fees to HL is equally necessary in light of *Hensley* and *Barfield*, but is correspondingly less, as the firm was not involved with the arbitration issues just discussed.  The fees to HL are reduced by 15%, resulting in an award, exclusive of fees incurred in drafting the fee petitions, of **$290,720.30**.

### 4.     Determining Reasonable "Fees on Fees"

B&S and HL seek attorneys' fees and costs incurred in drafting and submitting the instant fee petitions.  Courts in this Circuit have not been uniform in their allowance of "fees on fees," *see, e.g.*, *Makinen* v. *City of New York*, No. 11 Civ. 7535 (ALC) (GWG), 2019 WL 970945, at *2 (S.D.N.Y. Feb. 28, 2019) (discussing different approaches), but this Court will permit such recovery here, to the extent it is reasonable.  *See generally Weyant* v. *Okst*, 198 F.3d 311, 316 (2d Cir. 1999) ("[A] reasonable fee should be awarded for time reasonably spent in preparing and defending an application for ... fees[.]").  In previous cases arising in other contexts, this Court has allowed reasonable fees and costs in drafting the fee petition.  *See, e.g.*, *Carrington*, 2020 WL 5758916, at *12.

B&S seeks $232,182.50 for preparation of its fee application, reflecting the efforts of two partners, three associates, and two paralegals.  (*See* Dkt. #373-4 at 7).  HL seeks $92,057.50, reflecting the efforts of its name partner and paralegal.  (Dkt. #372-4).  Both submissions are not reasonable and will be reduced.[22]

To begin, the Court does not understand why two separate sets of supporting legal memoranda (as distinguished from factual declarations or administrative hours-tallying) were warranted.  The law is the same; the case-

---

[22]     The Court excludes from this section any time billed in response to the Court's September 27, 2019 Order (Dkt. #371), which hours were both mandated by the Court and reasonable.  The Court has reduced the percentage reductions it is imposing on the hours allocated to preparing the fee petitions in light of this fact.

specific arguments are the same; the firm-specific arguments are adequately addressed in the attorney declarations and could have been collected in a single opening memorandum.  Worse yet, several B&S attorneys billed time for reading the HL submissions, thereby adding more wasted time to the mix. Another source of confusion for the Court is the number of hours allocated to researching basic fee issues, such as the *Johnson* factors.  Plaintiff's two firms have decades of experience with deferred-fee or fee-shifting cases; even when the novelty of the SOX claims is taken into account, it confounds logic that so much time was spent on research.

More specific to each firm are the inefficiencies in staffing.  The Court recognizes that the B&S firm had six years of records to review.  Even so, the firm cannot justify the degree to which Mr. Stulberg and Mr. Walsh, the two most senior members of the team after Ms. Shulman's departure from the firm, were responsible for initial drafting of the submissions.  For all of these reasons, the Court will reduce the number of hours sought by B&S by 30% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stulberg | $650.00 | 78.5 | $51,025.00 |
| Shulman | $600.00 | 0.1 | $60.00 |
| Walsh | $500.00 | 164.2 | $82,100.00 |
| Bergman | $350.00 | 17.1 | $5,985.00 |
| Dabrowski | $350.00 | 111.1 | $38,885.00 |
| Follett | $150.00 | 143.9 | $21,585.00 |

| Vanden Heuvel | $150.00 | 22.8 | $3,420.00 |
| --- | --- | --- | --- |
|  |  | **Interim Total** | $203,060.00 |
|  |  | **Less 30%** | **$142,142.00** |

For the HL firm, the Court's concerns are less with the number of legal professionals and more with the allocation of responsibilities between them. Mr. Ashmore provided substantial assistance in researching and in gathering information, but the fact remains that one of the two highest-billing members of Plaintiff's legal team billed nearly 100 hours in preparing a fee application for less than one year of work. The Court will also reduce the number of hours sought by HL by 30% as follows:

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
| --- | --- | --- | --- |
| Herbst | $650.00 | 98.6 | $64,090.00 |
| Ashmore | $175.00 | 75.3 | $13,177.50 |
|  |  | **Interim Total** | $77,267.50 |
|  |  | **Less 30%** | **$54,087.25** |

## D.    Calculating Reasonable Costs

The final issue concerns the award of reasonable costs to the two firms. SOX permits a prevailing employee to recover for "litigation costs [and] expert witness fees." 18 U.S.C. § 1514A(c)(2)(C). "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc-Sternberg*, 143 F.3d at 763 (citation omitted); *accord Fisher* v. *SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020) ("An award of costs 'normally include[s] those reasonable out-of-pocket expenses incurred by

the attorney and which are normally charged fee-paying clients.'" (quoting

*Reichman* v. *Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir.

1987)); *see generally Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020 WL

5512718, at *12 (S.D.N.Y. Sept. 14, 2020)

B&S seeks costs in the amount of $128,508.81, for an array of items that

include legal research, PACER fees, mail and delivery fees, photocopying

expenses, deposition transcripts, travel expenses, expert witness fees,

mediation fees, lodging, meals during trial, and court reporter fees.  (Dkt. #351-

13, 365).  B&S advises that it did not bill for clerical or administrative overtime;

it limited meal expenses to those charged during trial; and it does not seek

reimbursement for office supplies consumed during the litigation.  (Dkt. #352

at 25).  The HL firm seeks travel and photocopying expenses in the amount of

$1,035.14.  (Dkt. #349 at 2, 364-2).

In its opposition, UBS advanced several arguments to reduce the number

of fees sought.  (Dkt. #357 at 23-25).  Among other things, UBS sought

additional information regarding travel and photocopying expenses and

challenged certain travel, meal, and cloud-based digital storage expenses.  (*Id.*).

In response, both B&S and HL reduced the fees sought, and HL provided

additional substantiation for its travel expenses.  (Dkt. #365, 364-2).  It is true

that B&S does not identify the precise topics as to which legal research was

sought or what materials were photocopied.  However, by looking back at the

billing entries, the Court was often able to make that determination.  More

pointedly, over the course of six years of litigation with substantial motion

practice and a multi-week trial, the research and photocopying charges sought by B&S are reasonable.

The Court deducts two charges totaling $80 relating to the failed arbitration effort, and thus awards B&S reasonable litigation costs in the amount of **$128,428.81.**  It awards HL reasonable litigation costs in the amount of **$1,035.14**.

## CONCLUSION

For the reasons set forth in the remainder of this Opinion, the Court awards attorneys' fees to Stulberg & Walsh, LLP, the successor firm to Broach & Stulberg, LLP, in the amount of **$1,295,116.02**, and litigation costs in the amount of **$128,428.81**.  The Court further awards attorneys' fees to Herbst Law PLLC in the amount of **$344,807.55**, and litigation costs in the amount of **$1,035.14**.

The Clerk of Court is directed to lift the stay on this litigation and to terminate the motions at docket entries 348, 350, and 374.

Judgment in this case will issue under separate cover.

SO ORDERED.

Dated:　　　December 16, 2020
　　　　　　 New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge